EXECUTION COPY

ASSET PURCHASE AGREEMENT

between

CONOPCO, INC.

and

LORNAMEAD BRANDS, INC.

Dated as of March 24, 2006

TABLE OF CONTENTS

Page

ARTICLE I

Purchase and Sale of Transferred Assets

SECTION 1.01. Purchase and Sale.................................................................................1
SECTION 1.02. Transferred Assets and Excluded Assets ...........................................1
SECTION 1.03. Consents to Certain Assignments ......................................................4
SECTION 1.04. Assumption of Liabilities.....................................................................5
SECTION 1.05. Excluded Patents and Technology License.......................................7
SECTION 1.06. Geographic Limitation .........................................................................7

ARTICLE II

Closing and Post-Closing Purchase Price Adjustment

SECTION 2.01. Closing ....................................................................................................7
SECTION 2.02. Transactions To Be Effected at the Closing......................................8

ARTICLE III

Representations and Warranties of Seller

SECTION 3.01. Organization and Standing...................................................................8
SECTION 3.02. Authority; Execution and Delivery; Enforceability .........................9
SECTION 3.03. No Conflicts or Violations; No Consents or Approvals Required...................9
SECTION 3.04. Financial Statements ...........................................................................10
SECTION 3.05. Good and Valid Title............................................................................10
SECTION 3.06. Intellectual Property ...........................................................................11
SECTION 3.07. Contracts ..............................................................................................11
SECTION 3.08. Taxes......................................................................................................12
SECTION 3.09. Proceedings ..........................................................................................13
SECTION 3.10. Absence of Changes or Events............................................................14
SECTION 3.11. Compliance with Applicable Laws ....................................................14

ARTICLE IV

Representations and Warranties of Purchaser

SECTION 4.01. Organization and Standing ............................................................................ 14
SECTION 4.02. Authority; Execution and Delivery; Enforceability ....................................... 14
SECTION 4.03. No Conflicts or Violations; No Consents or Approvals Required ................. 15
SECTION 4.04. Proceedings ................................................................................................... 16
SECTION 4.05. Availability of Funds; Solvency ................................................................... 16
SECTION 4.06. No Knowledge of Misrepresentations or Omissions ..................................... 16

ARTICLE V

Covenants

SECTION 5.01. Covenants Relating to Conduct of the Businesses ........................................... 16
SECTION 5.02. Access to Information .................................................................................... 17
SECTION 5.03. Confidentiality .............................................................................................. 18
SECTION 5.04. Reasonable Best Efforts ................................................................................ 18
SECTION 5.05. Brokers or Finders ........................................................................................ 18
SECTION 5.06. Additional Payments ..................................................................................... 19
SECTION 5.07. Aqua Net Mexico .......................................................................................... 20
SECTION 5.08. Audit Opinion ............................................................................................... 21

ARTICLE VI

Conditions to Closing

SECTION 6.01. Conditions to Each Party's Obligation ........................................................... 21
SECTION 6.02. Conditions to Obligation of Purchaser ........................................................... 21
SECTION 6.03. Conditions to Obligation of Seller ................................................................. 22
SECTION 6.04. Frustration of Closing Conditions .................................................................. 22

ARTICLE VII

Termination; Effect of Termination

SECTION 7.01. Termination .................................................................................................... 23
SECTION 7.02. Effect of Termination ..................................................................................... 23

ARTICLE VIII

Indemnification

SECTION 8.01. Indemnification by Seller ............................................................................... 24
SECTION 8.02. Indemnification by Purchaser ........................................................................ 24
SECTION 8.03. Indemnification Procedures ........................................................................... 25
SECTION 8.04. Limitations on Indemnification ...................................................................... 26

[[NYCORP:2539469v25]]

SECTION 8.05. Calculation of Indemnity Payments...............................................................27
SECTION 8.06. Tax Treatment of Indemnification ................................................................27

ARTICLE IX

Tax Matters

SECTION 9.01. Tax Matters ..................................................................................................28

ARTICLE X

Additional Agreements

SECTION 10.01. Publicity ......................................................................................................29
SECTION 10.02. No Use of Certain Names ..........................................................................29
SECTION 10.03. Support Services .........................................................................................30
SECTION 10.04. Post-Closing Information............................................................................30
SECTION 10.05. Records........................................................................................................30
SECTION 10.06. Bulk Transfer Laws....................................................................................30
SECTION 10.07. Refunds and Remittances...........................................................................30
SECTION 10.08. UPC Codes..................................................................................................30
SECTION 10.09. Shared Finesse Brand Mold .......................................................................31

ARTICLE XI

Miscellaneous

SECTION 11.01. Assignment..................................................................................................31
SECTION 11.02. No Third-Party Beneficiaries .....................................................................31
SECTION 11.03. Expenses......................................................................................................31
SECTION 11.04. Notices ........................................................................................................32
SECTION 11.05. Headings; Certain Definitions....................................................................33
SECTION 11.06. Counterparts ...............................................................................................34
SECTION 11.07. Integrated Contract; Exhibits and Schedules ............................................34
SECTION 11.08. Severability; Enforcement..........................................................................34
SECTION 11.09. Governing Law ...........................................................................................34
SECTION 11.10. Jurisdiction .................................................................................................35
SECTION 11.11. Service of Process .......................................................................................35
SECTION 11.12. Waiver of Jury Trial ...................................................................................35
SECTION 11.13. Amendments ...............................................................................................35

[[NYCORP:2539469v25]]

## EXHIBITS

Excluded Patents and Technology License........................................................................A

Manufacturing Agreement ...........................................................................................B

Transitional Services Agreement ...................................................................................C

![NYCORP:2539469v25]]

INDEX OF DEFINED TERMS

| Defined Term | Location of Definition |
|---|---|
| 2006 Calendar Year | Section 5.06(a) |
| 2006 Fixed Payment | Section 5.06(a) |
| 2006 Variable Payment | Section 5.06(a) |
| Acquisition | Section 1.01 |
| affiliate | Section 11.05(b) |
| Agreement | Preamble |
| Allocation | Section 9.01(a)(ii) |
| Ancillary Agreements | Section 3.02 |
| Applicable Law | Section 3.03 |
| Aqua Net Brand | Recitals |
| Aqua Net Mexico | Section 5.07 |
| Assumed Liabilities | Section 1.04(a) |
| Base Purchase Price | Section 1.01 |
| Brands | Recitals |
| Business | Section 11.05(b) |
| Business Contracts | Section 3.07(b) |
| business day | Section 11.05(b) |
| Businesses | Section 11.05(b) |
| Businesses Material Adverse Effect | Section 11.05(b) |
| Claims | Section 1.02(a)(vi) |
| Closing | Section 2.01 |
| Closing Date | Section 2.01 |
| Code | Section 3.08(a) |
| Confidentiality Agreement | Section 5.03 |
| Consent | Section 3.03 |
| Contracts | Section 1.02(a)(v) |
| DOJ | Section 5.04(b) |
| $ | Section 11.05(b) |
| Environmental Laws | Section 3.11(b) |
| Excluded Assets | Section 1.02(b) |
| Excluded Patents and Technology License | Section 1.05 |
| Financial Statements | Section 3.04(b) |
| Financing | Section 4.05(a) |
| Finesse Brand | Recitals |
| Finesse Independent Expert | Section 5.06(f)(ii) |
| Finesse Notice of Objection | Section 5.06(f)(i) |
| Finesse Payment Statement | Section 5.06(e) |
| Finesse Payments | Section 5.06(a) |
| Finesse U.S. Based Sales | Section 5.06(a) |

[[NYCORP:2539469v25]]

| Defined Term | Location of Definition |
|---|---|
| FTC | Section 5.04(b) |
| GAAP | Section 3.04(b) |
| Governmental Entity | Section 3.03 |
| HSR Act | Section 3.03 |
| including | Section 11.05(b) |
| Indemnified Party | Section 8.03(a) |
| Indemnifying Party | Section 8.03(a) |
| Inventory | Section 5.01 |
| Judgment | Section 3.03 |
| knowledge of Seller | Section 11.05(b) |
| Liens | Section 3.05(a) |
| Losses | Section 8.01 |
| Manufacturing Agreement | Section 10.03 |
| Molds | Section 1.02(a)(i) |
| Names | Section 1.02(b)(xiv) |
| Option | Section 5.07 |
| Other Transferred Intellectual Property | Section 1.02(a)(iii) |
| Payment Period | Section 5.06(a) |
| Permitted Liens | Section 3.05(a) |
| person | Section 11.05(b) |
| Pre-Closing Tax Period | Section 3.08(a) |
| Proceeding | Section 1.03(a) |
| Products | Section 11.05(b) |
| Product Claims | Section 1.04(a)(ii) |
| Purchase Price | Section 1.01 |
| Purchaser | Preamble |
| Purchaser Indemnitees | Section 8.01 |
| Purchaser Material Adverse Effect | Section 4.01 |
| Purchaser Subsidiary | Section 4.01 |
| Retained Liabilities | Section 1.04(b) |
| Seller | Preamble |
| Seller Affiliates | Recitals |
| Seller Indemnitees | Section 8.02 |
| Seller Insurance Policies | Section 5.01(b) |
| Seller's Product Liabilities | Section 1.04(a)(ii) |
| Statement of Assets | Section 3.04(a) |
| subsidiary | Section 11.05(b) |
| Tax | Section 3.08(a) |
| Taxes | Section 3.08(a) |
| Taxing Authority | Section 3.08(a) |
| Tax Return | Section 3.08(a) |

[[NYCORP:2539469v25]]

|  | Location of |
| Defined Term | Definition |

Technology ....................................................................................... Section 1.02(a)(iv)
Third Party Claim ............................................................................ Section 8.03(a)
Transfer Taxes ................................................................................. Section 3.08(a)
Transferred Assets ........................................................................... Section 1.02(a)
Transferred Contracts ...................................................................... Section 1.02(a)(v)
Transferred Intellectual Property .................................................... Section 1.02(a)(iii)
Transferred Technology ................................................................... Section 1.02(a)(iv)
Transferred Trademarks ................................................................... Section 1.02(a)(ii)
Transitional Services Agreement ..................................................... Section 10.03
Unaudited Financial Statements ...................................................... Section 3.04(a)

ASSET PURCHASE AGREEMENT dated as of March 24, 2006 (this "Agreement"), between CONOPCO, INC., a New York corporation ("Seller"), and LORNAMEAD BRANDS, INC., a Delaware corporation ("Purchaser").

WHEREAS Seller, directly or indirectly through certain of its affiliates (collectively, the "Seller Affiliates"), manufactures, markets, distributes and sells the Finesse brand of hair care products (the "Finesse Brand") and the Aqua Net brand of hair styling products (the "Aqua Net Brand", and together with the Finesse Brand, the "Brands"). Seller wishes to sell to Purchaser, and Purchaser wishes to purchase from Seller, the Transferred Assets (as defined in Section 1.02(a)) of the Businesses (as defined in Section 11.05(b)), upon the terms and subject to the conditions of this Agreement. In addition, Purchaser has agreed to assume from Seller and the Seller Affiliates the Assumed Liabilities (as defined in Section 1.04(a)), upon the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, the parties hereby agree as follows:

ARTICLE I

Purchase and Sale of Transferred Assets

SECTION 1.01. Purchase and Sale. Upon the terms and subject to the conditions of this Agreement, at the Closing (as defined in Section 2.01) Seller agrees to, and agrees to cause the Seller Affiliates to, sell, transfer, assign and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller and the Seller Affiliates, all of Seller's and the Seller Affiliates' right, title and interest in, to and under the Transferred Assets as of the Closing for (i) an aggregate purchase price of $40,000,000 (the "Base Purchase Price"), payable as set forth in Section 2.02(b), plus the additional payments payable as set forth in Section 5.06 (such aggregate purchase price, the "Purchase Price") and (ii) the assumption of the Assumed Liabilities. The purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities are collectively referred to in this Agreement as the "Acquisition".

SECTION 1.02. Transferred Assets and Excluded Assets. (a) The term "Transferred Assets" means all of Seller's and the Seller Affiliates' right, title and interest in, to and under the following assets as they exist at the time of Closing:

(i) all assets listed on Schedule 1.02(a)(i) (such assets, the "Molds");

(ii) all trademarks, trademark registrations and trademark applications set forth in Schedule 1.02(a)(ii), together with the goodwill associated exclusively therewith (collectively, the "Transferred Trademarks");

(iii) all trade names and domain names set forth in Schedule 1.02(a)(iii) and all copyrights owned by Seller or any Seller Affiliate that are used or held for use exclusively in the operation or conduct of the Businesses (collectively, the "Other Transferred

Intellectual Property" and, together with the Transferred Trademarks, the "Transferred Intellectual Property");

(iv) all trade secrets, proprietary inventions, know-how, formulae, processes, procedures, research records, records of inventions and test information ("Technology") owned by Seller or any Seller Affiliate that are used or held for use exclusively in the operation or conduct of the Businesses (the "Transferred Technology");

(v) all written contracts, leases, subleases, licenses, indentures, agreements, commitments and all other legally binding instruments ("Contracts") set forth in Schedule 3.07, and all other Contracts to which Seller or any Seller Affiliate is a party or by which Seller or any Seller Affiliate is bound that are used or held for use exclusively in the operation or conduct of the Businesses (the "Transferred Contracts");

(vi) all Claims (as defined below) of Seller or any Seller Affiliate to the extent relating to any other Transferred Asset or any Assumed Liability, other than (A) any such items arising under insurance policies and (B) all Seller's or any Seller Affiliate's rights, rights to assert claims, demands, actions, suits and causes of action, whether class, individual or otherwise in nature, in law or in equity (collectively, "Claims") including any Claim for damages, injunctive relief, declaratory relief or other relief under the antitrust laws of any foreign country or the United States or any State thereof, unfair competition, unfair practices, price discrimination, unitary pricing, consumer protection, fraud prevention or trade practice laws (in any such case, domestic or foreign), that Seller or any Seller Affiliate, in any capacity, ever had, now have or may or shall have in the future, whether known or unknown, relating in any way to (x) the Businesses' purchase or procurement of any good, service or product or (y) Seller's or any Seller Affiliate's purchase or procurement of any good, service or product for, or on behalf of, the Businesses, in either case, at any time up until the Closing, along with any and all recoveries by settlement, judgment or otherwise in connection with any such Claims;

(vii) all books of account, general, financial and accounting records, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, advertising materials, manuals and customer and supplier correspondence owned by Seller or any Seller Affiliate that are used or held for use exclusively in, or that arise exclusively out of, the operation or conduct of the Businesses, except to the extent relating to the Excluded Assets (as defined in Section 1.02(b)) or the Retained Liabilities (as defined in Section 1.04(b)) and except to the extent not reasonably separable from documents that do not relate exclusively to the Businesses; and

(viii) all pre-paid expenses that are used or held for use exclusively in, or that arise exclusively out of, the operation or conduct of the Businesses.

(b) Notwithstanding anything to the contrary contained in this Agreement, the Transferred Assets shall not include any assets or rights other than the assets specifically listed or described in Section 1.02(a) and shall expressly exclude the following assets (collectively, the "Excluded Assets"), which shall not be sold, transferred, assigned or delivered to Purchaser:

(i) all assets listed in Schedule 1.02(b)(i);

(ii) all cash, cash equivalents or securities of Seller or any Seller Affiliate;

(iii) all accounts, notes receivable and similar rights to receive payments of Seller or any Seller Affiliate on the Closing Date arising out of the operation or conduct of the Businesses;

(iv) all Claims of Seller or any Seller Affiliate relating to any other Excluded Asset or any Retained Liability, including (A) any such items arising under insurance policies and (B) all Claims that Seller or any Seller Affiliate, in any capacity, ever had, now have or may or shall have in the future, whether known or unknown, relating in any way to (x) the Businesses' purchase or procurement of any good, service or product or (y) Seller's or any Seller Affiliate's purchase or procurement of any good, service or product for, or on behalf of, the Businesses, in either case, at any time up until the Closing, along with any and all recoveries by settlement, judgment or otherwise in connection with any such Claims;

(v) any shares of capital stock of any affiliate of Seller or any Seller Affiliate;

(vi) all tangible personal property and interests therein, including all machinery, equipment, furniture, furnishings, parts, spare parts, molds and vehicles, owned by Seller or any Seller Affiliate, that is not specifically listed or described in Section 1.02(a);

(vii) all patents (including all reissues, divisions, continuations and extensions thereof), patent applications and patent rights held by the Seller or any Seller Affiliate ;

(viii) all permits, licenses, franchises, approvals or authorizations from any Governmental Entity (as defined in Section 3.03) issued to Seller or any Seller Affiliate;

(ix) any assets relating to any employee benefit plan in which any employees of Seller, any Seller Affiliate or any of their respective affiliates participate;

(x) any refunds or credits, claims for refunds or credits or rights to receive refunds or credits from any Taxing Authority (as defined in Section 3.08(a)) with respect to Taxes (as defined in Section 3.08(a)) paid or to be paid by Seller, any Seller Affiliate or any of their respective affiliates relating to any Pre-Closing Tax Period (as defined in Section 3.08(a));

(xi) any records (including accounting records) related to Taxes paid or payable by Seller, any Seller Affiliate or any of their respective affiliates and all financial and Tax records relating to the Businesses that form part of Seller's, any Seller Affiliate's or any of their respective affiliates' general ledger;

(xii) all records prepared in connection with the sale of the Businesses, including bids received from third persons and analyses relating to the Businesses;

4

(xiii) all rights of Seller or any Seller Affiliate under this Agreement and any other agreements, certificates and instruments relating to the sale of the Businesses (or any portion thereof) or otherwise delivered in connection with this Agreement;

(xiv) the names and marks "Unilever", "CONOPCO", "Unilever Home & Personal Care", "Helene Curtis", "Chesebrough-Pond's", "Lever Brothers", "Lever Ponds" and the name of any Seller Affiliate (in any style or design), and any name or mark derived from, similar to or including any of the foregoing, and any other logos or trademarks of Seller or its affiliates not included in Schedules 1.02(a)(ii) or 1.02(a)(iii) (collectively, the "Names");

(xv) all real property, leaseholds and other interests in real property of Seller or any Seller Affiliate; and

(xvi) all division or corporate-level services of the type currently provided to the Businesses by Seller, any Seller Affiliate or any of their respective affiliates.

SECTION 1.03.  Consents to Certain Assignments.  (a)  Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign, directly or indirectly, any asset or any claim or right or any benefit arising under or resulting from such asset if an attempted direct or indirect assignment thereof, without the consent of a third party, would constitute a breach, default, violation or other contravention of the rights of such third party, would be ineffective with respect to any party to an agreement concerning such asset, claim or right, or would in any way adversely affect the rights of Seller or any Seller Affiliate or, upon transfer, Purchaser under such asset, claim or right.  If any transfer or assignment by Seller or any Seller Affiliate to Purchaser, or any direct or indirect acquisition or assumption by Purchaser of, any interest in, or liability, obligation or commitment under, any asset, claim or right requires the consent of a third party, then such transfer or assignment or assumption shall be made subject to such consent being obtained.  Purchaser agrees that neither Seller nor any Seller Affiliate shall have any liability whatsoever to Purchaser arising out of or relating to the failure to obtain any such consent that may be required in connection with the transactions contemplated by this Agreement or because of any circumstances resulting therefrom.  Purchaser further agrees that no representation, warranty or covenant of Seller in this Agreement shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of (i) the failure to obtain any such consent, (ii) any circumstances resulting therefrom or (iii) any suit, action or proceeding (a "Proceeding") or investigation commenced or threatened by or on behalf of any person arising out of or relating to the failure to obtain any such consent or any circumstances resulting therefrom.

(b)  If any such consent is not obtained prior to the Closing, the Closing shall nonetheless take place on the terms set forth in this Agreement and, thereafter, Purchaser shall use its reasonable best efforts to secure such consent as promptly as practicable after the Closing and Seller shall provide or cause to be provided all commercially reasonable assistance to Purchaser (not including the payment of any consideration) reasonably requested by Purchaser to secure such consent after the Closing or cooperate with Purchaser (at Purchaser's expense) in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or

5

violating any Applicable Law (as defined in Section 3.03)) the economic claims, rights and benefits (net of the amount of any related Tax costs imposed on Seller, any Seller Affiliate or any of their respective affiliates) under the asset, claim or right with respect to which the consent has not been obtained in accordance with this Agreement and (ii) Purchaser shall assume any related economic burden (including the amount of any related Tax costs imposed on Seller, any Seller Affiliate or any of their respective affiliates) with respect to the asset, claim or right with respect to which the consent has not been obtained in accordance with this Agreement.

SECTION 1.04.  Assumption of Liabilities.  (a)  Upon the terms and subject to the conditions of this Agreement, Purchaser shall assume, effective as of the Closing, and shall pay, perform and discharge when due, and indemnify, defend and hold harmless from and after the Closing, Seller, each Seller Affiliate and each of their respective affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives from and against all obligations, liabilities and commitments of any nature, whether known or unknown, express or implied, primary or secondary, direct or indirect, liquidated, absolute, accrued, contingent or otherwise and whether due or to become due, arising out of, relating to or otherwise in respect of the Transferred Assets, the Businesses or the operation or conduct of the Businesses, including (collectively, the "Assumed Liabilities"):

(i) all obligations, liabilities and commitments of Seller or any Seller Affiliate under the Transferred Contracts to the extent such obligations, liabilities and commitments relate to the period from and after the Closing;

this Agreement in accordance with the terms of this Agreement and (B) for trade promotions and consumer promotions (x) as set forth in Schedule 1.04(a)(v) or (y) planned or committed on or after the date of this Agreement in accordance with the terms of this Agreement, in each case in respect of any and all Products of the Businesses sold by Purchaser on and after the Closing Date.

(b)  Notwithstanding any other provision of this Agreement, Purchaser shall not assume any Retained Liability, each of which shall be retained and paid, performed and discharged when due by Seller and the Seller Affiliates.  The term "Retained Liabilities" means:

(i) all obligations, liabilities and commitments of Seller or any Seller Affiliate not listed in Section 1.04(a);

(ii) all accounts payable of Seller or any Seller Affiliate on the Closing Date arising out of the operation or conduct of the Businesses before the Closing Date;

(iii) all Taxes arising out of, relating to or in respect of the Businesses imposed upon Seller or any Seller Affiliate or any present or former affiliate of Seller or any Seller Affiliate for any Pre-Closing Tax Period;

(iv) all obligations, liabilities and commitments of Seller or any Seller Affiliate to the extent relating to or arising out of the Excluded Assets;

(v) all obligations, liabilities and commitments of Seller or any Seller Affiliate to the extent solely arising from the employment of any employee by the Seller or any Seller Affiliate;

(vi) all obligations, liabilities and commitments of Seller or any Seller Affiliate to the extent relating to or arising out of any suit, action or Proceeding (other than any Proceeding relating to Product Claims) pending before the Closing Date;

(vii)  all obligations, liabilities and commitments under Environmental Laws to the extent arising out of or relating to the operation or conduct of the Businesses or the use or ownership of the Transferred Assets in each case before the Closing Date;  and

(viii) the Seller's Product Liabilities and all obligations, liabilities and commitments related to the Squicciarini v. Unilever Home and Personal Care matter.

(c)  Purchaser agrees to reimburse Seller and any Seller Affiliate , dollar for dollar, in the event that any of Seller's or such Seller Affiliate's customers offset the cost of any Products returned by such customer which are the responsibility of Purchaser pursuant to Section 1.04(a)(ii) against accounts payable by such customer to Seller or such Seller Affiliate. Seller agrees to, and to cause the Seller Affiliates to, provide notice to Purchaser of any such offset for which Seller or such Seller Affiliate is entitled to be reimbursed by Purchaser pursuant to this Section 1.04(c).  Purchaser shall pay Seller or such Seller Affiliate promptly following receipt of notice (together with supporting documentation) of any such offset by a customer.

7

SECTION 1.05. Excluded Patents and Technology License. At the Closing, Seller will execute and deliver a royalty-free, non-exclusive license (in the form attached hereto as Exhibit A) to Purchaser with respect to any patent or Technology owned by Seller or any Seller Affiliate that is used in connection with the operation or conduct of the Businesses on the Closing Date and that is not included in the Transferred Technology (the "Excluded Patents and Technology License").

SECTION 1.06. Geographic Limitation. (a) Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges and agrees that it shall not, directly or indirectly, market, distribute or sell any products under the Aqua Net Brand in Mexico (it being understood that (x) if Seller notifies Purchaser in writing, or if Purchaser otherwise has knowledge, that a customer or other third person to which Purchaser has sold products is importing any products under the Aqua Net Brand into, or is marketing, distributing or selling any products under the Aqua Net Brand in, Mexico, Purchaser shall promptly notify in writing such customer or third person (with a copy to Seller) of the existence of this Agreement and the prohibition on such activities in Mexico and (y) if requested by Seller in writing following its receipt of a copy of the correspondence referred to in the immediately preceding clause (x), Seller and Purchaser shall agree to confer in good faith to develop a mutually agreed resolution of any issues arising from a situation described in the immediately preceding clause (x)). Purchaser further agrees that it will not register, apply to register or otherwise use any trademark relating to the Aqua Net Brand in Mexico.

(b) Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges and agrees that Seller, the Seller Affiliates and their respective affiliates may continue to manufacture, market, distribute and sell, or have manufactured, marketed, distributed or sold on their behalf, products under the Aqua Net Brand in Mexico (it being understood that (x) if Purchaser notifies Seller in writing, or if Seller otherwise has knowledge, that a customer or other third person to which Seller has sold products is exporting any products under the Aqua Net Brand out of, or is marketing, distributing or selling any products under the Aqua Net Brand outside of, Mexico, Seller shall promptly notify in writing such customer or third person (with a copy to Purchaser) of the existence of this Agreement and the prohibition on such activities outside of Mexico and (y) if requested by Purchaser in writing following its receipt of a copy of the correspondence referred to in the immediately preceding clause (x), Purchaser and Seller shall agree to confer in good faith to develop a mutually agreed resolution of any issues arising from a situation described in the immediately preceding clause (x)). Purchaser further agrees that Seller, the Seller Affiliates and their respective affiliates may register, apply to register or otherwise use any trademark relating to the Aqua Net Brand in Mexico.

ARTICLE II

Closing and Post-Closing Purchase Price Adjustment

SECTION 2.01. Closing. The closing of the Acquisition (the "Closing") shall take place at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York,

New York 10019, at 10:00 a.m. on April 14, 2006, or, if on such day any condition set forth in Article VI has not been satisfied (or, to the extent permitted, waived by the party or parties entitled to the benefit thereof), as soon as practicable after all the conditions set forth in Article VI have been satisfied (or, to the extent permitted, waived by the party or parties entitled to the benefit thereof), or at such other place, time and date as may be agreed by Seller and Purchaser. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date". The Closing shall be deemed to be effective as of the close of business on the Closing Date.

SECTION 2.02.  Transactions To Be Effected at the Closing.  At the Closing:

(a)  Seller shall deliver or cause to be delivered to Purchaser (i) such appropriately executed deeds, bills of sale, assignments and other instruments of transfer relating to the Transferred Assets (other than the Transferred Intellectual Property), (ii) appropriately executed assignments of the Transferred Intellectual Property, (iii) an appropriately executed counterpart to the Excluded Patents and Technology License, (iv) an appropriately executed counterpart to the Transitional Services Agreement (as defined in Section 10.03), (v) an appropriately executed counterpart to the Manufacturing Agreement (as defined in Section 10.03), and (vi) appropriately executed letters, in form and content reasonably satisfactory to Purchaser, addressed to the makers or suppliers of fragrances used in the Products authorizing such makers and suppliers to sell and deliver such fragrances to Purchaser (it being understood that such deeds, bills of sale, assignments and other instruments of transfer shall not require Seller to make any additional representations, warranties or covenants, expressed or implied, not contained in this Agreement); and

(b)  Purchaser shall deliver to Seller and the Seller Affiliates (i) payment, by wire transfer of immediately available funds to one or more accounts designated in writing by Seller (such designation to be made at least one business day prior to the Closing Date), in an amount equal to the Base Purchase Price, (ii) appropriately executed counterparts to such deeds, bills of sale, assignments and other instruments of transfer referred to in Section 2.02(a), (iii) appropriately executed assumption agreements and other instruments of assumption providing for the assumption of the Assumed Liabilities, (iv) an appropriately executed counterpart to the Excluded Patents and Technology License, (v) an appropriately executed counterpart to the Transitional Services Agreement and (vi) an appropriately executed counterpart to the Manufacturing Agreement.

ARTICLE III

Representations and Warranties of Seller

Seller hereby represents and warrants to Purchaser as follows:

SECTION 3.01.  Organization and Standing.  Seller is validly existing and in good standing under the laws of the State of New York. Each Seller Affiliate is validly existing under the laws of its jurisdiction of its organization. Each of Seller and each Seller Affiliate has full corporate power and authority to enable it to own, lease or otherwise hold the Transferred

Assets owned, leased or otherwise held by it and to conduct the Businesses as presently conducted by it.

SECTION 3.02. Authority; Execution and Delivery; Enforceability. Seller has full corporate power and authority to execute this Agreement and the other agreements and instruments to be executed and delivered in connection with this Agreement (the "Ancillary Agreements") to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements. Each Seller Affiliate has full corporate power and authority to execute the Ancillary Agreements to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it by such Ancillary Agreements. Seller has taken all corporate action required by its Certificate of Incorporation and By-laws to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is, or is specified to be, a party and to authorize the consummation of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements. Each Seller Affiliate has taken all corporate action required by its comparable organizational documents to authorize the execution and delivery of the Ancillary Agreements to which it is, or is specified to be, a party and to authorize the consummation of the transactions contemplated to be consummated by it by such Ancillary Agreements. Seller has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and this Agreement constitutes, and each Ancillary Agreement to which it is, or is specified to be, a party will after the Closing constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles. Each Seller Affiliate prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and each Ancillary Agreement to which it is, or is specified to be, a party will after the Closing constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles.

SECTION 3.03. No Conflicts or Violations; No Consents or Approvals Required. The execution and delivery by Seller of this Agreement does not, the execution and delivery by Seller and each Seller Affiliate of each Ancillary Agreement to which it is, or is specified to be, a party will not, and the consummation by Seller of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements and by each Seller Affiliate of the transactions contemplated to be consummated by it by such Ancillary Agreements, will not conflict with, or result in any breach of or constitute a default under, or result in the creation of any Lien (as defined in Section 3.05) (other than Permitted Liens (as defined in Section 3.05) or Liens caused by Purchaser) upon any of the Transferred Assets under, any provision of (i) in the case of Seller, its Certificate of Incorporation or By-laws and, in the case of each Seller Affiliate, its comparable organizational documents, (ii) except as set forth in Schedule 3.03, any Transferred Contract or (iii) any judgment, order or decree ("Judgment") or statute, law, ordinance, rule or regulation ("Applicable Law") applicable to Seller or any Seller Affiliate or any of the Transferred Assets, other than, in the case of clauses (i), (ii) and (iii) above, any such items that would not reasonably be expected to have a Businesses Material

Adverse Effect. No consent, approval or authorization ("Consent") of, or registration, declaration or filing with, any Federal, state, local or foreign court of competent jurisdiction, governmental agency, authority, instrumentality or regulatory body (a "Governmental Entity"), is required to be obtained or made by or with respect to Seller or any Seller Affiliate in connection with the execution, delivery and performance of this Agreement or the consummation of the Acquisition, other than (A) compliance with and any filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (B) compliance with and filings and notifications under applicable Environmental Laws (as defined in Section 3.11(b)), (C) those that may be required solely by reason of Purchaser's (as opposed to any other third party's) participation in the Acquisition and the other transactions contemplated by this Agreement and by the Ancillary Agreements and (D) those the failure of which to obtain or make would not reasonably be expected to have a Businesses Material Adverse Effect.

 SECTION 3.04. Financial Statements. (a) Schedule 3.04(a) sets forth (i) the unaudited special-purpose Statement of Net Assets to be Sold at December 31, 2005 of the Businesses (the "Statement of Assets") and (ii) the unaudited special-purpose Statement of Direct Revenues and Expenses for the year ended December 31, 2005 of the Businesses (such financial statements, the "Unaudited Financial Statements"). The Unaudited Financial Statements present fairly (subject to normal recurring year-end adjustments and the absence of notes), in all material respects, the assets of the Businesses as of December 31, 2005 and the related direct revenues and expenses of their operations, for the year ended December 31, 2005 in conformity with the internal accounting policies and practices of Seller and the Seller Affiliates.

 (b) Schedule 3.04(b) sets forth (i) the unaudited special-purpose Statement of Net Assets to be Sold at December 31, 2004 of the Businesses and (ii) the unaudited special-purpose Statement of Direct Revenues and Expenses for the years ended December 31, 2004 and December 31, 2003 of the Businesses, together with the notes to such financial statements (such financial statements, together with the notes to such financial statements, the "Financial Statements"). The Financial Statements present fairly, in all material respects, the assets of the Businesses as of December 31, 2004 and the related direct revenues and expenses of their operations, for each of the years ended December 31, 2004 and December 31, 2003 in conformity with United States generally accepted accounting principles ("GAAP").

 SECTION 3.05. Good and Valid Title. (a) Seller or one Seller Affiliate has, or as of the close of business on the Closing Date will have, good and valid title to all material Transferred Assets, other than those set forth in Schedule 3.05 and those sold or otherwise disposed of not in violation of this Agreement, in each case free and clear of all mortgages, liens, charges, claims, pledges or other encumbrances of any kind (collectively, "Liens"), except for (i) such Liens as are set forth in Schedule 3.05, (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business, (iii) Liens arising under original purchase price conditional sales Contracts or equipment leases with third parties entered into in the ordinary course of business, (iv) Liens for Taxes and other governmental charges that are not due and payable or that may be paid without penalty and (v) other imperfections of title, licenses or encumbrances, if any, which do not materially impair the continued use and operation of the assets to which they relate in the conduct of the

11

Businesses as presently conducted (the Liens described in clauses (i) through (v) above are referred to collectively as "Permitted Liens").

(b) This Section 3.05 does not relate to Intellectual Property, such items being the subject of Section 3.06.

SECTION 3.06. Intellectual Property. (a) With respect to the Transferred Trademarks, Schedule 1.02(a)(ii) sets forth a list of the trademarks, trademark registration and application numbers and the jurisdictions where such Transferred Trademarks are registered or where applications have been filed. Except as set forth in Schedule 3.06, Seller or a Seller Affiliate is the owner of the registrations and applications set forth in Schedule 1.02(a)(ii) for the Transferred Trademarks and the other Transferred Intellectual Property and no license fees in respect of any Transferred Intellectual Property are paid to non-affiliated third parties for the use by Seller or the applicable Seller Affiliate of the Transferred Intellectual Property in those jurisdictions listed in Schedule 1.02(a)(ii). Purchaser acknowledges and agrees that Seller does not make any representations or warranties relating to the Transferred Intellectual Property for any Brand in jurisdictions other than those set forth in Schedule 1.02(a)(ii) with respect to such Brand.

(b) Except as set forth in Schedule 3.06, or as provided in any Contract listed in Schedule 3.06, neither Seller nor any Seller Affiliate has granted any license of any kind relating to any material Transferred Technology, except nonexclusive licenses to (i) end-users or (ii) co-packers in connection with co-packing arrangements, in each case in the ordinary course of business. Neither Seller nor any Seller Affiliate is bound by or a party to any material option, license or similar Contract relating to any intellectual property of any other person for the use of such intellectual property in the conduct of the Businesses, except (i) as set forth in Schedule 3.06, (ii) for nonexclusive licenses to end-users of machinery and equipment in the ordinary course of business and (iii) for so-called "shrink-wrap" and other non-customized license agreements relating to computer software licensed to Seller or a Seller Affiliate in the ordinary course of business. Except as set forth in Schedule 3.06, no material claims are pending or, to the knowledge of Seller, threatened, as of the date of this Agreement against Seller or any Seller Affiliate by any person claiming that use of the Transferred Technology as presently used infringes the intellectual property rights of any such person.

(c) Except as set forth in Schedule 3.06 and other than (i) rights in connection with co-packing arrangements and (ii) cross-promotional rights entered into in the ordinary course of business, neither Seller nor any Seller Affiliate is a party to or bound by any material license, sublicense, option or other agreement relating in whole or in part to the Transferred Technology.

SECTION 3.07. Contracts. (a) Except as set forth in Schedule 3.07 and except for Contracts relating to Excluded Assets, neither Seller nor any Seller Affiliate is a party to or bound by any Contract that is used and held for use exclusively in, or that arises exclusively out of, the operation or conduct of the Businesses (other than (x) any Transferred Contract that is not material in relation to the Businesses, (y) this Agreement and the Ancillary Agreements and (z) Transferred Contracts entered into after the date of this Agreement in the ordinary course of business) and that is:

12

(i) a covenant not to compete (other than (A) pursuant to any radius restriction contained in any lease, reciprocal easement or development, construction, operating or similar agreement and (B) any such covenant contained in any agreement with a broker) that materially limits the conduct of the Businesses as currently conducted;

(ii) (A) a continuing Contract for the future purchase of materials, supplies, equipment, raw materials, packaging or commodities (other than (x) purchase Contracts and orders for raw materials, supplies, packaging materials and other inventories in the ordinary course of business and (y) purchase orders for the co-packing or manufacturing of Products of the Businesses in the ordinary course of business), (B) a management, service, consulting or other similar Contract (other than Contracts for services in the ordinary course of business, including transportation and warehousing Contracts) or (C) an advertising Contract (other than Contracts relating to obligations, liabilities and commitments described in Section 1.04(a)(v)), in any such case of clauses (A), (B) or (C) which has an aggregate future liability to any person (other than Seller or a Seller Affiliate ) in excess of $150,000 and is not terminable by Seller or a Seller Affiliate by notice of not more than 90 days for a cost of less than $75,000;

(iii) a lease or similar Contract with any person (other than Seller or a Seller Affiliate ) under which Seller or a Seller Affiliate is lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by any person which lease or similar Contract has an aggregate future liability in excess of $150,000 and is not terminable by Seller or a Seller Affiliate by notice of not more than 90 days for a cost of less than $75,000; or

(iv) any other Contract that has an aggregate future liability to any person (other than Seller or a Seller Affiliate ) in excess of $150,000 and is not terminable by Seller or a Seller Affiliate by notice of not more than 90 days for a cost of less than $75,000 (other than (A) purchase orders, sales orders and Contracts with brokers, (B) leases of real property and (C) employment agreements and other Contracts relating to employee matters).

(b)   Except as set forth in Schedule 3.07, all Transferred Contracts required to be listed in Schedule 3.07 (such Contracts, the "Business Contracts") are valid, binding and in full force and effect and are enforceable by Seller or the applicable Seller Affiliate in accordance with their terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles, except for such failures to be valid, binding, in full force and effect or enforceable that would not reasonably be expected to have a Businesses Material Adverse Effect. Except as set forth in Schedule 3.07, Seller or the applicable Seller Affiliate has performed all material obligations required to be performed by it to date under the Business Contracts, and it is not in breach or default thereunder and, to the knowledge of Seller, no other party to any Business Contract, as of the date of this Agreement, is in breach or default thereunder, except to the extent that such breach or default would not reasonably be expected to have a Businesses Material Adverse Effect.

SECTION 3.08. Taxes.  (a)  For purposes of this Agreement:

"Code" means the Internal Revenue Code of 1986, as amended.

"Pre-Closing Tax Period" means all taxable periods ending on or before the Closing Date and the portion ending on the Closing Date of any taxable period that includes but does not end on the Closing Date.

"Tax" or "Taxes" means all forms of taxation imposed by any Federal, state, provincial, local, foreign or other Taxing Authority, including income, franchise, property, sales, use, excise, employment, unemployment, payroll, social security, estimated, value added, ad valorem, transfer, recapture, withholding, health and other taxes of any kind, including any interest, penalties and additions thereto.

"Taxing Authority" means any Federal, state, provincial, local or foreign government, any subdivision, agency, commission or authority thereof or any quasi-governmental body exercising Tax regulatory authority.

"Tax Return" means any report, return, document, declaration or other information or filing required to be supplied to any Taxing Authority with respect to Taxes, including any amendment made with respect thereto.

"Transfer Taxes" means all sales (including bulk sales), use, transfer, recording, ad valorem, privilege, documentary, gross receipts, registration, conveyance, excise, license, stamp or similar Taxes and fees arising out of, in connection with or attributable to the transactions effectuated pursuant to this Agreement.

(b)  Except as set forth in Schedule 3.08(b), (i) all material Tax Returns required to be filed by the Code or by applicable state, provincial, local or foreign Tax laws to the extent such Tax Returns relate to the Transferred Assets for Pre-Closing Tax Periods have been timely filed or will be timely filed, (ii) all material Taxes due on such Tax Returns with respect to the Transferred Assets have been paid in full or will be timely paid in full by the due date thereof, (iii) no material claims are being asserted in writing with respect to any Taxes with respect to the Transferred Assets and (iv) no material Tax liens with respect to the Transferred Assets have been filed.

(c)  Seller is not a "foreign person" within the meaning of Section 1445 of the Code.  Certain of the Seller Affiliates are foreign persons within the meaning of Section 1445 of the Code, but none of the assets to be transferred by such Seller Affiliates pursuant to this Agreement constitutes a "United States real property interest" within the meaning of Section 897(c)(l) of the Code.

SECTION 3.09.  Proceedings.  Schedule 3.09 sets forth a list as of the date of this Agreement of each pending Proceeding against Seller or any Seller Affiliate (as to which a complaint has been served on Seller or any Seller Affiliate), which relates to the Businesses and pursuant to which a party seeks (a) more than $150,000 from Seller or any Seller Affiliate or (b) injunctive relief prohibiting the consummation of the Acquisition.  Except as set forth in Schedule 3.09, neither Seller nor any Seller Affiliate is a party or subject to or in default under any unsatisfied Judgment applicable to the conduct of the Businesses, other than for such Judgments that would not reasonably be expected to have a Businesses Material Adverse Effect.

14

This Section 3.09 does not relate to Taxes, environmental matters or Intellectual Property matters, such items being the subject of Sections 3.08, 3.11(b) and 3.06, respectively.

SECTION 3.10.  Absence of Changes or Events.  Except as set forth in Schedule 3.10 or Schedule 5.01, since the date of the Statement of Assets (i) there has not been a Businesses Material Adverse Effect and (ii) Seller has operated the Businesses, with regard to the return of Products by customers of the Products, in the ordinary course, consistent with past practice.  Purchaser acknowledges that there may be disruption to the operation of the Businesses as a result of the announcement by Seller of its intention to sell the Businesses (and there may be further disruption to the Businesses as a result of the execution of this Agreement (including the identity of Purchaser) and the consummation of the transactions contemplated by this Agreement), and Purchaser agrees that any such disruptions do not and shall not constitute a breach of this Section 3.10.

SECTION 3.11.  Compliance with Applicable Laws.  (a) Except as set forth in Schedule 3.11 and except for any matter that would not reasonably be expected to have a Businesses Material Adverse Effect, to the knowledge of Seller, the Businesses are in compliance with all Applicable Laws. This Section 3.11(a) does not relate to matters with respect to Taxes, which are the subject of Section 3.08, or to environmental matters, which are the subject of Section 3.11(b).

(b)  Except as set forth in Schedule 3.11, and except for any matter that would not reasonably be expected to have a Businesses Material Adverse Effect, to the knowledge of Seller (i) Seller and the Seller Affiliates conduct the Businesses in substantial compliance with all Applicable Laws relating to protection of the environment ("Environmental Laws") and (ii) there are no pending Proceedings against Seller or any Seller Affiliate alleging that the Businesses are in violation of any Environmental Law.


ARTICLE IV

Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller as follows:

SECTION 4.01.  Organization and Standing.  Purchaser, and each subsidiary of Purchaser that is specified to be a party to any Ancillary Agreement (each, a "Purchaser Subsidiary"), is validly existing and in good standing under the laws of the jurisdiction in which it is organized and has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Acquisition (a "Purchaser Material Adverse Effect").

SECTION 4.02.  Authority; Execution and Delivery; Enforceability.  Purchaser has full corporate power and authority to execute this Agreement and the Ancillary Agreements

to which it is, or is specified to be, a party and to consummate the Acquisition and the other transactions contemplated hereby and thereby. Each Purchaser Subsidiary has full corporate power and authority to execute the Ancillary Agreements to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it by such Ancillary Agreements. Purchaser has taken all corporate action required by its organizational documents to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is, or is specified to be, a party and to authorize the consummation of the Acquisition and the other transactions contemplated hereby and thereby. Each Purchaser Subsidiary has taken all corporate action required by its organizational documents to authorize the execution and delivery of the Ancillary Agreements to which it is, or is specified to be, a party and to authorize the consummation of the transactions contemplated to be consummated by it by such Ancillary Agreements. Purchaser has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and this Agreement constitutes, and each Ancillary Agreement to which it is, or is specified to be, a party will after the Closing constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles. Each Purchaser Subsidiary prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and each Ancillary Agreement to which it is, or is specified to be, a party will after the Closing constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles.

SECTION 4.03. No Conflicts or Violations; No Consents or Approvals Required. The execution and delivery by Purchaser of this Agreement does not, the execution and delivery by Purchaser and each Purchaser Subsidiary of each Ancillary Agreement to which it is, or is specified to be, a party will not, and the consummation by the Purchaser of the Acquisition and the other transactions contemplated hereby and thereby and by each Purchaser Subsidiary of the transactions contemplated to be consummated by it by such Ancillary Agreements will not conflict with, or result in any breach of or constitute a default under, or result in the creation of any Lien upon any of the properties or assets of Purchaser or any of Purchaser's subsidiaries under, any provision of (i) the organizational documents of Purchaser or any of Purchaser's subsidiaries, (ii) any Contract to which Purchaser or any of Purchaser's subsidiaries is a party or by which any of their respective properties or assets is bound or (iii) any Judgment or Applicable Law applicable to Purchaser or any of Purchaser's subsidiaries or their respective properties or assets, other than, in the case of clauses (i), (ii) and (iii) above, any such items that would not reasonably be expected to have a Purchaser Material Adverse Effect. No Consent of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Purchaser or any of Purchaser's subsidiaries in connection with the execution, delivery and performance of this Agreement or the consummation of the Acquisition other than (A) compliance with and any filings under the HSR Act, (B) compliance with and filings and notifications under Environmental Laws, (C) those that may be required solely by reason of Seller's (as opposed to any third party's) participation in the Acquisition and the other transactions contemplated by this Agreement and by the Ancillary

16

Agreements and (D) those the failure of which to obtain or make would not reasonably be
expected to have a Purchaser Material Adverse Effect.

SECTION 4.04. Proceedings. There are not any (a) outstanding Judgments
against Purchaser or any of Purchaser's subsidiaries, (b) Proceedings pending or, to the
knowledge of Purchaser, threatened against Purchaser or any of Purchaser's subsidiaries or
(c) investigations by any Governmental Entity that are pending or threatened against Purchaser
or any of Purchaser's subsidiaries that, in any such case, would reasonably be expected to have a
Purchaser Material Adverse Effect.

SECTION 4.05. Availability of Funds; Solvency. (a) Purchaser has cash
available or has existing borrowing facilities which together are sufficient to enable it to
consummate the Acquisition and the other transactions contemplated by this Agreement and the
Ancillary Agreements. Copies of any such facilities have been provided to Seller. The financing
required to consummate the Acquisition and the other transactions contemplated by this
Agreement and the Ancillary Agreements is referred to in this Agreement collectively as the
"Financing". Purchaser does not have any reason to believe that any of the conditions to the
Financing will not be satisfied or that the Financing will not be available to Purchaser on a
timely basis to consummate the Acquisition and the other transactions contemplated by this
Agreement and the Ancillary Agreements.

(b) As of the Closing and immediately after consummating the Acquisition and
the other transactions contemplated by this Agreement and the Ancillary Agreements, Purchaser
will not (i) be insolvent (either because its financial condition is such that the sum of its debts is
greater than the fair value of its assets or because the present fair salable value of its assets will
be less than the amount required to pay its probable liability on its debts as they become absolute
and matured), (ii) have unreasonably small capital with which to engage in its business,
including the Businesses, or (iii) have incurred or plan to incur debts beyond its ability to repay
such debts as they become absolute and matured.

SECTION 4.06. No Knowledge of Misrepresentations or Omissions. Purchaser
does not have any knowledge that any of the representations and warranties of Seller made in
this Agreement are not true and correct in all material respects. Purchaser does not have any
knowledge of any material errors in, or material omissions from, any Schedule.


## ARTICLE V

### Covenants

SECTION 5.01. Covenants Relating to Conduct of the Businesses. (a) Except
for matters (x) set forth in Schedule 5.01, (y) expressly agreed to by Purchaser or (z) otherwise
contemplated by the terms of this Agreement, from the date of this Agreement to the Closing
Date, Seller shall, and shall cause the Seller Affiliates to, conduct the Businesses in all material
respects in the ordinary course in a manner substantially consistent with past practice and, to the
extent consistent therewith, use commercially reasonable efforts to preserve the material business
relationships with customers, suppliers, distributors and others with whom Seller and the Seller

17

Affiliates deal with in connection with the conduct of the Businesses in the ordinary course of business. Notwithstanding the foregoing, Purchaser acknowledges and agrees that relationships with Seller and certain of its affiliates providing services to the Businesses will terminate as of the Closing as contemplated in Section 10.04 and that such termination shall not constitute a breach of this Agreement. In addition, except as set forth in Schedule 5.01 or otherwise contemplated by the terms of this Agreement, Seller shall not, and shall not cause any Seller Affiliate to, do any of the following in connection with the Businesses without the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed):

(i) subject any of the Transferred Assets to any Lien of any nature whatsoever that would have been required to be set forth in Schedule 3.05 if existing on the date of this Agreement;

(ii) waive any claims or rights of material value that relate exclusively to the Businesses;

(iii) sell, lease, license or otherwise dispose of any Transferred Asset that is material to the Businesses, except raw materials, work-in-process, finished goods, supplies, packaging materials and other inventories ("Inventory"); or

(iv) agree, whether in writing or otherwise, to do any of the foregoing.

(b) Seller shall use its reasonable best efforts to keep, or to cause to be kept, all insurance policies currently maintained with respect to the Transferred Assets (the "Seller Insurance Policies"), or suitable replacements therefor, in full force and effect through the close of business on the Closing Date; it being understood that any and all Seller Insurance Policies are owned and maintained by Seller and its affiliates (and do not exclusively relate to the Businesses). Purchaser will not have any rights under the Seller Insurance Policies from and after the Closing Date.

(c) Upon the execution of this Agreement or as soon as reasonably practicable thereafter, Seller shall instruct its sales employees who handle the Products that, unless otherwise indicated by Purchaser, (i) such employees have no authority to agree with any customer of any Product to the return to Seller, any Seller Affiliate or Purchaser by such customer of any Product sold before or after the Closing Date, (ii) such employees shall not encourage the delisting of any Product by any customer and (iii) from and after the Closing Date, any customer request regarding such a return or delisting he promptly referred to Purchaser.

SECTION 5.02. Access to Information. Seller shall, and shall cause the Seller Affiliates to, afford to Purchaser and its accountants, counsel and other representatives reasonable access, upon reasonable prior notice during normal business hours during the period prior to the Closing, to personnel, properties, books, Contracts, commitments and records relating exclusively to the Businesses (other than the Excluded Assets); provided, however, that such access does not unreasonably disrupt the normal operations of Seller or any Seller Affiliate relating to the Businesses. Nothing contained in this Section 5.02 shall obligate Seller or any of its affiliates to breach any duty of confidentiality owed to any person whether such duty arises contractually, statutorily or otherwise.

18

SECTION 5.03.  Confidentiality.  Purchaser acknowledges that the information being provided to it in connection with the Acquisition and the consummation of the other transactions contemplated by this Agreement and the Ancillary Agreements is subject to the terms of a confidentiality agreement between Purchaser and Conopco, Inc. (the "Confidentiality Agreement"), the terms of which are incorporated in this Agreement by reference.  Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate with respect to information relating solely to the Businesses (other than information related to the Excluded Assets and the personnel engaged in the conduct of the Businesses); provided, however, that Purchaser acknowledges that any and all other information provided to it by Seller or Seller's representatives concerning Seller and its affiliates shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

SECTION 5.04.  Reasonable Best Efforts.  (a)  On the terms and subject to the conditions of this Agreement, each of Seller and Purchaser shall use its reasonable best efforts to cause the Closing to occur, including taking all reasonable actions necessary to comply promptly with all legal requirements that may be imposed on it or any of its affiliates with respect to the Closing.  Each of Seller and Purchaser shall not, and shall not permit any of their respective affiliates to, take any actions that would, or that could reasonably be expected to, result in any of the conditions set forth in Article VI not being satisfied.

(b)  Each of Seller and Purchaser shall as promptly as practicable, but in no event later than five business days following the execution and delivery of this Agreement, (i) file or cause to be filed with the United States Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") any notification and report form required for the transactions contemplated by this Agreement and any supplemental information requested in connection therewith pursuant to the HSR Act and (ii) make such other filings as are necessary in other jurisdictions in order to comply with all Applicable Laws relating to competition and shall promptly provide any supplemental information requested by applicable Governmental Entities relating thereto.  Any such filing, notification and report form and supplemental information shall be in substantial compliance with the requirements of the HSR Act or such other Applicable Law.  Each of Seller and Purchaser shall furnish to the other such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such other Applicable Law.  Each of Seller and Purchaser shall keep the other apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC, the DOJ and any other applicable Governmental Entity and shall comply promptly with any such inquiry or request and shall promptly provide any supplemental information requested in connection with any filings made hereunder pursuant to the HSR Act or such other Applicable Law.  Any such supplemental information shall be in substantial compliance with the requirements of the HSR Act or such other Applicable Law.  Each party shall use its reasonable best efforts to obtain any clearance required under the HSR Act or such other Applicable Law for the consummation of the transactions contemplated by this Agreement.

SECTION 5.05.  Brokers or Finders.  Each of Purchaser and Seller represents, as to itself and its affiliates, that no agent, broker, investment banker or other firm or person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in

connection with any of the transactions contemplated by this Agreement, except, as to Seller, Deutsche Bank Securities Inc., whose fees and expenses will be paid by Seller.

SECTION 5.06. Additional Payments.

(a) Definitions. For the purposes of this Agreement:

"2006 Fixed Payment" means $4,250,000.

"2006 Calendar Year" means the year ended December 31, 2006.

"2006 Variable Payment" means 50% of the amount by which the Finesse U.S. Based Sales for the 2006 Calendar Year exceed $27,500,000.

"Finesse U.S. Based Sales" means the net sales of the Finesse Brand, as determined in accordance with GAAP, (i) in the United States and (ii) arising from any export from the United States to any other country.

"Finesse Payments" means, collectively, the 2006 Fixed Payment and the 2006 Variable Payment.

(b) Finesse Payment. If the Finesse U.S. Based Sales for the 2006 Calendar Year exceed $27,500,000, Purchaser shall pay to Seller the sum of (i) the 2006 Fixed Payment plus (ii) the 2006 Variable Payment.

(c) Calculation of Payments. No later than February 15, 2007, Purchaser shall prepare and deliver to Seller a written statement (the "Finesse Payment Statement") (i) setting forth the Finesse U.S. Based Sales for the 2006 Calendar Year, including a detailed analysis of how such Finesse U.S. Based Sales were derived, (ii) setting forth the Finesse Payment for the 2006 Calendar Year, including how such Finesse Payment was calculated, (iii) certified by the chief financial officer of Purchaser and (iv) certified by Purchaser's independent auditor in a written agreed upon procedures report of such firm.

(d) Objection; Resolution of Disputes.

(i) Unless Seller notifies Purchaser in writing within 30 days after Purchaser's delivery of the Finesse Payment Statement of any objection to the computation of Finesse U.S. Based Sales or the calculation of the Finesse Payment set forth therein (a "Finesse Notice of Objection"), such Finesse Payment Statement shall become final and binding. During such 30 day period Seller and its representatives shall be permitted to review the working papers of Purchaser relating to such Finesse Payment Statement. Any Finesse Notice of Objection shall specify in reasonable detail the basis for the objections set forth therein.

(ii) If Seller provides the Finesse Notice of Objection to Purchaser within such 30 day period, Seller and Purchaser shall, during the 15–day period following Purchaser's receipt of such Finesse Notice of Objection, attempt in good faith to resolve Seller's objections. During such 15–day period, Purchaser and its representatives shall be permitted

to review the working papers of Seller relating to the Finesse Notice of Objection. If Seller and Purchaser are unable to resolve all such objections within such 15–day period, the matters remaining in dispute shall be submitted to KPMG LLP (or, if such firm declines to act, to another internationally recognized public accounting firm mutually agreed upon by Seller and Purchaser and, if Seller and Purchaser are unable to so agree within 10 days after the end of such 15–day period, then Seller and Purchaser shall each select such a firm and such firms shall jointly select a third internationally recognized firm to resolve the disputed matters (such selected firm being the "Finesse Independent Expert")). Seller and Purchaser shall instruct the Finesse Independent Expert to render its reasoned written decision as promptly as practicable but in no event later than 60 days after its selection. The resolution of disputed items by the Finesse Independent Expert shall be final and binding, and the determination of the Finesse Independent Expert shall constitute an arbitral award that is final, binding and non appealable and upon which a judgment may be entered by a court having jurisdiction thereover. The fees and expenses of the Finesse Independent Expert shall be borne equally by Seller and Purchaser. After the Finesse Payment Statement shall have become final and binding, Seller shall have no further right to make any claims against Purchaser in respect of the Finesse Payment set forth in such Finesse Payment Statement.

(e) Time and Form of Payment. Upon the later of (i) April 2, 2007 and (ii) 5 business days after the Finesse Payment Statement shall have become final and binding, Purchaser shall pay to Seller (or its designee) the Finesse Payment, if any, in U.S. dollars by wire transfer of immediately available funds to a bank account designated by Seller.

(f) Seller's Right of Access. Not more than once per calendar year, Purchaser shall afford or cause to be afforded to Seller and its affiliates and its and their accountants and other representatives (i) reasonable access during normal business hours to the personnel, properties, books, contracts, commitments and records relating to the business of Purchaser and its affiliates in connection with Seller's review of each Finesse Payment Statement and (ii) the right to make copies of such books, contracts, commitments and records.

(g) Monthly Net Sales Reports. Within 15 days immediately following the end of each calendar month, from April 2006 to and including December 2006, Purchaser shall deliver to Seller a written statement setting forth the Finesse U.S. Based Sales for such calendar month.

SECTION 5.07. Aqua Net Mexico. Until the date that is 18-months immediately following the date of this Agreement, (a) Seller agrees that it shall not sell, transfer or otherwise dispose of all or substantially all the assets of the Aqua Net Brand located in Mexico ("Aqua Net Mexico") to a single third party or a number of third parties acting as a group; provided, however, that Seller shall be allowed to continue to operate the business of Aqua Net Mexico as it is currently operated as of the date of this Agreement and subject to the provisions of Section 1.06 hereof, including engaging in the sale of any raw materials, work-in-process, finished goods, supplies, packaging materials and other inventories in the ordinary course of business and (b) Purchaser shall have the option (the "Option") during such 18-month period to purchase Aqua Net Mexico from Seller at a purchase price in cash in United States dollars equal to the sum of (i) the net sales of Aqua Net Mexico for the 12 full calendar months immediately preceding the date of Seller's receipt of notice of exercise of the Option, calculated in accordance with GAAP, plus (ii) the aggregate value of all useable or saleable raw materials, work-in-

process, finished goods, supplies, packaging materials and other inventories existing as of the date of the closing of such purchase, at Aqua Net Mexico's fully absorbed cost therefor. In order to exercise the Option, Purchaser shall deliver to Seller a written notice of such exercise prior to the expiration of such 18-month period, which shall state that it is being delivered pursuant to this Section 5.07. If Purchaser shall have delivered such written notice to Seller and a definitive agreement between Purchaser and Seller (or any of their respective affiliates) for the purchase of Aqua Net Mexico by Purchaser or any of its affiliates shall not have been executed within 4 weeks from the date of Seller's receipt of such notice (provided, that Seller shall have used its commercially reasonable efforts to reach such an agreement), Purchaser shall be considered to have forfeited the Option and Seller shall no longer be bound by the terms of this Section 5.07. If Purchaser shall not have delivered such written notice to Seller during such 18-month period, the Option shall expire and Seller shall no longer be bound by the terms of this Section 5.07.

SECTION 5.08. Audit Opinion. At or prior to the Closing, Seller shall deliver to Purchaser a signed audit opinion of PricewaterhouseCoopers LLP relating to the Financial Statements.

## ARTICLE VI

### Conditions to Closing

SECTION 6.01. Conditions to Each Party's Obligation. The obligation of Purchaser to purchase and pay for the Transferred Assets and the obligation of Seller to, or to cause the Seller Affiliates to, sell, transfer, assign and deliver the Transferred Assets to Purchaser is subject to the satisfaction (or waiver by Purchaser and Seller) on or prior to the Closing Date of the following conditions:

(a) Governmental Approvals. All material Consents of, or registrations, declarations or filings with, or expirations of waiting periods imposed by, any Governmental Entity the absence of which would prohibit the consummation of the purchase of any portion of the Transferred Assets, or the assumption of any portion of the Assumed Liabilities, in each case that is material, individually or in the aggregate, to the Businesses, shall have been obtained or filed or shall have occurred.

(b) No Injunctions or Restraints. No Applicable Law or injunction enacted, entered, promulgated, enforced or issued by any Governmental Entity or other legal restraint or prohibition preventing the purchase of any portion of the Transferred Assets, or the assumption of any portion of the Assumed Liabilities, in each case that is material, individually or in the aggregate, to the Businesses, shall be in effect; provided, however, that each of the parties shall have used its reasonable best efforts (as required by Section 5.04) to prevent the occurrence or entry of any such legal restraint and to remove or appeal as promptly as possible any such legal restraint.

SECTION 6.02. Conditions to Obligation of Purchaser. The obligation of Purchaser to purchase and pay for the Transferred Assets is subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date of the following conditions:

[[NYCORP:2539469v25]]

22

(a) <u>Representations and Warranties.</u> The representations and warranties of Seller in this Agreement qualified as to materiality or Businesses Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality or Businesses Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date). Purchaser shall have received a certificate signed by an authorized officer of Seller as to the satisfaction of the foregoing condition.

(b) <u>Performance of Obligations of Seller.</u> Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller by the time of the Closing. Purchaser shall have received a certificate signed by an authorized officer of Seller as to the satisfaction of the foregoing condition.

(c) <u>Ancillary Agreements.</u> Seller or the applicable Seller Affiliate shall have duly executed and delivered the Excluded Patents and Technology License, the Manufacturing Agreement and the Transitional Services Agreement.

SECTION 6.03. <u>Conditions to Obligation of Seller.</u> The obligation of Seller to, or to cause the Seller Affiliates to, sell, transfer, assign and deliver the Transferred Assets is subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date of the following conditions:

(a) <u>Representations and Warranties.</u> The representations and warranties of Purchaser made in this Agreement qualified as to materiality or Purchaser Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality or Purchaser Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date). Seller shall have received a certificate signed by an authorized officer of Purchaser as to the satisfaction of the foregoing condition.

(b) <u>Performance of Obligations of Purchaser.</u> Purchaser shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Purchaser by the time of the Closing. Seller shall have received a certificate signed by an authorized officer of Purchaser as to the satisfaction of the foregoing condition.

SECTION 6.04. <u>Frustration of Closing Conditions.</u> Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VI to be satisfied if such failure was caused by such party's failure to act in good faith or to use its reasonable best efforts to cause the Closing to occur, as required by Section 5.04.

23

## ARTICLE VII

### Termination; Effect of Termination

SECTION 7.01. <u>Termination.</u> (a) Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated and the Acquisition and the other transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(i) by mutual written consent of Seller and Purchaser;

(ii) by Seller if (x) any of the conditions set forth in Section 6.01 or 6.03 shall have become incapable of fulfillment, and shall not have been waived by Seller, (y) 15 days have elapsed since the receipt by Purchaser of a written notice by Seller of such incapability and (z) Purchaser shall have failed to fulfill such condition within such 15-day period;

(iii) by Purchaser if (x) any of the conditions set forth in Section 6.01 or 6.02 shall have become incapable of fulfillment, and shall not have been waived by Purchaser, (y) 15 days have elapsed since the receipt by Seller of a written notice by Purchaser of such incapability and (z) Seller shall have failed to fulfill such condition within such 15-day period; or

(iv) by Seller or Purchaser, if the Closing does not occur on or prior to April 24, 2006;

provided, however, that the party seeking termination pursuant to clause (ii), (iii) or (iv) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

(b) In the event of termination by Seller or Purchaser pursuant to this Section 7.01, written notice thereof shall forthwith be given to the other party and the transactions contemplated by this Agreement shall be terminated, without further action by any party. If the transactions contemplated by this Agreement are terminated as provided herein:

(i) Purchaser shall, and shall cause each of its directors, officers, employees, agents, representatives and advisors to, return to Seller all documents and other material received from Seller or any of its affiliates relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution hereof; and

(ii) all confidential information received by Purchaser, its directors, officers, employees, agents, representatives or advisors with respect to the businesses of Seller and its affiliates (including with respect to the Businesses) shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

SECTION 7.02. <u>Effect of Termination.</u> If this Agreement is terminated and the transactions contemplated hereby are abandoned as described in Section 7.01, this Agreement shall become null and void and of no further force and effect, except for the provisions of (i) Section 5.03 relating to the obligation of Purchaser to keep confidential certain information

24

and data obtained by it from Seller or Seller's representatives, (ii) Section 11.03 relating to certain expenses, (iii) Section 5.05 relating to finder's fees and broker's fees, (iv) Section 7.01 and this Section 7.02 and (v) Section 10.01 relating to publicity. Nothing in this Section 7.02 shall be deemed to release any party from any liability for any breach by such party of the terms, conditions, covenants and other provisions of this Agreement or to impair the right of any party to compel specific performance by any other party of its obligations under this Agreement.

ARTICLE VIII

Indemnification

SECTION 8.01.  Indemnification by Seller.  Subject to the limitations set forth in Section 8.04, from and after the Closing, Seller shall indemnify, defend and hold harmless Purchaser and its affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives (the "Purchaser Indemnitees") from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third-party legal fees and expenses (collectively, "Losses"), to the extent arising or resulting from any of the following:

(i) any breach of any representation or warranty of Seller contained in this Agreement;

(ii) any breach of any covenant of Seller contained in this Agreement;

(iii) any Retained Liability; and

(iv) any fees, expenses or other payments incurred or owed by Seller to any agent, broker, investment banker or other firm or person retained or employed by it in connection with the transactions contemplated by this Agreement.

SECTION 8.02.  Indemnification by Purchaser.  From and after the Closing, Purchaser shall indemnify, defend and hold harmless Seller and each of its affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives (the "Seller Indemnitees") from and against any and all Losses, to the extent arising or resulting from any of the following:

(i) any breach of any representation or warranty of Purchaser contained in this Agreement;

(ii) any breach of any covenant of Purchaser contained in this Agreement;

(iii) any Assumed Liability; and

(iv) any fees, expenses or other payments incurred or owed by Purchaser or its affiliates to any agent, broker, investment banker or other firm or person retained or employed by it in connection with the transactions contemplated by this Agreement.

25

SECTION 8.03.  Indemnification Procedures.  (a)  Procedures Relating to Indemnification of Third Party Claims.  If any party (the "Indemnified Party") receives written notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under Section 8.01 or 8.02 (a "Third Party Claim"), and such Indemnified Party intends to seek indemnity pursuant to this Article VIII, the Indemnified Party shall promptly provide the other party (the "Indemnifying Party") with written notice of such Third Party Claim, stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought.  Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from liability on account of this indemnification, except if and to the extent that the Indemnifying Party is actually prejudiced thereby.  The Indemnifying Party will have 60 days from receipt of any such notice of a Third Party Claim to give notice to assume the defense thereof.  If notice to the effect set forth in the immediately preceding sentence is given by the Indemnifying Party, the Indemnifying Party will have the right to assume the defense of the Indemnified Party against the Third Party Claim with counsel of its choice.  So long as the Indemnifying Party has assumed the defense of the Third Party Claim in accordance herewith, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (ii) the Indemnified Party will not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party and (iii) the Indemnifying Party will not (A) admit to any wrongdoing or (B) consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim to the extent such judgment or settlement provides for equitable relief, in each case, without the prior written consent of the Indemnified Party (such written consent will not be withheld or delayed unreasonably).  The parties will use reasonable best efforts to minimize Losses from Third Party Claims and will act in good faith in responding to, defending against, settling or otherwise dealing with such claims.  The parties will also cooperate in any such defense and give each other reasonable access to all information relevant thereto.  Whether or not the Indemnifying Party has assumed the defense, such Indemnifying Party will not be obligated to indemnify the Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent.

(b)  Procedures for Non-Third Party Claims.  The Indemnified Party will notify the Indemnifying Party in writing promptly of its discovery of any matter that does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party, giving rise to the claim of indemnity pursuant hereto.  The failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party from liability on account of this indemnification, except only to the extent that the Indemnifying Party is actually prejudiced thereby.  The Indemnifying Party will have 60 days from receipt of any such notice to give notice of dispute of the claim to the Indemnified Party.  The Indemnified Party will reasonably cooperate and assist the Indemnifying Party in determining the validity of any claim for indemnity by the Indemnified Party and in otherwise resolving such matters.  Such assistance and cooperation will include providing reasonable access to and copies of information, records and documents relating to such matters, furnishing employees to assist in the investigation, defense and resolution of such matters and providing legal and business assistance with respect to such matters.

SECTION 8.04. Limitations on Indemnification. (a) Notwithstanding the foregoing provisions of this Article VIII:

(i) Seller shall not be responsible, pursuant to Section 8.01(i) or (ii), for any indemnifiable Losses suffered by any Purchaser Indemnitee arising out of a breach of any representation, warranty or covenant of Seller in this Agreement unless a claim therefor is asserted in writing within 18 months after the Closing Date, failing which such claim shall be waived and extinguished,

(ii) Seller shall not be liable, pursuant to Section 8.01(i) or (ii), for (x) any Losses suffered by any Purchaser Indemnitee unless the aggregate of all Losses suffered by the Purchaser Indemnitees exceeds, on a cumulative basis, an amount equal to $750,000, and then only to the extent of any such excess or (y) any individual items where the Loss relating thereto is less than $25,000 and such items shall not be aggregated for purposes of the immediately preceding clause (x);

(iii) the aggregate liability of Seller hereunder, pursuant to Section 8.01(i) or (ii), for Losses suffered by the Purchaser Indemnitees shall in no event exceed $4,000,000; provided, however, that the foregoing limitation shall not apply in connection with a breach of Section 3.05 or Section 3.06(a), in which case the aggregate liability of Seller pursuant to Section 8.01(i) shall in no event exceed $40,000,000; provided, further, however, the neither of the foregoing limitations shall apply in connection with a breach of Section 3.04, in which case the aggregate liability of Seller pursuant to Section 8.01(i) shall in no event exceed $20,000,000;

(iv) Seller shall not have any liability pursuant to Section 8.01(i) for any breach if Purchaser had knowledge of such breach as of the date of this Agreement; and

(v) neither party hereto shall be liable to the other for indirect, special, incidental, consequential or punitive damages claimed by such other party resulting from such first party's breach of its representations, warranties or covenants hereunder.

(b) Purchaser acknowledges that it and its representatives have received or been afforded the opportunity to review prior to the date of this Agreement all written materials which Seller was required to deliver or make available, as the case may be, to Purchaser pursuant to this Agreement on or prior to the date of this Agreement. Purchaser acknowledges that it and its representatives have been permitted full and complete access to the books and records, facilities, equipment, machinery, molds, parts, spare parts, Tax Returns, Contracts and other properties and assets of the Businesses that it and its representatives have desired or requested to see and/or review, and that it and its representatives have had a full opportunity to meet with the officers and employees of Seller and its affiliates to discuss the Businesses and the Transferred Assets. Purchaser further acknowledges and agrees that (i) other than the representations and warranties of Seller specifically contained in Article III of this Agreement, none of Seller, any of its affiliates or any other person has made any representation or warranty either expressed or implied (A) with respect to the Businesses, the Transferred Assets, the Assumed Liabilities or the transactions contemplated by this Agreement or the Ancillary Agreements or (B) as to the accuracy or completeness of any information regarding the Businesses, the Transferred Assets,

27

the Assumed Liabilities or the transactions contemplated by this Agreement or by the Ancillary Agreements furnished or made available to Purchaser and its representatives and (ii) Purchaser shall have no claim or right to indemnification pursuant to this Article VIII and none of Seller, any of its affiliates or any other person shall have or be subject to any liability to Purchaser or any other person with respect to any information, documents or materials furnished by Seller, any of its affiliates or any of their respective officers, directors, employees, agents or advisors to Purchaser, including the Confidential Information Memorandum dated September 2005 prepared by Deutsche Bank Securities Inc. and any information, documents or material made available to Purchaser and its representatives in certain "data rooms" (whether electronic or otherwise), management presentations or any other form in expectation of the transactions contemplated by this Agreement or the Ancillary Agreements. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller nor any Seller Affiliate makes any representations or warranties relating to the maintenance, repair, condition, design, performance or marketability of any Transferred Asset, including merchantability or fitness for a particular purpose. Purchaser acknowledges and agrees that it shall obtain rights in the Transferred Assets in their present condition and state of repair, "as is" and "where is".

(c) Purchaser further acknowledges and agrees that, should the Closing occur, its sole and exclusive remedy with respect to any and all claims relating to this Agreement, the Businesses, the Transferred Assets, the Excluded Assets, the Assumed Liabilities, the Retained Liabilities or the transactions contemplated by this Agreement and by the Ancillary Agreements (other than claims of, or causes of action arising from, fraud) shall be pursuant to the indemnification provisions set forth in this Article VIII. In furtherance of the foregoing, Purchaser hereby waives, from and after the Closing, any and all rights, claims and causes of action (other than claims of, or causes of action arising from, fraud) Purchaser or any other Purchaser Indemnitee may have against Seller or any of its affiliates or any of their respective directors, officers and employees arising under or based upon any Federal, state, provincial, local or foreign statute, law, ordinance, rule or regulation or otherwise (except pursuant to the indemnification provisions set forth in this Article VIII).

SECTION 8.05. Calculation of Indemnity Payments. The amount of any Loss for which indemnification is provided under this Article VIII shall be net of any amounts recovered or recoverable by the Indemnified Party under insurance policies with respect to such Loss and shall be (a) increased to take account of any net Tax cost actually incurred by the Indemnified Party arising from the receipt of indemnity payments hereunder (grossed up for such increase) and (b) reduced to take account of any net Tax benefit actually realized by the Indemnified Party arising from the incurrence or payment of any such indemnified amount. In computing the amount of any such Tax cost or Tax benefit, the Indemnified Party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified amount.

SECTION 8.06. Tax Treatment of Indemnification. For all Tax purposes, Purchaser and Seller agree to treat (and shall cause each of their respective affiliates to treat) any indemnity payment under this Agreement as an adjustment to the Final Purchase Price unless a final determination (which shall include the execution of an IRS Form 870-AD or successor form) provides otherwise.

28

## ARTICLE IX

### Tax Matters

SECTION 9.01. Tax Matters. (a) Purchase Price Allocations. (i) At least seven calendar days prior to the Closing Date, Purchaser shall provide Seller with an estimate of the allocation of the Base Purchase Price (including liabilities assumed) among the Transferred Assets, with a single number for all of the Transferred Assets of each of Seller and each Seller Affiliate. This estimate will be used at the Closing. If Seller does not agree with such estimate, Seller and Purchaser shall use good faith efforts to agree on an estimate prior to the Closing Date. If the parties cannot agree on such estimate prior to the Closing Date, Purchaser's estimate shall be used for allocating the Base Purchase Price pursuant to this Agreement at the Closing.

(ii) Without regard to the estimate determined pursuant to Section 9.01(a)(i), within 75 calendar days of the Closing, Purchaser shall provide Seller a proposed allocation (the "Allocation") of the Base Purchase Price (including liabilities assumed) among the Transferred Assets, as well as with a single amount for all of the Transferred Assets of each of Seller and each Seller Affiliate. The Allocation will be supported by a valuation report from a nationally recognized appraiser. The Allocation shall be made in accordance with Code §1060 and Treasury regulations thereunder (and any similar provisions of state, local or foreign law, as appropriate). The Allocation Statement shall become final and binding 20 calendar days after Purchaser provides the Allocation to Seller, unless Seller objects on the grounds that there is no reasonable basis for the Allocation (in which case, Seller shall propose an allocation). If the parties cannot agree on the Allocation, the parties shall each use their own Allocation, as each party shall see fit.

(iii) Any additional payments made pursuant to Section 5.06 shall be allocated in the same manner and pursuant to the same procedures as described in the preceding paragraph (ii). The Allocation with respect to each payment shall be delivered by the Purchaser within 60 days of the final determination of each payment amount.

(iv) Seller (and its affiliates) and Purchaser (and its affiliates) agree to file all Tax Returns consistent with the final versions of the allocations and forms described in this Section 9.01.

(b) Transfer Taxes. (i) Seller and Purchaser shall cooperate in timely making all filings, returns, reports and forms as may be required in connection with Purchaser's payment of Transfer Taxes. Each party shall execute and deliver all instruments and certificates reasonably necessary to enable the other to comply with any filing requirements relating to any such Transfer Taxes.

(ii) Purchaser shall pay all Transfer Taxes; provided, however, that Seller and each Seller Affiliate shall use reasonable efforts to avail itself of any available exemptions from any such Transfer Taxes, and to cooperate with the other parties in providing any information and documentation that may be necessary to obtain such exemption.

       (c) Purchaser, Seller and each Seller Affiliate agree to provide each other with such information and assistance as is reasonably necessary, including access to records and personnel, for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with an audit or otherwise.

       (d) Seller shall furnish to Purchaser on or prior to the Closing Date a certificate of its non-foreign status complying with the provisions of United States Treasury Regulation Section 1.1445-2(b).

## ARTICLE X

### Additional Agreements

       SECTION 10.01. Publicity. From the date of this Agreement through the Closing Date, Purchaser shall not make any release or announcement, whether publicly or privately (such as internally to Purchaser's employees), concerning the transactions contemplated by this Agreement and by the Ancillary Agreements; provided, however, that Purchaser may discuss such transactions internally with each employee of Purchaser whose knowledge of such transactions is necessary for Purchaser to consummate such transactions on the Closing Date. From the date of this Agreement through the Closing Date, Seller shall not make any public release or announcement concerning the transactions contemplated by this Agreement and by the Ancillary Agreements without the prior consent of Purchaser (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case Seller shall allow Purchaser reasonable time to comment on such release or announcement in advance of such issuance.

       SECTION 10.02. No Use of Certain Names. Purchaser shall, and shall cause the Businesses, promptly, and in any event (a) within 180 days after the Closing, to revise print advertising, Product labeling and all other information or other materials, including any internet or other electronic communications vehicles, to delete all references to the Names and (b) within 180 days after the Closing, to change signage and stationery and otherwise discontinue use of the Names; provided, however, that for a period of 180 days after the Closing Date Purchaser may continue to distribute product literature relating to the Businesses that uses any Names and distribute Products with labeling that uses any Names to the extent that such product literature and labeling exists on the Closing Date. In no event shall Purchaser or the Businesses use any Names after the Closing in any manner or for any purpose different from the use of such Names by Seller and the Seller Affiliates during the 90-day period preceding the Closing. With respect to any Inventory existing as of the Closing Date, Purchaser may sell such Inventory through the Manufacturing Agreement or the Transitional Services Agreement or otherwise, notwithstanding that it bears one or more of the Names, for a reasonable time after the Closing (not to exceed six months). Promptly after the Closing, Purchaser shall, and shall cause the Businesses to, file applications to amend or terminate any certificate of assumed name or d/b/a filings so as to eliminate the right of Purchaser and the Businesses to use the Names.

SECTION 10.03.  <u>Support Services.</u>  Purchaser acknowledges that as of the Closing Date, neither Seller nor any of its affiliates shall have any obligation to provide any support or other services to Purchaser relating to the Businesses other than those services expressly required to be provided pursuant to the manufacturing agreement in the form attached hereto as Exhibit B (the "<u>Manufacturing Agreement</u>") and the transitional services agreement in the form attached hereto as Exhibit C (the "<u>Transitional Services Agreement</u>"), each of which agreements shall be entered into by Seller and Purchaser as of the Closing Date.

SECTION 10.04.  <u>Post-Closing Information.</u>  Following the Closing, upon reasonable written notice to Purchaser, Purchaser shall afford or cause to be afforded to Seller and its affiliates reasonable access to the personnel, properties, books, Contracts, commitments and records relating to the Businesses for any reasonable business purpose, including in respect of litigation, insurance matters and financial reporting of Seller and its affiliates.

SECTION 10.05.  <u>Records.</u>  Purchaser recognizes that certain records may contain information relating to subsidiaries, divisions or businesses of Seller and its affiliates other than the Businesses and that Seller and its affiliates may retain copies thereof.

SECTION 10.06.  <u>Bulk Transfer Laws.</u>  Purchaser hereby waives compliance by Seller and the Seller Affiliates with the provisions of any so-called "bulk transfer laws" of any jurisdiction in connection with the sale of the Transferred Assets to Purchaser.

SECTION 10.07.  <u>Refunds and Remittances.</u>  After the Closing, if Seller or any of its affiliates receive any refund or other amount which is a Transferred Asset or is otherwise properly due and owing to Purchaser in accordance with the terms of this Agreement, Seller promptly shall remit, or shall cause to be remitted, such amount to Purchaser at the address set forth in Section 11.04.  After the Closing, if Purchaser or any of its affiliates receive any refund or other amount which is an Excluded Asset or is otherwise properly due and owing to Seller or any of its affiliates in accordance with the terms of this Agreement, Purchaser promptly shall remit, or shall cause to be remitted, such amount to Seller at the address set forth in Section 11.04.  After the Closing, if Seller or any of its affiliates receive any refund or other amount which is related to claims, litigation, insurance or other matters for which Purchaser is responsible hereunder, and which amount is not an Excluded Asset, or is otherwise properly due and owing to Purchaser in accordance with the terms of this Agreement, Seller promptly shall remit, or cause to be remitted, such amount to Purchaser at the address set forth in Section 11.04. After the Closing, if Purchaser or any of its affiliates receive any refund or other amount which is related to claims (including workers' compensation), litigation, insurance or other matters for which Seller is responsible hereunder, and which amount is not a Transferred Asset, or is otherwise properly due and owing to Seller in accordance with the terms of this Agreement, Purchaser promptly shall remit, or cause to be remitted, such amount to Seller at the address set forth in Section 11.04.

SECTION 10.08.  <u>UPC Codes</u>.  Notwithstanding that Seller's UPC Codes for the Products shall not be transferred to Purchaser as a Transferred Asset pursuant to the terms of this Agreement, Purchaser shall be entitled to use such UPC Codes for the Products in the operation of the Businesses from the Closing Date until the date that is 18 months immediately following the Closing Date.

31

SECTION 10.09. Shared Finesse Brand Mold. Notwithstanding that Seller's mold listed on Schedule 10.09 shall not be transferred to Purchaser as a Transferred Asset pursuant to the terms of this Agreement, Seller shall provide Purchaser reasonable access to such mold and shall allow Purchaser to use such mold in the operation of the Businesses, consistent with past use by Seller of such mold; provided, however, that Seller shall have no obligation to maintain, repair or otherwise replace such mold. If Seller and the Seller Affiliates permanently discontinue the use of such mold and have no intent to resume use of such mold, Seller or the applicable Seller Affiliate shall offer to sell such mold to Purchaser, and Purchaser may purchase such mold from Seller or such Seller Affiliate, for the greater of net book value thereof and $1.00.

## ARTICLE XI

### Miscellaneous

SECTION 11.01. Assignment. Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any of the parties hereto without the prior written consent of the other party hereto, except that (a) Purchaser may assign its right to purchase the Transferred Assets hereunder to any of its wholly owned subsidiaries without the prior written consent of Seller and (b) Seller may assign any rights and obligations hereunder to any affiliate of Seller without the prior written consent of Purchaser. Notwithstanding the foregoing, each of Seller and Purchaser shall remain liable for all of their respective obligations under this Agreement. Subject to the first sentence of this Section 11.01, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and no other person shall have any right, obligation or benefit hereunder. Any attempted assignment or transfer in violation of this Section 11.01 shall be void.

SECTION 11.02. No Third-Party Beneficiaries. Except as provided in Article VIII, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 11.03. Expenses. Whether or not the transactions contemplated by this Agreement and the Ancillary Agreements are consummated, except as otherwise expressly provided herein or therein, each of the parties hereto and thereto shall be responsible for the payment of its own respective costs and expenses incurred in connection with the negotiations leading up to and the performance of its respective obligations pursuant to this Agreement and the Ancillary Agreements including the fees of any attorneys, accountants, brokers or advisors employed or retained by or on behalf of such party. Purchaser shall pay any filing fee required under the HSR Act.

32

SECTION 11.04. Notices. All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

(i) if to Seller:

Conopco, Inc. d/b/a Unilever
33 Benedict Place
Greenwich, Connecticut 06830
Attention: President
Facsimile No.: (203) 625-1602

with copies to:

Conopco, Inc., d/b/a Unilever
700 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Attention: General Counsel
Facsimile No.: (201) 894-2727

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attention: Mark I. Greene, Esq.
Facsimile No.: (212) 474-3700

(ii) if to Purchaser:

Lornamead Brands, Inc.
175 Cooper Avenue
Tonawanda, New York 14150
Attention: Daryle M. Shaw, CFO
Facsimile No.: (716) 874-0670

with a copy to:

Harris Beach PLLC
726 Exchange Street, Suite 1000
Buffalo, New York 14210
Attention: Alan J. Laurita, Esq.
Facsimile No.: (716) 200-5201

33

or to such other address(es) as shall be furnished in writing by any such party to the other party to this Agreement in accordance with the provisions of this Section 11.04.

SECTION 11.05. Headings; Certain Definitions. (a) The descriptive headings of the several Articles and Sections of this Agreement and the Disclosure Schedule to this Agreement and the Table of Contents to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references in this Agreement to "Articles", "Sections", "Exhibits" or "Schedules" shall be deemed to be references to Articles or Sections of this Agreement or Exhibits or Schedules hereto unless otherwise indicated.

(b) For all purposes of this Agreement:

"affiliate" of any party means any person or entity controlling, controlled by or under common control with such party and, in the case of Seller, shall include Unilever N.V., Unilever PLC or any entity a majority of the voting shares of which is owned directly or indirectly by Unilever N.V. or Unilever PLC or both of them together (including the Seller Affiliates).

"business day" shall refer to a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in New York City.

"Business" means (i) in the case of the Finesse Brand, the business of manufacturing, marketing, distributing and selling the Products constituting such Brand on a worldwide basis as such business is currently conducted by Seller and the Seller Affiliates and (ii) in the case of the Aqua Net Brand, the business of manufacturing, marketing, distributing and selling the Products constituting such Brand on a worldwide basis (other than in or from Mexico) as such business is currently conducted by Seller and the Seller Affiliates.

"Businesses" shall refer, collectively, to the Business of each Brand.

"Businesses Material Adverse Effect" means a material adverse effect (i) on the financial condition or results of operations of the Businesses, taken as a whole or (ii) on the ability of Seller to consummate the Acquisition. For purposes of this Agreement, "Businesses Material Adverse Effect" shall exclude any effects to the extent resulting from (A) changes in the United States or foreign economies in general, (B) changes in industries relating to the Businesses in general and not specifically relating to the Businesses or (C) the execution of this Agreement (including the identity of Purchaser) or any of the Ancillary Agreements and the consummation of the transactions contemplated hereby or thereby.

"$" means United States dollars.

"including" means including, without limitation.

"knowledge of Seller" means the actual knowledge of Stan Cook, Geert van Iwaarden and Michael Spendio.

34

"person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"Products" means, with respect to each Brand, products currently held for sale by Seller or a Seller Affiliate, including those products set forth in Schedule 11.05(b).

"subsidiary" of any person means another person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its Board of Directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first person or by another subsidiary of such first person.

SECTION 11.06. Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

SECTION 11.07. Integrated Contract; Exhibits and Schedules. This Agreement, including the Schedules (and the Introduction thereto) and Exhibits hereto, any written amendments to the foregoing satisfying the requirements of Section 11.13 hereof, the Confidentiality Agreement and the Ancillary Agreements, including the schedules, exhibits and annexes thereto, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any previous agreements and understandings between the parties with respect to such matters. All Exhibits and Schedules annexed hereto or referred to in this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. There are no restrictions, promises, representations, warranties, agreements or undertakings of any party to this Agreement with respect to the transactions contemplated by this Agreement, the Confidentiality Agreement or the Ancillary Agreements other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder. In the event of any conflict between the provisions of this Agreement (including the Schedules (and the Introduction thereto) and Exhibits hereto), on the one hand, and the provisions of the Confidentiality Agreement or the Ancillary Agreements (including the schedules and exhibits thereto), on the other hand, the provisions of this Agreement shall control.

SECTION 11.08. Severability; Enforcement. The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 11.09. Governing Law. This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be

35

governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 11.10. Jurisdiction. Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam*, with respect to any such action, suit or proceeding.

SECTION 11.11. Service of Process. Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 11.04 shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 11.10.

SECTION 11.12. Waiver of Jury Trial. Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto. Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 11.12.

SECTION 11.13. Amendments. This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.

*[SIGNATURE PAGE IS THE NEXT PAGE]*

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

CONOPCO, INC., as Seller,

by ~~T. S. Girardi~~

Name: Thomas S. Girardi
Title: Authorized Signatory


LORNAMEAD BRANDS, INC., as Purchaser,

by

Name:
Title:

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

[[NYCORP:2539469]]

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

CONOPCO, INC., as Seller,

by _____

Name:
Title:

LORNAMEAD BRANDS, INC., as Purchaser,

by _____

Name: DARRYLE M SHAW
Title: CHIEF FINANCIAL OFFICER

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

## EXCLUDED PATENTS AND TECHNOLOGY LICENSE AGREEMENT

This Excluded Patents and Technology License Agreement (this "Agreement") dated as of [ ● ], 2006, between Conopco, Inc., a New York corporation ("Licensor"), and Lornamead Brands, Inc., a Delaware corporation ("Licensee").

WHEREAS, Licensee and Licensor have entered into an Asset Purchase Agreement dated as of March 24, 2006 (the "Asset Purchase Agreement"), pursuant to which Licensor has agreed to sell to Licensee and Licensee has agreed to purchase from Licensor the Transferred Assets related to the Businesses, and Licensee has agreed to assume from Licensor the Assumed Liabilities;

WHEREAS, the patents listed on Exhibit A to this Agreement, and the respective inventions disclosed therein, are owned by Licensor and are used in the operation of the Businesses, but are not being sold to Licensee pursuant to the Asset Purchase Agreement (the "Retained Licensed Patents");

WHEREAS, certain trade secrets, proprietary inventions, know-how, formulae, processes, procedures, research records, records of inventions, test information, market surveys and marketing know-how may be in possession of Licensor and its affiliates and used in the operation of the Businesses, but are not being sold to Licensee pursuant to the Asset Purchase Agreement (the "Retained Licensed Technology"); and

WHEREAS, Licensee wishes to use the Retained Licensed Patents and Retained Licensed Technology in its operation of the Businesses (the "Transferred Businesses"), and Licensor, as the owner of the entire right, title and interest in and to the Retained Licensed Technology and Retained Licensed Patents, has agreed to license the Retained Licensed Patents and Retained Licensed Technology to Licensee for use exclusively in the Transferred Businesses, subject to the limitations set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein it is hereby agreed:

SECTION 1. Definitions. Terms that are not otherwise defined in this Agreement shall have the meanings ascribed to them in the Asset Purchase Agreement.

SECTION 2. Grant. Subject to the terms and conditions set forth in this Agreement, Licensor grants to Licensee a fully paid and royalty-free, non-exclusive license to use the Retained Licensed Patents and Retained Licensed Technology exclusively in the Transferred Businesses, with respect to Retained Licensed Patents and Retained Licensed Technology related to the Finesse Brand, on a worldwide basis, and, with respect to Retained Licensed Patents and Retained Licensed Technology related to the Aqua Net Brand, on a worldwide basis, other than in Mexico; provided, however, that Licensee may use the Retained License Patents and Retained License Technology related to (a) the Finesse Brand only in

2

connection with the Business of the Finesse Brand and (b) the Aqua Net Brand only in connection with the Business of the Aqua Net Brand. This License shall be effective as of the date first above written.

SECTION 3. Term and Termination. The license granted by Section 2 of this Agreement with respect to each Retained Licensed Patent shall extend for the period during which such Retained Licensed Patent and any renewals thereof are in force and indefinitely (which, for the avoidance of doubt, shall not be less than the duration of the license applicable to any Retained License Patent and any renewals thereof), with respect to Retained Licensed Technology; provided that this Agreement may be terminated by Licensor in the event Licensee makes or attempts to make an assignment of this Agreement, or grants a sublicense hereunder, in violation of Section 17 below.

SECTION 4. No Waiver of Breach. No forbearance, indulgence or relaxation by either party at any time to require performance of any provision of this Agreement shall in any way affect, diminish or prejudice the right of such party to require performance of that provision, and waiver by either party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision.

SECTION 5. Infringement Actions. Licensor will from time to time take all steps which it may consider necessary to protect its rights, and Licensee agrees forthwith to communicate to Licensor any infringements or threatened infringements of any of the rights of Licensor which may come to its notice and, at Licensor's expense, to do all and any such acts as Licensor may reasonably require for preventing such infringements or threatened infringements, provided always that nothing in this Section 5 shall impose upon Licensor any obligation to incur any expense in protecting any of its rights in any case where, in Licensor's absolute discretion, such expense is considered not warranted. In the event Licensor decides to take affirmative action against an infringement or unfair competition, Licensee agrees to assist Licensor in whatever manner Licensor directs, at the expense of Licensor. Recovery of damages resulting from any such action shall be solely for the account of Licensor. Licensee will provide information reasonably requested by Licensor in any infringement action, including in connection with the calculation of damages.

SECTION 6. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 7. Notices. All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

3

(i) if to Licensor:

    Conopco, Inc. d/b/a Unilever
    33 Benedict Place
    Greenwich, Connecticut 06830
    Attention: President
    Facsimile No.: (203) 625-1602

    with copies to:

    Conopco, Inc., d/b/a Unilever
    700 Sylvan Avenue
    Englewood Cliffs, New Jersey 07632
    Attention: General Counsel
    Facsimile No.: (201) 894-2727

    Cravath, Swaine & Moore LLP
    Worldwide Plaza
    825 Eighth Avenue
    New York, NY 10019-7475
    Attention: Mark I. Greene, Esq.
    Facsimile No.: (212) 474-3700

(ii) if to Licensor:

    Lornamead Brands, Inc.
    175 Cooper Avenue
    Tonawanda, New York 14150
    Attention: Daryle M. Shaw, CFO
    Facsimile No.: (716) 874-0670

    with a copy to:

    Harris Beach PLLC
    726 Exchange Street, Suite 1000
    Buffalo, New York 14210
    Attention: Alan J. Laurita, Esq.
    Facsimile No.: (716) 200-5201

or to such other address(es) as shall be furnished in writing by any such party to the other party to this Agreement in accordance with the provisions of this Section 7.

        SECTION 8.    Amendments.    This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.

4

SECTION 9.  Independent Contractors.  The parties to this Agreement intend by this Agreement to enter into only a license agreement and this Agreement shall not in any way be deemed to establish any other relation between them.  Neither Licensee, on the one hand, nor Licensor, on the other hand, shall be considered a partner, joint venturer, agent or other representative of the other for any purpose whatsoever and neither shall hold itself out as such. Neither Licensee, on the one hand, nor Licensor, on the other hand, nor any employee, officer, director or agent of either shall hold themselves out as an agent of the other party.  Nothing in this Agreement shall be construed to grant either party any right or authority to assume or create any obligation on behalf or in the name of the other; to accept summons or legal process for the other; or to bind the other in any manner whatsoever.

SECTION 10.  Severability; Enforcement.  The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions hereof.  If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 11.  Integrated Contract; Schedule.  This Agreement, including the Schedule hereto, any written amendments to the foregoing satisfying the requirements of Section 8 hereof, the Asset Purchase Agreement, the Ancillary Agreements and the Confidentiality Agreement, including the schedules, exhibits and annexes thereto, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any previous agreements and understandings between the parties with respect to such matters.  The Schedule annexed to this Agreement is hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any terms used in the Schedule but not otherwise defined therein shall be defined as set forth in this Agreement or the Asset Purchase Agreement, as the case may be.  There are no restrictions, promises, representations, warranties, agreements or undertakings of any party to this Agreement with respect to the transactions contemplated by this Agreement, the Asset Purchase Agreement, the Ancillary Agreements or the Confidentiality Agreement other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder.  In the event of any conflict between the provisions of this Agreement (including the Schedule hereto), on the one hand, and the provisions of the Asset Purchase Agreement (including the schedules and exhibits thereto), on the other hand, the provisions of the Asset Purchase Agreement shall control.

SECTION 12.  Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

SECTION 13.  Governing Law.  This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference

to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 14. Jurisdiction. Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam, with respect to any such action, suit or proceeding.

SECTION 15. Service of Process. Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 14.

SECTION 16. Waiver of Jury Trial. Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto. Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 16.

SECTION 17. Assignment; Sublicense. This Agreement and all rights and obligations of Licensee hereunder may not be assigned by Licensee or subject to a sublicense without the prior written consent of Licensor; provided, however, that Licensee may, without such consent, (a) assign this Agreement, in whole or in part, or grant sublicenses, in each case to any Affiliate of Licensee (in which case Licensee shall continue to be bound by the terms of this Agreement), (b) grant limited sublicenses to present and future suppliers, co–packers, consultants, contractors and contract researchers and developers solely for the benefit of Licensee or any Affiliate of Licensee (in which case Licensee shall continue to be bound by the terms of this Agreement) or (c) assign this Agreement, in whole or in part, to a purchaser or transferee of all or substantially all of the Transferred Businesses; provided that in each case the assignee or sublicensee agrees to be bound by the terms and conditions of this Agreement by executing an acknowledgement in the form and substance acceptable to Licensor. Any transfer or other disposition by Licensor of any Retained Licensed Patent or Retained Licensed Technology shall be made subject to the terms of this Agreement and the person or entity acquiring such Retained Licensed Patent or Retained Licensed Technology from Licensor shall agree to be bound by the terms and conditions of this Agreement by executing an acknowledgement in form and substance acceptable to Licensee.

6

SECTION 18.  Effectiveness.  Notwithstanding anything to the contrary in this Agreement, this Agreement shall only become effective as of the Closing and shall not become effective if the Closing does not occur.

SECTION 19.  Headings.  The descriptive headings of the several Sections of this Agreement and the Schedule hereto are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references in this Agreement to "Sections" or "Schedules" shall be deemed to be references to Sections of this Agreement or the Schedules hereto unless otherwise indicated.

*[SIGNATURE PAGE IS THE NEXT PAGE]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives effective as of the date first set forth above.

CONOPCO, INC.,

By _____

Name:

Title:

LORNAMEAD BRANDS, INC.,

By _____

Name:

Title:

*[SIGNATURE PAGE TO EXCLUDED PATENTS AND TECHNOLOGY LICENSE AGREEMENT]*

## SCHEDULE A

### TO THE

### EXCLUDED PATENTS AND TECHNOLOGY LICENSE AGREEMENT

| Case No. | Title | Country | Application No. | Patent No. | Filing Date | Applicant | Associated Brands |
|---|---|---|---|---|---|---|---|
| J6316 | Aqueous Hair Styling Aid | United States | 07/716,109 | 5,164,177 | 6/18/91 | Helene Curtis, Inc. | Aqua Net; Finesse |
| J3126 | Conditioning Shampoo Comprising a Surfactant, A Non-Volatile Silicone Oil and Guar Hydroxypropyltrimmonium Chloride as a Cationic Conditioning Polymer | United States | 07/621,482 | 5,085,857 | 12/3/1990 | Chesebrough-Ponds | Finesse |
| | | Canada | 2031382 | 2031382 | 12/3/1990 | Unilever PLC | |
| J3267 | Hair Conditioning Shampoo Composition | United States | 08/660,974 | 5,720,964 | 6/12/96 | Chesebrough Ponds; Division of Conopco, Inc. | Finesse |
| | | Canada | 2171184 | 2171184 | 9/28/94 | Unilever PLC | |

EXHIBIT B TO THE
ASSET PURCHASE AGREEMENT

## MANUFACTURING AGREEMENT

This Manufacturing Agreement dated as of [ ● ], 2006 (this "Agreement") is made by and between Lornamead Brands, Inc., a Delaware corporation ("Purchaser"), and Unilever Supply Chain, Inc., a Delaware corporation ("Manufacturer").

WITNESSETH

WHEREAS, pursuant to an Asset Purchase Agreement dated as of March 24, 2006 (the "Asset Purchase Agreement"), between Conopco, Inc. ("Seller") and Purchaser, Manufacturer has agreed to manufacture certain products for Purchaser;

WHEREAS, Purchaser desires Manufacturer to manufacture for it such products at Manufacturer's facilities located in Southern California and Connecticut (the "Facilities" or the "Manufacturer's Facilities");

WHEREAS, Seller and Purchaser have entered into a Transitional Services Agreement (the "Transitional Services Agreement") contemporaneously with the entry into this Agreement, pursuant to which Seller will provide certain services to Purchaser, including procuring the manufacture of certain products by third parties on behalf of Purchaser; and

WHEREAS, the Transitional Services Agreement contains provisions regarding the Purchaser's payment for services of Manufacturer rendered pursuant to this Agreement.

NOW, THEREFORE, in consideration of the premises and of the covenants and conditions hereinafter contained, the parties to this Agreement mutually agree as follows:

ARTICLE I

Definitions

SECTION 1.01. Definitions. Terms that are not otherwise defined in this Agreement shall have the meanings ascribed to them in the Asset Purchase Agreement.

ARTICLE II

Products, Pricing and Purchases

SECTION 2.01. Products; Purchase Contracts. Manufacturer agrees to manufacture and sell to Purchaser, and Purchaser agrees to purchase from Manufacturer, the products set forth in Section 2.01 of the Disclosure Schedule attached to this Agreement (the "Products") in certain quantities specified in electronic or written purchase orders (each a "Purchase Order").

SECTION 2.02. Price and Payment Terms. All pricing, payment terms, discounts, rebates, incentives, restrictions, allowable adjustments, guarantees and other pricing programs applicable to the Products shall be set forth in Section 2.01 of the Disclosure Schedule.

[[NYCORP:2542066v12]]

Section 2.01 of the Disclosure Schedule shall be deemed amended to reflect any new Products, pricing or payment terms agreed to in writing by the parties after the date of this Agreement.

SECTION 2.03.  Terms and Conditions. Each transaction under this Agreement shall be subject to the terms and conditions set forth herein; any terms and conditions in any Purchase Order, invoice, instrument or other document provided by one party to the other during the course of performance that conflict with, vary or add to the terms and conditions set forth herein shall be void and of no force and effect.

SECTION 2.04.  Binding and Estimated Forecasts.  (a)  Not later than the fifth day of each calendar month during the term of this Agreement, commencing in the calendar month immediately following the month in which the date of the commencement of the term of this Agreement occurs (the "Effective Date"), Purchaser shall provide Manufacturer with a written forecast of Purchaser's projected demand for the Products for the three month period commencing on the first day of the calendar month following the month in which the forecast is delivered and for the two calendar months following such month (it being understood that during the period form and after the Effective Date through the end of the first calendar month following the month in which the Effective Date occurs, Manufacturer's production plan for the Products in existence as of the Effective Date shall constitute the forecast for such period).  Each forecast delivered by Purchaser shall also specify the quantities of Products required on a weekly basis during the forecast period.  The forecast for the period between the Effective Date and the end of the calendar month including the month in which the Effective date occurs, as well as the forecast for the first full calendar month of each forecast period (each, a "Binding Forecast") shall set forth the total quantity of Products that Purchaser shall order for delivery in such period and shall constitute a commitment by Purchaser to purchase and pay for the quantity of Products specified therein.  The period following the first full calendar month in each forecast delivered by Purchaser shall, subject to subparagraph (b) below, constitute a nonbinding, good faith estimate of the quantity of Products that Purchaser expects to order for delivery during such period (the "Estimated Forecast").

(b) In the event that Purchaser does not deliver a Binding Forecast for the next month by the fifth day of the then current month, the Estimated Forecast for the following month shall become the Binding Forecast for such following month.

(c) Notwithstanding anything in this Agreement to the contrary, any quantities set forth in a Binding Forecast and/or a Purchase Order shall be subject to and limited by Manufacturer's available capacity and run rules for the manufacture of the Products, in each case consistent with Manufacturer's past practices.

(d) Manufacturer may, without penalty, manufacture, package and deliver Products in a quantity ranging from 5% above to 5% below that specified in the applicable Binding Forecast.

SECTION 2.05.  Purchase of Materials.  Manufacturer shall purchase all ingredients, raw materials, packaging materials and other supplies necessary to produce the Products manufactured hereunder (the "Materials").

SECTION 2.06. <u>Production Plant</u>. The Products shall be manufactured at the Facilities or any alternative facility that is approved in writing by Purchaser in its reasonable discretion.

SECTION 2.07. <u>Warehousing</u>. Manufacturer shall warehouse all Materials, unfinished inventory and work-in-process (together, "<u>Unfinished Inventory</u>") and Products.

SECTION 2.08. <u>Freight and Shipment</u>. Manufacturer shall prepare Products for shipment in accordance with reasonable directions provided to Manufacturer in writing, from time to time. Manufacturer shall deliver the Products F.O.B. Manufacturer's Facility. Purchaser shall arrange for shipment of Products from Manufacturer's Facility at its own cost and expense. Manufacturer shall coordinate with Purchaser's approved carriers in order to arrange for pickup of the Products.

SECTION 2.09. <u>Manufacturer Non-Exclusivity</u>. Purchaser agrees to purchase from Manufacturer, during the term of the Agreement, 100% of Purchaser's requirements for the Products; <u>provided, however</u>, the parties acknowledge that Purchaser is not obligated to purchase any minimum amount (either in terms of aggregated purchase price or aggregated volume) of Products beyond its actual business requirements therefor; <u>provided, further, however</u>, that Purchaser shall be entitled to reduce the percentage of Purchaser's requirements for the Products purchased from Manufacturer pursuant the terms of this Agreement so long as each such reduction (i) is made on a basis consistent with Manufacturer's past practices on run rules and minimum batch sizes and (ii) does not adversely affect Manufacturer, Seller or any Seller Affiliate, taking into account all costs suffered by Manufacturer, Seller or any Seller Affiliate of such reduction.

## ARTICLE III

### Intellectual Property; Equipment

SECTION 3.01. <u>Intellectual Property Licenses</u>. Purchaser hereby grants to Manufacturer a non-exclusive and non-transferable right and license to use the formulations for the Products, patents, know-how, technology, trade secrets and other proprietary information of Purchaser relating to the manufacture and use of the Products including, without limitation, the information, if any, set forth in Section 3.01 of the Disclosure Schedule (collectively, "<u>Purchaser's Intellectual Property</u>"), solely for the purpose of manufacturing Products in accordance with the terms of this Agreement. Manufacturer hereby grants to Purchaser a non-exclusive and non-transferable right and license to use the formulations for the Products, patents, know-how, technology, trade secrets and other proprietary information of Manufacturer relating to the manufacture and use of the Products including, without limitation, the information, if any, set forth in Section 3.01 of the Disclosure Schedule (collectively, "<u>Manufacturer's Intellectual Property</u>"), solely for the purpose of procuring or manufacturing Products in accordance with the terms of this Agreement.

SECTION 3.02. <u>Use of Purchaser's Molds</u>. Purchaser hereby grants to Manufacturer a non-exclusive and non-transferable right and license to use the product molds set forth in Section 3.02 of the Disclosure Schedule ("<u>Purchaser's Molds</u>"), solely for the purpose of manufacturing Products in accordance with the terms of this Agreement. Purchaser shall be

4

responsible for the cost of maintenance and repair of Purchaser's Molds and for the cost of any mutually agreed upon capital improvements to Purchaser's Molds.

SECTION 3.03. Termination of License. Each of the licenses granted hereunder shall terminate upon the expiration or earlier termination of this Agreement.

## ARTICLE IV

### Manufacturing Standards

SECTION 4.01. Manufacturing Standards. The Products shall be manufactured in accordance with the product specifications utilized by Manufacturer as of the date of this Agreement with respect to the manufacture of the Products (the "Manufacturing Standards").

SECTION 4.02. Compliance with Law. The Products shall be manufactured in accordance with applicable laws, rules or regulations. All Products shall be manufactured in compliance with the Federal Food, Drug and Cosmetic Act (as amended, the "FFDC Act"), and the regulations promulgated thereunder. All Products shall not be adulterated or otherwise prohibited from use under or misbranded within the meaning of the FFDC Act or the pure food and drug laws of each state of the United States, and not prohibited from introduction into interstate commerce under Sections 404 or 406 of the FFDC Act.

SECTION 4.03. Loss Allowance. With respect to Materials, if any, to be procured and paid for by Purchaser as set forth in Section 2.05 of the Disclosure Schedule, Manufacturer shall not exceed any applicable loss allowances mutually agreed upon by the parties, in writing, with respect to such Materials. If Manufacturer exceeds such loss allowances, as measured by a physical count of Materials, Unfinished Inventory and Products against Manufacturer's book amount of these items, Purchaser shall receive a credit or refund, as appropriate, equal to its cost for the Materials allocable to such excess. The parties acknowledge that Manufacturer is entitled to the deduction under Section 199 of the Internal Revenue Code of 1986, as amended, as well as any comparable state income tax incentive, for all Products manufactured pursuant to this Agreement.

SECTION 4.04. Inspection Rights. Manufacturer shall maintain quality control/assurance records and other records relating to the manufacture of the Products in compliance with applicable laws, rules or regulations. Purchaser may assign a representative who shall have reasonable access to the Facility during normal business hours in order to observe the manufacturing process, storage facilities and have access to the applicable quality control/assurance records.

## ARTICLE V

### Nonconforming Products

SECTION 5.01. Nonconforming Products. Any Products supplied hereunder that do not conform in all material respects to the Manufacturing Standards shall be deemed "Nonconforming Products".

5

SECTION 5.02. <u>Right to Reject</u>. Purchaser shall notify Manufacturer of any Nonconforming Products within thirty days after delivery of such Nonconforming Products and have the right to reject any such Nonconforming Products.

SECTION 5.03. <u>Product Recall</u>. If a recall of any Product is initiated by Purchaser or Manufacturer, either voluntarily or by order of any governmental agency, entity or authority (a "<u>Governmental Entity</u>"), Manufacturer shall provide reasonable assistance to Purchaser in developing a recall strategy and will work with Purchaser and any applicable Governmental Entity in monitoring the recall operation and in preparing such reports as may be reasonably required in connection therewith.

SECTION 5.04. <u>Replace, Rework or Destroy</u>. In the event any Nonconforming Product is the result of Manufacturer's gross negligence or willful misconduct, Manufacturer shall promptly issue a full credit or refund, as appropriate, and promptly ship new Products, at Manufacturer's sole cost and expense, F.O.B., Manufacturer's Facility. The price for any such replacement Products shall be the price for the replacement Products when they are shipped.

ARTICLE VI

Term and Termination.

SECTION 6.01. <u>Term</u>. This Agreement shall commence on date hereof and shall continue in full force and effect until [insert date that is 180 days following the date of this Agreement], unless earlier terminated in accordance with the terms of this Agreement.

SECTION 6.02. <u>Termination</u>. This Agreement may be terminated (a) by either party, if the other party commits a breach of any provision of this Agreement and such breach continues for a period of thirty days following written notice, (b) by either party, effective immediately, if the other party files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law or makes or seeks to make a general assignment for the benefit of its creditors or applies for or consents to the appointment of a trustee, receiver or custodian for its or a substantial part of its property, (c) by either party, in the event of a Force Majeure Occurrence (as defined in Section 9.09) affecting the other party which continues for more than forty-five days or (d) by Purchaser upon 60 days prior written notice to Manufacturer.

SECTION 6.03. <u>Effect of Expiration or Termination</u>. Upon the expiration or earlier termination of this Agreement, all Materials, Unfinished Inventory and Products, in each case, whether purchased or produced before or after the date of this Agreement and whether held at a Manufacturer's Facility, a distribution center of Seller or a Seller Affiliate or a distribution center of a third-party, shall be loaded F.O.B. at such facility for shipment at Purchaser's sole cost and expense to a location designated by Purchaser. Purchaser shall purchase from Manufacturer all such quantities of Materials and Unfinished Inventory at Manufacturer's actual cost therefor. Purchaser shall purchase all Products at the then current price for the Products. Manufacturer shall, at Purchaser's option and expense, destroy such Materials, Unfinished Inventory and Products, in compliance with all applicable laws, rules and regulations. Notwithstanding the foregoing, Purchaser shall not be obligated to purchase from Manufacturer any Materials, Unfinished Inventory or Products if such Materials, Unfinished Inventory or

Products are not valued as such by Manufacturer pursuant to the accounting practices of Manufacturer. Manufacturer shall make Purchaser's Molds, if any, available for pickup by Purchaser at Purchaser's cost during normal business hours; provided that Manufacturer shall indemnify and hold harmless Purchaser against any losses, damages, claims or expenses (including reasonable attorney's fees) incurred by Purchaser arising out of property damage or personal injury (including death) to the extent caused by Purchaser or its contractors in connection with the removal of such Molds.

ARTICLE VII

Indemnification

SECTION 7.01. Indemnification. (a) Purchaser shall indemnify, defend and hold Manufacturer harmless, to the maximum extent permitted by law, from and against any and all claims, losses, damages, costs, expenses or other liabilities, including without limitation, reasonable attorney's fees ("Losses"), arising out of or relating to (i) actual or alleged injury to any person (including death) or property to the extent caused in whole in part by Purchaser's gross negligence or willful misconduct, (ii) non-fulfillment or breach by Purchaser of any agreement or covenant under this Agreement, or (iii) the inaccuracy or breach of any warranty or representation made by Purchaser under this Agreement.

(b) Manufacturer shall indemnify, defend and hold Purchaser harmless, to the maximum extent permitted by law, from and against any and all Losses arising out of or relating to (i) actual or alleged injury to any person (including death) or property to the extent caused in whole or in part by Manufacturer's gross negligence or willful misconduct, (ii) non-fulfillment or breach by Manufacturer of any agreement or covenant under this Agreement, or (iii) the inaccuracy or breach of any warranty or representation made by Manufacturer under this Agreement.

ARTICLE VIII

Confidentiality

SECTION 8.01. Confidential Information. The parties acknowledge that in the course of performing their respective obligations hereunder, each party will come into possession of confidential information of the other (collectively, "Confidential Information").

SECTION 8.02. Ownership; Disclosure. Confidential Information of the disclosing party coming into possession of the receiving party shall remain the sole and exclusive property of the disclosing party. The receiving party shall use reasonable care, but in no event less care than such party uses to safeguard and protect its own Confidential Information, to protect the Confidential Information of the other party and such party shall not use such Confidential Information for any purpose other than the discharge of its obligations under this Agreement. Each party may make available the Confidential Information of the other party to those of its and its affiliates' officers, directors, employees, agents and representatives (each a "Representative") only on a "need to know" basis. Representatives shall be advised of their obligation to abide by the confidentiality obligations set forth in this Agreement and the

receiving party shall be responsible for a breach by any of its Representatives. Neither party shall divulge the Confidential Information of the other to any third party without the prior written consent of the disclosing party, except as the receiving party is specifically required by any Governmental Entity lawfully requesting the same, under compulsion of civil or criminal process or to any court of competent jurisdiction acting pursuant to its powers and then only after notice has been given to the disclosing party as early as reasonably possible so that the disclosing party can attempt to object to such disclosure.

SECTION 8.03. Exceptions to Confidential Information. Information disclosed hereunder shall not be considered "Confidential Information" to the extent it is (a) previously known by the receiving party prior to the disclosure thereof, (b) hereafter becomes, other than through the fault of the receiving party, generally available to the public, (c) disclosed to the receiving party by a third party other than in breach of an obligation of confidentiality owed by such third party to the disclosing party or (d) independently developed by the receiving party without using Confidential Information as shown by the receiving party's written records.

SECTION 8.04. Duration. Upon the expiration or early termination of this Agreement, unless otherwise required by applicable laws, rules or regulations, each party shall return to the other all Confidential Information of the other within its possession or control, and not thereafter use such Confidential Information in the promotion of its own business or the business of any third party, or otherwise make use of or refer to any Confidential Information or the identity of the other party. The obligations of confidentiality set forth in this Agreement shall remain in effect for five years after the expiration or earlier termination of this Agreement.

ARTICLE IX

Miscellaneous

SECTION 9.01. Notices. All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

if to Manufacturer:

Unilever Supply Chain, Inc. d/b/a Unilever
1 John Street
Clinton, CT 06413

8

with copies to:

Conopco, Inc., d/b/a Unilever
700 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Attention:  General Counsel
Facsimile No.:  (201) 894-2727

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attention:  Mark I. Greene, Esq.
Facsimile No.:  (212) 474-3700

if to Purchaser:

Lornamead Brands, Inc.
175 Cooper Avenue
Tonawanda, New York 14150
Attention:  Daryle M. Shaw, CFO
Facsimile No.:  (716) 874-0670

with a copy to:

Harris Beach PLLC
726 Exchange Street, Suite 1000
Buffalo, New York 14210
Attention:  Alan J. Laurita, Esq.
Facsimile No.:  (716) 200-5201

or to such other address(es) as shall be furnished in writing by any such party to the other party
to this Agreement in accordance with the provisions of this Section 9.01.

SECTION 9.02.  Integrated Contract; Exhibits and Schedules.  This Agreement,
including the Schedules to this Agreement, any written amendments to the foregoing satisfying
the requirements of Section 9.14 hereof, the Asset Purchase Agreement, the Ancillary
Agreements and the Confidentiality Agreement, including the schedules, exhibits and annexes
thereto, constitute the entire agreement among the parties with respect to the subject matter
hereof and thereof and supersede any previous agreements and understandings between the
parties with respect to such matters.  All Schedules annexed to this Agreement or referred to
herein are incorporated in and made a part of this Agreement as if set forth in full herein.  Any
terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this
Agreement or the Asset Purchase Agreement, as the case may be.  There are no restrictions,
promises, representations, warranties, agreements or undertakings of any party to this Agreement
with respect to the transactions contemplated by this Agreement, the Asset Purchase Agreement,
the Ancillary Agreements or the Confidentiality Agreement, other than those set forth herein or
therein or in any other document required to be executed and delivered hereunder or thereunder.

9

In the event of any conflict between the provisions of this Agreement (including the Schedules hereto), on the one hand, and the provisions of the Asset Purchase Agreement (including the schedules and exhibits thereto), on the other hand, the provisions of the Asset Purchase Agreement shall control.

SECTION 9.03. Severability; Enforcement. The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 9.04. Assignment. Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any of the parties hereto without the prior written consent of the other party hereto, except that (a) Purchaser may assign its rights under this Agreement to any of its wholly owned subsidiaries without the prior written consent of Manufacturer and (b) Manufacturer may assign any rights and obligations hereunder to (i) any affiliate of Seller or (ii) third parties to the extent such third parties are routinely used to manufacture the Products, in either case, without the prior written consent of Purchaser. Notwithstanding the foregoing, each of Manufacturer and Purchaser shall remain liable for all of their respective obligations under this Agreement. Subject to the first sentence of this Section 9.04, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and no other person shall have any right, obligation or benefit hereunder. Any attempted assignment or transfer in violation of this Section 9.04 shall be void.

SECTION 9.05. No Third-Party Beneficiaries. Except as provided in Article VII, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 9.06. Public Announcements. No public release or announcement concerning this Agreement or the transactions contemplated hereby shall be issued by a party without the prior consent of the other party (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance; provided, however, that each of the parties may make internal announcements to their respective employees that are consistent with the parties' prior public disclosures regarding the transactions contemplated by this Agreement.

SECTION 9.07. Independent Status. Manufacturer is an independent contractor engaged by Purchaser to manufacture the Products. Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of any party with respect to the indebtedness, liabilities, obligations or actions of the other party or any of its respective officers, directors, employees, stockholders, agents or representatives, or any other

[NYCORP:2542066v12]]

person or entity, nor shall either party have the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against, in the name of or on behalf of, the other party.

SECTION 9.08. Survival. The provisions of this Agreement that survive by their terms shall survive the expiration or earlier termination of this Agreement.

SECTION 9.09. Force Majeure. Manufacturer shall not be in default hereunder by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to any cause beyond its control, including strikes, labor disputes, civil disturbances, riot, rebellion, invasion, epidemic, hostilities, war, terrorism, embargo, natural disaster, acts of God, flood, fire, sabotage, accident, delay in transportation, loss and destruction of property, intervention by Governmental Entities, change in laws, regulations or orders, other events or any other circumstances or causes beyond Manufacturer's control (a "Force Majeure Occurrence").

SECTION 9.10. Governing Law. This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 9.11. Jurisdiction. Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam*, with respect to any such action, suit or proceeding.

SECTION 9.12. Service of Process. Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 9.11.

SECTION 9.13. Waiver of Jury Trial. Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto. Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 9.13.

11

SECTION 9.14.  Amendments.  This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.

SECTION 9.15.  Headings.  The descriptive headings of the several Articles or Sections of this Agreement and the Disclosure Schedule to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  All references in this Agreement to "Articles", "Sections" or "Schedules" shall be deemed to be references to Articles or Sections of this Agreement or Schedules to this Agreement unless otherwise indicated.

SECTION 9.16.  Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

*[SIGNATURE PAGE IS THE NEXT PAGE]*

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

UNILEVER SUPPLY CHAIN, INC., as Manufacturer,

by

_____
Name:
Title:


LORNAMEAD BRANDS, INC., as Purchaser,

by

_____
Name:
Title:

*[SIGNATURE PAGE TO MANUFACTURING AGREEMENT]*

# DISCLOSURE SCHEDULE
# TO
# MANUFACTURING AGREEMENT

## Section 2.01 Products, Pricing and Payment Terms

*Products and Pricing*

### PRODUCT PRICING - FINESSE USA

| | | Units Per Case | DU Code | Raw Material Costs [1] | | Packaging Costs | | Variable Manufacturing | | Fixed Manufacturing | | Total Product Cost | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FINESSE** | | | | | | | | | | | | | |
| Finesse | Finesse SH Moisturizing 6pc 15 | 6 | 037220601 | $ | 1.88 | $ | 1.66 | $ | 0.06 | $ | 0.48 | $ | 4.06 |
| 15z | Finesse CD Moisturizing 6pc 15 | 6 | 037230601 | $ | 0.98 | $ | 1.63 | $ | 0.06 | $ | 0.47 | $ | 3.14 |
| SH/CD | Finesse SH Enhancing 6pc 15z | 6 | 037240601 | $ | 1.61 | $ | 1.66 | $ | 0.06 | $ | 0.48 | $ | 3.81 |
| | Finesse CD Enhancing 6pc 15z | 6 | 037250601 | $ | 0.99 | $ | 1.63 | $ | 0.06 | $ | 0.47 | $ | 3.15 |
| | Finesse SH 2N1 Enhancing 6pc 1 | 6 | 037260601 | $ | 1.86 | $ | 1.66 | $ | 0.06 | $ | 0.48 | $ | 4.06 |
| | FIN SH BeautiFULL Volume 6pc 1 | 6 | 037290603 | $ | 1.41 | $ | 1.66 | $ | 0.06 | $ | 0.47 | $ | 3.60 |
| | FIN CD BeautiFULL Volume 6pc 1 | 6 | 037300603 | $ | 0.94 | $ | 1.55 | $ | 0.06 | $ | 0.46 | $ | 3.01 |
| | Finesse SH Color Care 6pc 15z | 6 | 037310601 | $ | 1.89 | $ | 1.66 | $ | 0.06 | $ | 0.48 | $ | 4.09 |
| | Finesse CD Color Care 6pc 15z | 6 | 037320601 | $ | 1.04 | $ | 1.37 | $ | 0.05 | $ | 0.43 | $ | 2.89 |
| | Finesse SH 2N1 Moisturizing 6p | 6 | 037350601 | $ | 1.88 | $ | 1.66 | $ | 0.06 | $ | 0.48 | $ | 4.06 |
| Finesse | Finesse Conditioner Enhancing | 6 | 038680605 | $ | 1.56 | $ | 1.74 | $ | 0.08 | $ | 0.55 | $ | 4.13 |
| 26.4x | Finesse Conditioner Moisturizi | 6 | 038700605 | $ | 1.65 | $ | 1.74 | $ | 0.12 | $ | 0.54 | $ | 4.05 |
| SH/CD | Finesse Shampoo Enhancing 6pc | 6 | 038720605 | $ | 2.72 | $ | 2.12 | $ | 0.12 | $ | 0.56 | $ | 5.52 |
| | Finesse Shampoo Moisturizing 6 | 6 | 038740605 | $ | 3.14 | $ | 2.12 | $ | 0.12 | $ | 0.56 | $ | 5.94 |
| | Finesse SH BeautiFull Volume 6 | 6 | 11108170 | $ | 2.44 | $ | 2.11 | $ | 0.12 | $ | 0.54 | $ | 5.21 |
| | Finesse CD BeautiFull Volume 6 | 6 | 11108171 | $ | 1.67 | $ | 1.75 | $ | 0.12 | $ | 0.54 | $ | 4.08 |
| | Finesse SH 2 n1 Moisturizing 6 | 6 | 11108172 | $ | 3.17 | $ | 2.11 | $ | 0.12 | $ | 0.56 | $ | 5.96 |
| Finesse | FIN HS MAX NA 12 8.5Z | 12 | 038510015 | $ | 3.29 | $ | 3.62 | $ | 1.48 | $ | 0.24 | $ | 8.63 |
| 8.5z Non-Aero | FIN HS XH NA 12 8.5Z | 12 | 038530015 | $ | 3.05 | $ | 3.66 | $ | 1.48 | $ | 0.24 | $ | 8.43 |

**Notes**
(1) All raw materials and packaging materials costs are subject to change based on the then current costs of raw materials and packaging materials.

1

(Section 2.01 – continued)

*Payment Terms*

All payments made pursuant to the terms of this Agreement, including those required by Section 6.03, shall be (i) made in accordance with the terms of the Transitional Services Agreement as if they were payments required by the terms of the Transitional Services Agreement and (ii) incorporated into a Reconciliation Statement (as defined in the Transitional Services Agreement) delivered by Seller to Purchaser pursuant to the terms of the Transitional Services Agreement.

Section 3.01 Intellectual Property

*Purchaser's Intellectual Property*

All Transferred Intellectual Property and Transferred Technology.

*Manufacturer's Intellectual Property*

All Retained Licensed Patents (as defined in the Manufacturing Agreement) and Retained Licensed Technology (as defined in the Manufacturing Agreement).

Section 3.02 Purchaser's Molds

All Molds.

[[NYCORP 2542066v12]]

EXHIBIT C TO THE
ASSET PURCHASE AGREEMENT

## TRANSITIONAL SERVICES AGREEMENT

TRANSITIONAL SERVICES AGREEMENT, dated as of [●], 2006 (this "Agreement"), between CONOPCO, INC., a New York corporation ("Seller"), and LORNAMEAD BRANDS, INC., a Delaware corporation ("Purchaser").

WHEREAS, pursuant to an Asset Purchase Agreement dated as of March 24, 2006 (the "Asset Purchase Agreement"), between Seller and Purchaser, Seller has agreed to, and has agreed to cause the Seller Affiliates to, sell, transfer, assign and deliver to Purchaser, and Purchaser has agreed to purchase, acquire and accept from Seller and the Seller Affiliates, all of Seller's and the Seller Affiliates' right, title and interest in, to and under the Transferred Assets, in each case as provided in the Asset Purchase Agreement;

WHEREAS, Purchaser has agreed to assume the Assumed Liabilities, as provided in the Asset Purchase Agreement;

WHEREAS, Purchaser desires to purchase from Seller, and Seller is willing to provide to Purchaser, transitional services on the terms and conditions set forth in this Agreement;

WHEREAS, Seller and Purchaser have entered into a Manufacturing Agreement (the "Manufacturing Agreement") contemporaneously with the entry into this Agreement, pursuant to which Seller will manufacture certain products for Purchaser at certain facilities owned by Seller or a Seller Affiliate; and

WHEREAS, this Agreement contains provisions regarding Purchaser's payment for products manufactured for it pursuant to the Manufacturing Agreement.

NOW, THEREFORE, the parties agree as follows:

SECTION 1. Definitions. Terms used but not defined in this Agreement shall have the meanings assigned to them in the Asset Purchase Agreement.

SECTION 2. Transitional Services. (a) During the term of this Agreement as set forth in Section 6, Seller shall provide, or shall cause one or more of its affiliates to provide, to Purchaser the services set forth on Annex A to this Agreement (the "Services"), in the manner and at a level of service generally consistent with that provided by Seller or its affiliates to the Businesses immediately preceding the date of this Agreement, and Purchaser shall use the Services for substantially the same purposes and in substantially the same manner as the Businesses had used the Services prior to the date of this Agreement. Seller shall be required to provide the Services only to Purchaser or its affiliates in connection with the conduct of the Businesses. Purchaser shall not resell any of the Services to any person whatsoever or permit the use of the Services by any person other than in connection with the conduct of the Businesses in the ordinary course consistent with past practice.

2

(b) Purchaser acknowledges that Seller may be providing similar services, and/or services that involve the same resources as those used to provide the Services, to its internal organizations, affiliates and to third parties. Seller reserves the right to modify the Services in connection with changes to its internal organization in the ordinary course of business; provided, however, that no such modifications materially diminish the Services.

(c) Purchaser further acknowledges that, in connection with providing the Services, Seller will not be required to use its own funds for any third party provided service or payment obligation of Purchaser, its affiliates or the Businesses, except to the extent that (i) such use by Seller is necessary to fulfill Seller's obligations hereunder and (ii) Seller will be reimbursed by Purchaser for such use. In addition, Seller shall not be obligated to pay any amounts to Purchaser, the Businesses or any of Purchaser's employees in respect of payroll, benefits or similar obligations, unless Seller has received such amounts in advance from Purchaser.

SECTION 3.  Access; Books and Records.  Purchaser shall make available on a timely basis to Seller all information and materials reasonably requested by Seller to enable it to provide the Services hereunder. Purchaser shall give Seller and its representatives reasonable access, during regular business hours and at such other times as are reasonably required, to Purchaser's premises or the premises of the Businesses for the purpose of providing the Services hereunder. Seller shall make available on a timely basis to Purchaser all information and materials reasonably requested by Purchaser. Seller shall give Purchaser reasonable access, during regular business hours and at such other times as are reasonably required, to Seller's premises or the premises of the Businesses providing the Services hereunder.

SECTION 4.  Payment.  (a) For each Service rendered under this Agreement, Purchaser shall pay to Seller the fees (the "Fees") set forth in Annex B hereto, in accordance with the terms of this Agreement.

(b) No later than the tenth business day of each month, Seller shall deliver to Purchaser a reconciliation statement in the form of Annex C hereto (the "Reconciliation Statement") setting forth the information required by such Reconciliation Statement for the immediately preceding month. Seller shall include in each such Reconciliation Statement any payments required to be made by Purchaser pursuant to the terms of the Manufacturing Agreement or by Seller pursuant to the terms of this Agreement. Any amounts set forth on the Reconciliation Statement as owed by Purchaser to Seller or by Seller to Purchaser shall be paid within 10 days after Purchaser's receipt of such Reconciliation Statement (the date such a payment is due, as may be adjusted pursuant to Section 4(c) below, a "Payment Date"). All payments required to be paid under this Section 4 shall be paid by wire transfer in immediately available funds to one or more accounts designated in writing by Seller or Purchaser. Any Fees not paid within five days of a Payment Date shall be subject to late charges for each day such Fees are overdue, calculated at a rate of 15% per annum from the Payment Date to the date of payment.

(c) If Purchaser disagrees with any amounts set forth on a Reconciliation Statement, Purchaser shall send to Seller written notice of such disagreement (a "Reconciliation

3

Objection") within 10 days after Purchaser's receipt of such Reconciliation Statement. Notwithstanding the delivery of a Reconciliation Objection, Purchaser shall pay to Seller, or Seller shall pay to Purchaser, within 10 days after Purchaser's receipt of such Reconciliation Statement that part of the amount set forth on the Reconciliation Statement as to which Purchaser does not disagree. Purchaser and Seller shall attempt in good faith to resolve any dispute within 30 days after the delivery of a Reconciliation Objection. If Purchaser and Seller are unable to resolve all such disputes within such 30-day period, the matters remaining in dispute shall be submitted to KPMG LLP (the "Independent Expert"). The parties shall instruct the Independent Expert to render its reasoned written decision as promptly as practicable, but in no event later than 60 days after its selection. The resolution of disputed items by the Independent Expert shall be final and binding, and the determination of the Independent Expert shall constitute an arbitral award that is final, binding and non-appealable and upon which a judgment may be entered by a court having jurisdiction thereover. The fees and expenses of the Independent Expert shall be borne equally by Purchaser and Seller. Within 10 days after the Independent Expert renders its decision, any amounts the Independent Expert determines are owed shall be paid by the applicable party to the other.

(d) For the duration of this Agreement, the parties hereto shall use the Reconciliation Statement to fulfill their obligations under this Agreement, the Asset Purchase Agreement and the Manufacturing Agreement, to the extent that such obligations require the payment of any amounts from one party to the other.

SECTION 5. Taxes. Any taxes assessed on the provision of the Services hereunder shall be paid by Purchaser.

SECTION 6. Term of Agreement. The term of this Agreement shall commence on the Closing Date and shall continue for a period ending on the date that is 180 days after the Closing Date; provided, however, that Purchaser will use its best efforts to cease using all Services under this Agreement as soon as reasonably possible following the Closing Date.

SECTION 7. Partial Termination; Termination. (a) Purchaser may terminate any individual Service upon 30 days prior written notice to Seller; provided, however, that (i) in connection with the termination of any Service, Purchaser shall also terminate all other directly related Services at the same time and (ii) Purchaser shall not be able to terminate any individual Service if Seller or any Seller Affiliate is adversely affected by such termination, taking into account all costs suffered by Seller or any Seller Affiliate of such termination. Once Purchaser has terminated any of the Services, Purchaser shall not be permitted to request such Services be resumed pursuant to this Agreement.

(b) This Agreement, in its entirety, may be terminated prior to the expiration of its stated term, upon written notice as set forth below:

(i) by Seller, if Purchaser fails to pay any Fees within ten days following a Payment Date;

(ii)  by Seller, on the one hand, or Purchaser, on the other hand, if the other party commits a breach of any provision of this Agreement and such breach continues for a period of 30 days following a written request to cure such breach; or

(iii)  by Seller, on the one hand, or Purchaser, on the other hand, if the other party files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law or makes or seeks to make a general assignment for the benefit of its creditors or applies for or consents to the appointment of a trustee, receiver or custodian for it or a substantial part of its property.

(iv)  by Purchaser upon 30 days written notice to Seller.

(c)  Upon the expiration or earlier termination of this Agreement or any of the Services hereunder, if applicable to any particular Service, Purchaser shall purchase from Seller all existing ingredients, raw materials, packaging materials, work-in-process, finished goods inventory and other supplies, in each case, whether purchased or produced before or after the date of this Agreement, held at third-party manufacturers, third-party distribution centers or distribution centers of Seller or any Seller Affiliate in connection with the Services provided hereunder (or in connection with the Services being terminated at such time) (the "Purchased Inventory"), F.O.B. at the location of any such facility, at actual cost therefor.  Payment for the Purchased Inventory shall be made by Purchaser to Seller within 21 days following delivery of such Inventory to Purchaser;  provided, however, that if payment is not made within 21 days, such payment shall be subject to late charges for each day such payment is overdue, calculated at a rate of 15% per annum from the date such payment was due to the date of payment. Notwithstanding the foregoing, Purchaser shall not be obligated to purchase from Seller any portion of the Purchased Inventory to the extent that such portion of the Purchased Inventory is not valued as such by Seller pursuant to the accounting practices of Seller.

SECTION 8.  Consequential and Other Damages.  (a) Seller shall not be liable, whether in contract, in tort (including negligence and strict liability), or otherwise, for any special, indirect, incidental or consequential damages whatsoever, which in any way arise out of, relate to, or are a consequence of, its performance or nonperformance hereunder, or the provision of or failure to provide any of the Services hereunder, including loss of profits, business interruptions and claims of customers or employees of Purchaser.

(b) Notwithstanding anything to the contrary contained in this Agreement, the liability of Seller with respect to this Agreement or anything done in connection herewith, including the performance or breach hereof, or from the sale, delivery, provision or use of any of the Services provided under or pursuant to this Agreement, whether in contract, in tort (including negligence and strict liability) or otherwise, shall not exceed the Fees previously paid to Seller by Purchaser in respect of the Service from which such liability flows; provided, however, that this paragraph (b) shall not limit Seller's liability with regard to Seller's willful failure in bad faith to provide the Services in breach of the terms of this Agreement.

SECTION 9.  Indemnification.  (a) Purchaser hereby releases Seller and each of its affiliates and each of their respective officers, directors, employees, stockholders, agents and

5

representatives (the "<u>Seller Indemnitees</u>") and agrees to indemnify and hold harmless the Seller Indemnitees from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third-party legal fees and expenses (collectively, "<u>Losses</u>"), to the extent arising or resulting from Seller's performance of the Services hereunder, except to the extent such Losses are due to Seller's gross negligence or willful misconduct in performing the Services hereunder.

(b) If a Seller Indemnitee (the "<u>Indemnified Party</u>") receives written notice of the commencement of any action or proceeding, the assertion of any claim by a third-party or the imposition of any penalty or assessment for which indemnity may be sought under this Section 9 (a "<u>Third Party Claim</u>"), and the Indemnified Party intends to seek indemnity pursuant to this Section 9, the Indemnified Party shall promptly provide Purchaser with written notice of such Third Party Claim. Purchaser shall be entitled to participate in or, at its option, assume the defense, appeal or settlement of such Third Party Claim. If Purchaser assumes the defense, appeal or settlement of such Third Party Claim, such defense, appeal or settlement shall be conducted through counsel selected by Purchaser and the Indemnified Party shall fully cooperate with Purchaser in connection therewith.

SECTION 10. <u>Assignment.</u> Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any of the parties hereto without the prior written consent of the other party hereto, except that (a) Purchaser may assign its rights under this Agreement to any of its wholly owned subsidiaries without the prior written consent of Seller and (b) Seller may assign any rights and obligations hereunder to (i) any affiliate of Seller or (ii) third parties to the extent such third parties are routinely used to provide the Services to affiliates and businesses of Seller, in either case, without the prior written consent of Purchaser. Notwithstanding the foregoing, each of Seller and Purchaser shall remain liable for all of their respective obligations under this Agreement. Subject to the first sentence of this Section 10, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and no other person shall have any right, obligation or benefit hereunder. Any attempted assignment or transfer in violation of this Section 10 shall be void.

SECTION 11. <u>No Third Party Beneficiaries.</u> Except as provided in Section 9, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 12. <u>Notices.</u> All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; <u>provided</u> that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

if to Seller:

[[NYCORP:2540022v15]]

Conopco, Inc. d/b/a Unilever
33 Benedict Place
Greenwich, Connecticut 06830
Attention: President
Facsimile No.: (203) 625-1602

with copies to:

Conopco, Inc., d/b/a Unilever
700 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Attention: General Counsel
Facsimile No.: (201) 894-2727

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attention: Mark I. Greene, Esq.
Facsimile No.: (212) 474-3700

if to Purchaser:

Lornamead Brands, Inc.
175 Cooper Avenue
Tonawanda, New York 14150
Attention: Daryle M. Shaw, CFO
Facsimile No.: (716) 874-0670

with a copy to:

Harris Beach PLLC
726 Exchange Street, Suite 1000
Buffalo, New York 14210
Attention: Alan J. Laurita, Esq.
Facsimile No.: (716) 200-5201

or to such other address(es) as shall be furnished in writing by any such party to the other party
to this Agreement in accordance with the provisions of this Section 12.

SECTION 13. Headings. The descriptive headings of the several Sections of this
Agreement and the Annexes hereto are inserted for convenience only, do not constitute a part of
this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.
All references in this Agreement to "Sections" or "Annexes" shall be deemed to be references to
Sections of this Agreement or the Annexes hereto unless otherwise indicated.

SECTION 14.  Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

SECTION 15.  Integrated Contract; Annexes.  This Agreement, including the Annexes hereto, any written amendments to the foregoing satisfying the requirements of Section 21 hereof, the Asset Purchase Agreement, the Ancillary Agreements and the Confidentiality Agreement, including the schedules, exhibits and annexes thereto, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any previous agreements and understandings between the parties with respect to such matters.  The Annexes to this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any terms used in the Annexes hereto but not otherwise defined therein shall be defined as set forth in this Agreement or the Asset Purchase Agreement, as the case may be.  There are no restrictions, promises, representations, warranties, agreements or undertakings of any party to this Agreement with respect to the transactions contemplated by this Agreement, the Asset Purchase Agreement, the Ancillary Agreements or the Confidentiality Agreement other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder.  In the event of any conflict between the provisions of this Agreement (including the Annexes hereto), on the one hand, and the provisions of the Asset Purchase Agreement (including the schedules and exhibits thereto), on the other hand, the provisions of the Asset Purchase Agreement shall control.

SECTION 16.  Severability; Enforcement.  The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions hereof.  If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 17.  Governing Law.  This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 18.  Jurisdiction.  Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam, with respect to any such action, suit or proceeding.

8

SECTION 19.  Service of Process.  Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 12 shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 18.

SECTION 20.  Waiver of Jury Trial.  Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 20.

SECTION 21.  Amendments.  This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.

SECTION 22.  Public Announcements.  No public release or announcement concerning this Agreement or the transactions contemplated by this Agreement shall be issued by a party without the prior consent of the other party (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance; provided, however, that each of the parties may make internal announcements to their respective employees that are consistent with the parties' prior public disclosures regarding the transactions contemplated by this Agreement.

SECTION 23.  Independent Contractor.  At all times during the term of this Agreement, Seller shall be an  independent contractor in providing the Services hereunder with the sole right to supervise, manage, operate, control and direct the performance of the Services and the sole obligation to employ, compensate and manage its employees and business affairs. Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of any party with respect to the indebtedness, liabilities, obligations or actions of the other party or any of its respective officers, directors, employees, stockholders, agents or representatives, or any other person or entity, nor shall either party have the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against, in the name of or on behalf of, the other party.

SECTION 24.  Survival.  The provisions of Sections 4, 5, 8 & 9, as well as the related provisions of Sections 10 through 27, shall survive the expiration or earlier termination of this Agreement for any reason whatsoever.

9

SECTION 25. Force Majeure. Seller shall not be in default hereunder by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to any cause beyond its control, including strikes, labor disputes, civil disturbances, riot, rebellion, invasion, epidemic, hostilities, war, terrorism, embargo, natural disaster, acts of God, flood, fire, power failures, sabotage, accident, delay in transportation, loss and destruction of property, intervention by Governmental Entities, change in laws, regulations or orders, other events or any other circumstances or causes beyond Seller's control.

SECTION 26. Confidentiality. Purchaser and, except to the extent necessary to perform the Services hereunder, Seller shall, and shall cause their respective affiliates to, keep confidential all information, whether in tangible or intangible form, received from each other or that concerns the other party or the Businesses in the course of the performance of this Agreement, and Purchaser and, except to the extent necessary to perform the Services, Seller acknowledge and agree that such information is the sole property of the other party. Upon the expiration or earlier termination of this Agreement, Seller and Purchaser shall return to each other all such information and all copies, extracts and derivatives thereof.

SECTION 27. Warranties. Seller has not made any express or implied warranty with respect to the Services.

*[Signature Page is the Next Page]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first set forth above.

CONOPCO, INC.,

by _____
    Name:
    Title:


LORNAMEAD BRANDS, INC.,

by _____
    Name:
    Title:

ANNEX A

| DESCRIPTION OF TRANSITION SERVICES | | |
|---|---|---|
| With respect to the Businesses, during the term of this Agreement (the "Transition Period"), Seller shall provide the following: transitional order processing, product shipping, customer data transfer, inventory management, production planning, forecasting, storage and accounts receivable/collection on behalf of Purchaser. | | |
| **SERVICE AREA** | **DESCRIPTION OF SERVICE** | **REPORTING REQUIREMENT** |
| **SUPPLY CHAIN SUPPORT** | | |
| Production Planning/Scheduling | Develop consensus demand for products in accordance with the terms of the Manufacturing Agreement relating thereto. Develop a master production schedule and develop and agree, subject to Purchaser review, to a monthly production schedule with the plants and co-packers. | Consensus demand report (frequency: monthly). Production plan (frequency: bi-weekly). All normal plant reports for scheduling. |
| Purchase/Procure Components | Negotiate supply arrangements needed to fulfill this Agreement, and generate purchase orders for production items. Purchaser shall have the right to review and approve contracts involving obligations beyond the term of this Agreement and in excess of $25,000. Obtain component materials, ensuring procurement of sufficient quantity and quality thereof. | Contract/purchase order status (frequency: monthly). Copies of all applicable purchase orders, exclusive to the Businesses. |
| Third Party Manufacturing | Manage arrangements with third party manufacturers of the Products. | |
| Inventory Component Materials | Maintain and manage inventory of component items. Ensure appropriate controls over and maintenance of inventory. Maintain inventory records. Record inventory transactions on a timely basis. Have record-keeping in place to support vendor recall. | Plant component inventory (frequency: monthly). |
| Quality Assurance | Oversee and assure compliance with material product specifications. | |
| Forecasting Requirements | Develop forecasts for production requirements for the Products in accordance with applicable terms of the Manufacturing Agreement. | Monthly forecast report. |
| **SELLING** | | |
| Field Sales and Brokers | Manage field sales force and broker network. | |

| DESCRIPTION OF TRANSITION SERVICES | | |
|---|---|---|
| **CUSTOMER SERVICE – ORDERS** | | |
| Maintain Product/Customer Data | Maintain and provide Purchaser with the sales system master data regarding the Products – including: configurations, price and trade deals. Maintain and provide Purchaser with the sales system master customer files including: order, shipping and billing data for the product by customer account. | Customer master data for customer purchasing Businesses' brands (frequency: one time). |
| Communicate Info to Customers | Communicate news on the Products, prices and deals, with customers. | Copy provided of all customer communications (frequency: as needed). |
| Pricing Management | Within 15 business days of written request by Purchaser, Seller will provide customers notice of upcoming price changes with respect to the Businesses' list price customers, per Purchasers instruction consistent with past practices. | Product price list (frequency: monthly). |
| Process Customer Orders | Take customer orders (via EDI as consistent with past practice); accept and provide orders from customers, check to ensure final orders are correctly entered into the system on a timely basis, change orders as requested by customers and answer customer questions regarding order status. Orders received by Seller after the Transition Period shall be immediately transferred to Purchaser. | Orders by customer/SKU (frequency: daily). |
| **PICK/SHIP ORDERS** | | |
| Pick Product for Orders | Generate picking documents for orders/deliveries. Physically pick and stage product for pick-up by carrier or customer. | |
| Ship Product to Customer | Per customer purchase orders, arrange for carrier to pick up product at the warehouse and deliver to customer on a timely basis; provided that Seller shall prepare bills of lading relating to such carrier's delivery. | Customer short shipments (frequency: weekly). |
| **CUSTOMER SERVICE - CREDIT/COLLECTION** | | |
| Invoice Customer | Generate and deliver invoices to brokers/customers in a timely manner, consistent with past practice. Post accounts receivable and the status relating thereto. Handle customer billing inquiries. | Sales for the day (frequency: daily). Sales by customer/product month-to-date and year-to-date (frequency: weekly). |
| Receive/Apply Cash | Collect and process all receivables from customers, including, subject to commercially reasonable efforts, collection of amounts | Accounts Receivable status report including deductions - |

| DESCRIPTION OF TRANSITION SERVICES | | |
|---|---|---|
| | deducted by any customer invoices. | (frequency: monthly). |
| Credit | Use current credit terms and limits, monitor available credit and take appropriate preventative and corrective actions relating thereto. Seller shall notify Purchaser of any change in payment terms relating to the customers of the Businesses. | |
| Management of Direct Marketing and Trade Deals | Seller shall provide, or will arrange for a Seller Affiliate to provide, payment and financial services for direct marketing and trade deals to customers. | Detail of direct marketing and trade deal expenses (frequency: monthly). |
| **FINANCE** | | |
| Perform General Accounting | Process journal entries, allocations and period end adjustments, analyze and reconcile general ledger accounts, prepare and post management adjustments. | Sales for the day (frequency: daily). Sales by customer/product month-to-date and year-to-date (frequency: monthly). |
| Perform Cost Accounting | Maintain standard product costs. Ensure COGS is properly posted to the general ledger. Perform variance analysis and post variances to the general ledger. | Plant variance analysis (frequency: monthly). Variance analysis by profit center (frequency: monthly). |
| Report Results | Prepare and provide for Purchaser during the Transition Period financial statements in accordance with Unilever Management reporting principles in electronic and paper form for the Products and Businesses' as agreed by Purchaser and Seller including, without limitation, (i) the Statement of Direct Revenues and Expenses (ii) a statement of selected assets; provided that such information is provided on the 13th calendar day of each fiscal month. | Statement of Direct Revenues and Expenses, (frequency: monthly). Statement of Selected Assets (frequency: monthly). |
| **INFORMATION SYSTEMS** | | |
| Maintain IT Systems | Maintain existing software and hardware that supports the Businesses' business and locations consistent with Seller's overall IT infrastructure practices. | |
| **MISCELLANEOUS** | | |
| Manage Breakage/Spoilage/and Returns | Respond to all customer damaged product claims for Products sold after the Closing Date in accordance with standard procedures. | Returns, breakage / spoilage summary (frequency: monthly). |
| Manage Carrier Claims | Process product damage/loss claims with the carriers. Ensure credit | |

| DESCRIPTION OF TRANSITION SERVICES | | |
|---|---|---|
| | for the Businesses' claims are reflected on the Businesses' financial statements. | |
| Process Consumer Inquiries | Administer consumer inquiries, complaints and requests in a manner consistent with past practice, both through the call center and by way of correspondence handled by consumer affairs. | Businesses' brand consumer responses (frequency: monthly). |
| | | |
| | | |
| **TRANSITIONAL ASSISTANCE SERVICES (rendered by Seller only once and not on a recurring basis)** | | |
| Customer Letter | Promptly after Closing, Seller shall work with Purchaser to draft and distribute a joint letter to all of Seller's and the Seller Affiliates' customers of the Products concerning the sale of the Businesses to Purchaser. | |
| Joint Customer Sales Calls | During the Transition Period, Seller agrees to conduct a joint customer sales call with each of the top ten customers of each Brand with whom Seller has historically conducted such sales calls. Seller shall conduct one customer review meeting per customer prior to the joint sales calls to the customers. | |
| Procurement - Vendor Introductions | Seller shall introduce Purchaser to outside vendors and contract manufacturers. | |
| Information Meetings | Seller shall mutually agree with Purchaser on a schedule of informational meetings between appropriate customer business development personnel of Seller and appropriate personnel of Purchaser. | |
| Transferred Data | Seller or Seller Affiliates shall use its best efforts to ensure that all data sent to or shared with Purchaser is in a format compatible with Purchaser's computer system.* | |
| Introduction to Outside Consultants | Seller shall introduce Purchaser to the outside consultants, if any, that support the sales and marketing of the Products. | |
| Transactions, IS Numbering & 3rd Party | Seller will provide description of relevant electronic data protocols, including: Electronic Data Interchange, Vendor Managed Inventory and 3rd party Value Added Networks | |

* Does not include IT cost for cutover and conversion to Purchaser systems - to be charged on time and material basis at a rate of $75 per hour.

**ANNEX B**

# FEES FOR FINESSE & AQUA NET

| General Expense Category | Charge Methodology | Monthly Charge |
|---|---|---|
| **Manufacturing & Supply Chain** | | |
| Standard Raw/Pack Material Costs | Direct | Per Manufacturing Agreement |
| In-house Manufacturing Costs | Direct | Per Manufacturing Agreement |
| Third Party Manufacturing Costs | Direct * | Per Manufacturing Agreement |
| Freight | Direct (based on shipping weight) | Actual |
| Distribution | Direct based on pallet storage square footage and pallet throughput) | Actual |
| Material Price Variances/Rebates | Direct | Actual |
| Raw/Pack/Other Material Variances | Direct | Actual |
| Dies & Molds | Direct | Actual |
| Obsolete Goods/Spoils | Direct | Actual |
| Supply Support (incl. Factory Indirects) | Allocated - 1.7% of Turnover ** | Actual |
| Buying & Planning | Allocated - 1.3% of Turnover ** | Actual |
| **Trade & Promotional Support** | | |
| Trade Funding | Direct (per budget rates) | Actual |
| Deductions/Returns/Damages | Direct (approx. 2% of Turnover) | Actual |
| Trade Promotions | Budgeted per planned additional trade programs | Actual |
| Consumer Promotions | Direct | Actual |
| Advertising | Direct | Actual |
| Internet/PR/Consumer Services | Direct | Actual |
| **Overheads** | | |
| Field Sales (includes Brokerage) | 3.0% of Turnover ** | Actual |
| Customer Service & Operations | 0.7% of Turnover ** | Actual |
| Finance & IT-GIO | 1.8% of Turnover ** | Actual |
| Marketing (Brand Building) | 0.5% of Turnover ** | Actual |

Notes

\*   Pricing on products co-packed by third parties will be charged to Purchaser at Manufacturer's negotiated prices

\*\* Turnover as defined per Unilever management accounting definitions

## RECONCILIATION STATEMENT[1]

A.  Plus: Cash Collected against Accounts Receivable (Gross)                    $ _____

B.  Less: Deductions or discounts taken by customers that are
    specifically identified to the Businesses or that can be reasonably
    apportioned to the Businesses on a pro rata basis
    1. Cash discounts                                          $ _____
    2. Breakage and spoilage                                   $ _____
    3. Returns                                                 $ _____
    4. Trade promotions for Products shipped after the Closing $ _____
    Subtotal                                                                   $ _____

C.  Less: Payments made that are specifically identifiable to the
    Businesses or that can be reasonably apportioned to the
    Businesses on a pro rata basis
    1. Standard Cost of Goods Sold                             $ _____
    2. Purchasing Variances                                    $ _____
    3. Manufacturing Variances                                 $ _____
    4. Payments required by Manufacturing Agreement            $ _____
    5. Transportation from production facilities to distribution points $ _____
    6. Warehousing charges                                     $ _____
    7. Transportation to customer                              $ _____
    8. Trade promotions                                        $ _____
    9. Consumer promotions                                     $ _____
    10. Other direct marketing                                 $ _____
    11.                                                        $ _____
    12.                                                        $ _____
    Subtotal                                                                   $ _____

D.  Less: Fees (as defined in the Agreement)                                   $ _____
    Field Sales / Brokerage                                    $ _____
    Sales Operations / R&D / General Administration
E.  Less: Seller cash misdirected to Purchaser                $ _____
    Plus: Purchaser cash misdirected to Seller                $ _____
    Subtotal                                                                   $ _____

Total.  NET DUE FROM(/DUE TO) UNILEVER                                         $ _____

---

[1] There may be deductions or cash payments related to the Businesses other than those listed, which deductions
or cash payments will be specifically described on the particular Reconciliation Statement to which they relate.
Such deductions or cash payments will be consistent with the Asset Purchase Agreement.

EXECUTION COPY

**Conopco, Inc.**
**33 Benedict Place**
**Greenwich, CT 06830**

Lornamead Brands, Inc.
175 Cooper Avenue
Tonawanda, New York 14150
Attention: Daryle M. Shaw, CFO

April 26, 2006

Re:  Asset Purchase Agreement Dated as of March 24, 2006

Dear Sir or Madam:

Reference is made to the Asset Purchase Agreement dated as of March 24, 2006 (the "Asset Purchase Agreement"), between Conopco, Inc., a New York corporation ("Seller"), and Lornamead Brands, Inc., a Delaware corporation ("Purchaser"). Terms used but not defined in this letter agreement (this "Letter Agreement") shall have the meanings assigned to them in the Asset Purchase Agreement.

Pursuant to Section 11.13 of the Asset Purchase Agreement, each of Seller and Purchaser hereby agree as follows:

(a) Notwithstanding anything to the contrary contained in Section 2.01 of the Asset Purchase Agreement, the Closing shall take place at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY 10019, at 10:00 a.m. on April 26, 2006, or at such other place, time and date as may be further agreed by Seller and Purchaser.

(b) Section 1.04(b) of the Asset Purchase Agreement is hereby amended by deleting the word "and" the end of clause (vii) thereof, replacing the period at the end of clause (viii) thereof with "; and", and inserting the following text as a new clause (ix):

"(ix) all obligations, liabilities and commitments related to the Hopkins v. Alberto-Culver USA, Inc., et al. matter."

(c) Section 3.04 of the Asset Purchase Agreement is hereby deleted and replaced, in its entirety, with the following:

"Financial Statements. (a) Schedule 3.04(a) sets forth (i) the unaudited special-purpose Statement of Net Assets to be Sold at December 31, 2005 of the Businesses, excluding the Businesses in Sweden (the "Statement of Assets"), and (ii) the unaudited special-purpose Statement of Direct Revenues and Expenses for the year ended December 31, 2005 of the Businesses, excluding the Businesses in Sweden (such financial

2

statements, the "Unaudited Financial Statements").  The Unaudited Financial Statements present fairly (subject to normal recurring year-end adjustments and the absence of notes), in all material respects, the assets of the Businesses, excluding the Businesses in Sweden, as of December 31, 2005 and the related direct revenues and expenses of their operations, excluding the Businesses in Sweden, for the year ended December 31, 2005 in conformity with the internal accounting policies and practices of Seller and the Seller Affiliates.

(b)  Schedule 3.04(b) sets forth (i) the unaudited special-purpose Statement of Net Assets to be Sold at December 31, 2004 of the Businesses, excluding the Businesses in Sweden, and (ii) the unaudited special-purpose Statement of Direct Revenues and Expenses for the years ended December 31, 2004 and December 31, 2003 of the Businesses, excluding the Businesses in Sweden, together with the notes to such financial statements (such financial statements, together with the notes to such financial statements, the "Financial Statements").  The Financial Statements present fairly, in all material respects, the assets of the Businesses, excluding the Businesses in Sweden, as of December 31, 2004 and the related direct revenues and expenses of their operations, excluding the Businesses in Sweden, for each of the years ended December 31, 2004 and December 31, 2003 in conformity with United States generally accepted accounting principles ("GAAP")."

(d)  Section 9.01(d) of the Asset Purchase Agreement is hereby deleted in its entirety.

(e)  Exhibit B to the Disclosure Schedule to the Asset Purchase Agreement ("Exhibit B") is hereby amended by:

(i)  On page 1 of Exhibit B, under the section heading "**Countries:**", the word "Mexico," is hereby deleted.

(ii)  On page 7 of Exhibit B, the section heading "**Mexico**" and the numbered items listed one through five under such section heading, including all related bullet points, are hereby deleted.

(iii)  On page 10 of Exhibit B, under the section heading "**INTERNET DOMAINS**", the entire row beginning with the internet address "aquanet.com.mx" is hereby deleted.

(f)  Schedule 3.06 of the Disclosure Schedule to the Asset Purchase Agreement is hereby amended by deleting the text "Compromise Agreement dated May 20, 1993 between Pond's de Mexico S.A. de C.V., Faberge de Mexico S.A. de C.V., Gina Y Jasive S.A. de C.V. and Aerospray S.A.".

3

(g) Schedule 3.09 of the Disclosure Schedule to the Asset Purchase Agreement is hereby amended by inserting the text "The Hopkins v. Alberto-Culver USA, Inc., et al. matter and any related litigation or proceeding"

Except as expressly provided herein, the Asset Purchase Agreement is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed.

This Letter Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

This Letter Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

[remainder of page intentionally blank]

4

Very truly yours,

CONOPCO, INC.

Name: Paul McMahon
Title:  Vice President

Accepted and agreed
as of the date first written above:

LORNAMEAD BRANDS, INC.,

Name:
Title:

Copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attention:  Mark I. Greene

Harris Beach PLLC
726 Exchange Street, Suite 1000
Buffalo, New York 14210
Attention: Alan J. Laurita, Esq.

[NYCORP:2986700]

4

Very truly yours,

CONOPCO, INC.,

Name:
Title:

Accepted and agreed
as of the date first written above:

LORNAMEAD BRANDS, INC.,

Name:    DARYLE M SHAW
Title:    CHIEF FINANCIAL OFFICER

Copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attention: Mark I. Greene

Harris Beach PLLC
726 Exchange Street, Suite 1000
Buffalo, New York 14210
Attention: Alan J. Laurita, Esq.

[[NYCORP:2596706]]