# EXHIBIT "F"

✎AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

LORNAMEAD INC., formerly known as
LORNAMEAD BRANDS, INC.

**SUMMONS IN A CIVIL ACTION**

V.

CONOPCO, INC.

CASE NUMBER:

## 07 CV 10385

TO: (Name and address of Defendant)

CONOPCO, INC.
700 SYLVAN AVE
ENGLEWOOD CLIFFS, NEW JERSEY, 07632

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

HARRIS BEACH PLLC
Steven J. Rice
100 Wall Street
New York, NY 10005

an answer to the complaint which is served on you with this summons, within _____(twenty) 20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                         NOV 1.6 2007

CLERK    _Marcos Quintero_

DATE

(By) DEPUTY CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LORNAMEAD INC., formerly
known as LORNAMEAD BRANDS, INC.,

Plaintiff,

-vs-                                    COMPLAINT

CONOPCO, INC.

Defendant.

Plaintiff, by its attorneys, Harris Beach PLLC, for its Complaint against the Defendant

herein alleges:

THE PARTIES

1.      Plaintiff is a Delaware corporation with its office and principal place of business

in the State of Connecticut.

2.      Upon information and belief Defendant is a New York Corporation with its office

and principal place of business in the State of New Jersey.

JURISDICTION AND VENUE

3.      Jurisdiction in this action is pursuant to Section 1332 of Title 28 of the United

States Code. There is complete diversity between the parties and the amount in controversy

exceeds $75,000.

4.      Venue is proper in this Court pursuant to Section 11.10 of a March 24, 2006 Asset

Purchase Agreement between the parties.

THE ASSET PURCHASE AGREEMENT

5.      Plaintiff and Defendant entered into an Asset Purchase Agreement ("Agreement",

Exhibit "A") as of March 24, 2006 wherein the Defendant agreed to sell to the Plaintiff certain

"Transferred Assets" of the "Business" described in the Agreement for a base purchase price of $40,000,000 with certain additional payments to be determined by the Agreement.

6.    Certain of the "Transferred Assets" were described in a "Disclosure Schedule" (Exhibit "B") incorporated by reference in the Agreement. They related to the manufacture, marketing and selling of the "Finesse" brand "of hair products and the "Aqua Net" brand of hair styling products throughout the world.

7.    Section 11.05(b) of the Agreement defines the "Business" as,

> (i) in the case of the Finesse Brand, the business of manufacturing, marketing, distributing and selling the Products constituting such Brand on a worldwide basis as such business is currently conducted by the Seller and the Seller Affiliates and (ii) in the case of the Aqua Net Brand, the business of manufacturing, marketing, distributing and selling the Products constituting such Brand on a worldwide basis (other than from Mexico) as such business is currently conducted by Seller and the Seller Affiliates.

8.    The Transferred Assets included all trademarks, trademark registrations and trademark applications and associated goodwill for Trademarks listed on Schedule 1.02(a)(ii) of the Schedule included in the Disclosure Schedule.

9.    The Trademarks included FINESSE AQUA NET, FINESSE PLUS, FINESSE TOUCHABLES, SOMETIMES YOU NEED A LITTLE FINESSE and SOMETIMES YOU NEED A LOT within one hundred seventeen countries including Costa Rica, El Salvador and Guatemala.

10.    Section 2.02 of the Agreement provides in pertinent part that the Defendant would deliver to the Plaintiff, upon closing the transaction, "instruments of transfer" relating to the Transferred Assets as well as "appropriately executed assignments of the Transferred Intellectual Property".

11.     Article III of the Agreement, the "Representations and Warranties of Seller", includes Section 3.10 entitled "Absence of Changes or Events". Section 3.10 provides in pertinent part that,

> Except as set forth in Schedule 3.01 or Schedule 5.01, since the Statement of Assets (i) there has not been a Business Material Adverse Effect . . .

12.     "Business Material Adverse Effect" is defined in Section 11.05 of the Agreement. It includes a, "[M]aterial adverse effect (i) on the financial condition or results of operations of the Business as a whole . . .".

13.     Schedule 3.10 provides in pertinent part that, "Walmart has indicated to Seller that it has or will be reducing the number of Finesse Brand Products that it carries for sale" (the "Walmart Representation").

14.     Walmart was a major customer for the Finesse and Aqua Net brands acquired by Plaintiff pursuant to the Agreement.

15.     Plaintiff relied on the Walmart Representation when it entered into the Agreement.

16.     Defendant knew that Plaintiff was relying on the Walmart Representation when it agreed to sell the Transferred Assets.

17.     Plaintiff has fully complied with the terms and conditions of the Agreement.

FIRST CAUSE OF ACTION

18.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 17 as if fully set forth herein.

19.     Although duly demanded, Defendant has failed to deliver Finesse brand registrations for Costa Rica, El Salvador and Guatemala as required by the Agreement.

20.    The Finesse brand registrations for Costa Rica, El Salvador and Guatemala were to be included in the Transferred Assets sold by the Defendant.

21.    As a result of the Defendant's breach of the Agreement by failing to deliver the Finesse Brand registrations for Costa Rica, El Salvador and Guatemala, Plaintiff has been damaged in an amount exceeding the jurisdictional requirements of Section 1332 of Title 28 of the United States Code.

## SECOND CAUSE OF ACTION

22.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 21 as if fully alleged herein.

23.    Upon information and belief the Walmart Representation was untrue when made.

24.    Upon information and belief the Defendant knew the Walmart Representation was untrue when made.

25.    The Defendant knew that Plaintiff was relying on the Walmart Representation.

26.    As a result of the Defendant's breach of the Walmart Representation Plaintiff has been damaged in an amount exceeding the jurisdictional requirements of Section 1332 of Title 28 of the United States Code.

## THIRD CAUSE OF ACTION

25.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 26 as if alleged herein.

26.    Section 1.02(a)(viii) of the Agreement provides the "Transferred Assets" include,

> (viii) all pre-paid expenses that are used or held for use exclusively in, or that arise exclusively out of the oper-ation or conduct of the business.

27.     Beginning January 1, 2006 the Defendant established certain accruals or reserves for certain expenses that would be incurred during the calendar year, including a trade promotional accrual and a returns allowance accrual.

28.     After transfer of the assets pursuant to the Agreement, as promotional and returns expenses were incurred they were either paid by or deducted from sales revenues due to the Plaintiff.

29.     The promotional expenses incurred by the Plaintiff should have been paid from the accruals and reserves established by the Defendant. They are pre-paid expenses used or held for use exclusively in or that arise out of the operation or conduct of the Business.

30.     Plaintiff has demanded that Defendant reimburse it for all pre-paid expenses paid by it or deducted from sales revenues.

31.     Defendant has failed and refused to pay Plaintiff the promotional and returns expenses due to it for the period April 26, 2006 to December 31, 2006.

32.     As a result of the foregoing Plaintiff has been damaged in an amount in excess of the jurisdictional requirements of Section 1332 of Title 28 of the United States Code.

FOURTH CAUSE OF ACTION

33.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 32 as if fully set forth herein.

34. Section 1.02 (a)(vii) provides in pertinent part that the Transferred Assets shall include,

> (vii) all books of account, general, financial and accounting records, files . . . that are used or held for use exclusively in, or that arise exclusively out of, the operation or conduct of the business . . .

35.     The Defendant has failed to transfer to the Plaintiff the financial and accounting records including those necessary to obtain refunds on certain taxes collected by the Canadian

government on various internal inventory transactions and services performed pursuant to the

Temporary Services Agreement incorporated in the Agreement.

36.    As a result of the Defendant's failure to transfer accounting and financial records

as required by the Agreement Plaintiff has been damaged in an amount exceeding the

jurisdictional requirements of Section 1332 of Title 28 of the United States Code.

### DEMAND FOR JURY TRIAL

37.    Plaintiff demands a trial by jury of all causes of action alleged in this Complaint.

WHEREFORE, Plaintiff demands that a judgment be entered against the Defendant:

1.    On the First Cause of Action in an amount exceeding the jurisdictional

requirements of this Court;

2.    On the Second Cause of Action in an amount exceeding the jurisdictional

requirements of this Court;

3.    On the Third Cause of Action in an amount exceeding the jurisdictional

requirements of this Court;

4.    On the Fourth Cause of Action in an amount exceeding the jurisdictional

requirements of this Court.

5.    Granting such other and further relief as to the Court may seem just and proper.

Dated: November 13, 2007

Yours, etc.,
Harris Beach PLLC

By: _____
     Steven J. Rice, Esq. ID No. 1934
     Richard T. Sullivan, Esq.
     *Attorneys for Plaintiff*
     100 Wall Street
     New York, New York 10005
     (212) 687-0100
     (716) 200-5114

HARRIS BEACH PLLC
ATTORNEYS AT LAW

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
| --- | --- | --- |

LORNAMEAD INC., formerly known as
LORNAMEAD BRANDS, INC.

V.

CONOPCO, INC.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

## 07 CV 10385

TO: (Name and address of Defendant)

CONOPCO, INC.
700 SYLVAN AVE
ENGLEWOOD CLIFFS, NEW JERSEY, 07632

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

HARRIS BEACH PLLC
Steven J. Rice
100 Wall Street
New York, NY 10005

an answer to the complaint which is served on you with this summons, within _____(twenty) 20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                              NOV 16 2007

CLERK  *Marcos Quintero*

| | |
| --- | --- |
| (By) DEPUTY CLERK | DATE |

# EXHIBIT A
# TO COMPLAINT

EXECUTION COPY

ASSET PURCHASE AGREEMENT

between

CONOPCO, INC.

and

LORNAMEAD BRANDS, INC.

Dated as of March 24, 2006

# TABLE OF CONTENTS

Page

## ARTICLE I

### Purchase and Sale of Transferred Assets

SECTION 1.01. Purchase and Sale..................................................................1
SECTION 1.02. Transferred Assets and Excluded Assets ....................................1
SECTION 1.03. Consents to Certain Assignments ...............................................4
SECTION 1.04. Assumption of Liabilities..........................................................5
SECTION 1.05. Excluded Patents and Technology License...................................7
SECTION 1.06. Geographic Limitation ..............................................................7

## ARTICLE II

### Closing and Post-Closing Purchase Price Adjustment

SECTION 2.01. Closing ...................................................................................7
SECTION 2.02. Transactions To Be Effected at the Closing..................................8

## ARTICLE III

### Representations and Warranties of Seller

SECTION 3.01. Organization and Standing.........................................................8
SECTION 3.02. Authority; Execution and Delivery; Enforceability .......................9
SECTION 3.03. No Conflicts or Violations; No Consents or Approvals Required...................9
SECTION 3.04. Financial Statements ...............................................................10
SECTION 3.05. Good and Valid Title................................................................10
SECTION 3.06. Intellectual Property................................................................11
SECTION 3.07. Contracts ...............................................................................11
SECTION 3.08. Taxes ....................................................................................12
SECTION 3.09. Proceedings ...........................................................................13
SECTION 3.10. Absence of Changes or Events..................................................14
SECTION 3.11. Compliance with Applicable Laws ............................................14

## ARTICLE IV

### Representations and Warranties of Purchaser

[[NYCORP:2539469v25]]

SECTION 4.01. Organization and Standing.................................................................14
SECTION 4.02. Authority; Execution and Delivery; Enforceability .........................14
SECTION 4.03. No Conflicts or Violations; No Consents or Approvals Required...................15
SECTION 4.04. Proceedings ........................................................................................16
SECTION 4.05. Availability of Funds; Solvency ......................................................16
SECTION 4.06. No Knowledge of Misrepresentations or Omissions ......................16

## ARTICLE V

### Covenants

SECTION 5.01. Covenants Relating to Conduct of the Businesses............................16
SECTION 5.02. Access to Information ........................................................................17
SECTION 5.03. Confidentiality ..................................................................................18
SECTION 5.04. Reasonable Best Efforts ...................................................................18
SECTION 5.05. Brokers or Finders.............................................................................18
SECTION 5.06. Additional Payments..........................................................................19
SECTION 5.07. Aqua Net Mexico ..............................................................................20
SECTION 5.08. Audit Opinion ...................................................................................21

## ARTICLE VI

### Conditions to Closing

SECTION 6.01. Conditions to Each Party's Obligation..............................................21
SECTION 6.02. Conditions to Obligation of Purchaser..............................................21
SECTION 6.03. Conditions to Obligation of Seller ...................................................22
SECTION 6.04. Frustration of Closing Conditions.....................................................22

## ARTICLE VII

### Termination; Effect of Termination

SECTION 7.01. Termination.........................................................................................23
SECTION 7.02. Effect of Termination.........................................................................23

## ARTICLE VIII

### Indemnification

SECTION 8.01. Indemnification by Seller...................................................................24
SECTION 8.02. Indemnification by Purchaser ...........................................................24
SECTION 8.03. Indemnification Procedures ..............................................................25
SECTION 8.04. Limitations on Indemnification..........................................................26

[[NYCORP:2539469v25]]

SECTION 8.05. Calculation of Indemnity Payments................................................27
SECTION 8.06. Tax Treatment of Indemnification ................................................27

### ARTICLE IX

#### Tax Matters

SECTION 9.01. Tax Matters ................................................................................28

### ARTICLE X

#### Additional Agreements

SECTION 10.01. Publicity .......................................................................................29
SECTION 10.02. No Use of Certain Names ...........................................................29
SECTION 10.03. Support Services .........................................................................30
SECTION 10.04. Post-Closing Information............................................................30
SECTION 10.05. Records.........................................................................................30
SECTION 10.06. Bulk Transfer Laws.....................................................................30
SECTION 10.07. Refunds and Remittances............................................................30
SECTION 10.08. UPC Codes...................................................................................30
SECTION 10.09. Shared Finesse Brand Mold .......................................................31

### ARTICLE XI

#### Miscellaneous

SECTION 11.01. Assignment....................................................................................31
SECTION 11.02. No Third-Party Beneficiaries ......................................................31
SECTION 11.03. Expenses........................................................................................31
SECTION 11.04. Notices ..........................................................................................32
SECTION 11.05. Headings; Certain Definitions.....................................................33
SECTION 11.06. Counterparts.................................................................................34
SECTION 11.07. Integrated Contract; Exhibits and Schedules .............................34
SECTION 11.08. Severability; Enforcement...........................................................34
SECTION 11.09. Governing Law ............................................................................34
SECTION 11.10. Jurisdiction...................................................................................35
SECTION 11.11. Service of Process ........................................................................35
SECTION 11.12. Waiver of Jury Trial.....................................................................35
SECTION 11.13. Amendments .................................................................................35

[[NYCORP:2539469v25]]

<u>EXHIBITS</u>

Excluded Patents and Technology License..........................................................................A

Manufacturing Agreement ...............................................................................................B

Transitional Services Agreement......................................................................................C

[[NYCORP:2539469v25]]

## INDEX OF DEFINED TERMS

| Defined Term | Location of Definition |
| --- | --- |
| 2006 Calendar Year | Section 5.06(a) |
| 2006 Fixed Payment | Section 5.06(a) |
| 2006 Variable Payment | Section 5.06(a) |
| Acquisition | Section 1.01 |
| affiliate | Section 11.05(b) |
| Agreement | Preamble |
| Allocation | Section 9.01(a)(ii) |
| Ancillary Agreements | Section 3.02 |
| Applicable Law | Section 3.03 |
| Aqua Net Brand | Recitals |
| Aqua Net Mexico | Section 5.07 |
| Assumed Liabilities | Section 1.04(a) |
| Base Purchase Price | Section 1.01 |
| Brands | Recitals |
| Business | Section 11.05(b) |
| Business Contracts | Section 3.07(b) |
| business day | Section 11.05(b) |
| Businesses | Section 11.05(b) |
| Businesses Material Adverse Effect | Section 11.05(b) |
| Claims | Section 1.02(a)(vi) |
| Closing | Section 2.01 |
| Closing Date | Section 2.01 |
| Code | Section 3.08(a) |
| Confidentiality Agreement | Section 5.03 |
| Consent | Section 3.03 |
| Contracts | Section 1.02(a)(v) |
| DOJ | Section 5.04(b) |
| $ | Section 11.05(b) |
| Environmental Laws | Section 3.11(b) |
| Excluded Assets | Section 1.02(b) |
| Excluded Patents and Technology License | Section 1.05 |
| Financial Statements | Section 3.04(b) |
| Financing | Section 4.05(a) |
| Finesse Brand | Recitals |
| Finesse Independent Expert | Section 5.06(f)(ii) |
| Finesse Notice of Objection | Section 5.06(f)(i) |
| Finesse Payment Statement | Section 5.06(e) |
| Finesse Payments | Section 5.06(a) |
| Finesse U.S. Based Sales | Section 5.06(a) |

[[NYCORP:2539469v25]]

|                                                            | Location of      |
| Defined Term                                               | Definition       |
|------------------------------------------------------------|------------------|
| FTC                                                        | Section 5.04(b)  |
| GAAP                                                       | Section 3.04(b)  |
| Governmental Entity                                        | Section 3.03     |
| HSR Act                                                    | Section 3.03     |
| including                                                  | Section 11.05(b) |
| Indemnified Party                                          | Section 8.03(a)  |
| Indemnifying Party                                         | Section 8.03(a)  |
| Inventory                                                  | Section 5.01     |
| Judgment                                                   | Section 3.03     |
| knowledge of Seller                                        | Section 11.05(b) |
| Liens                                                      | Section 3.05(a)  |
| Losses                                                     | Section 8.01     |
| Manufacturing Agreement                                    | Section 10.03    |
| Molds                                                      | Section 1.02(a)(i) |
| Names                                                      | Section 1.02(b)(xiv) |
| Option                                                     | Section 5.07     |
| Other Transferred Intellectual Property                    | Section 1.02(a)(iii) |
| Payment Period                                             | Section 5.06(a)  |
| Permitted Liens                                            | Section 3.05(a)  |
| person                                                     | Section 11.05(b) |
| Pre-Closing Tax Period                                     | Section 3.08(a)  |
| Proceeding                                                 | Section 1.03(a)  |
| Products                                                   | Section 11.05(b) |
| Product Claims                                             | Section 1.04(a)(ii) |
| Purchase Price                                             | Section 1.01     |
| Purchaser                                                  | Preamble         |
| Purchaser Indemnitees                                      | Section 8.01     |
| Purchaser Material Adverse Effect                          | Section 4.01     |
| Purchaser Subsidiary                                       | Section 4.01     |
| Retained Liabilities                                       | Section 1.04(b)  |
| Seller                                                     | Preamble         |
| Seller Affiliates                                          | Recitals         |
| Seller Indemnitees                                         | Section 8.02     |
| Seller Insurance Policies                                  | Section 5.01(b)  |
| Seller's Product Liabilities                               | Section 1.04(a)(ii) |
| Statement of Assets                                        | Section 3.04(a)  |
| subsidiary                                                 | Section 11.05(b) |
| Tax                                                        | Section 3.08(a)  |
| Taxes                                                      | Section 3.08(a)  |
| Taxing Authority                                           | Section 3.08(a)  |
| Tax Return                                                 | Section 3.08(a)  |

[[NYCORP:2539469v25]]

Location of

**Defined Term** | Definition
---|---
Technology | Section 1.02(a)(iv)
Third Party Claim | Section 8.03(a)
Transfer Taxes | Section 3.08(a)
Transferred Assets | Section 1.02(a)
Transferred Contracts | Section 1.02(a)(v)
Transferred Intellectual Property | Section 1.02(a)(iii)
Transferred Technology | Section 1.02(a)(iv)
Transferred Trademarks | Section 1.02(a)(ii)
Transitional Services Agreement | Section 10.03
Unaudited Financial Statements | Section 3.04(a)

[[NYCORP:2539469v25]]

ASSET PURCHASE AGREEMENT dated as of March 24, 2006 (this "Agreement"), between CONOPCO, INC., a New York corporation ("Seller"), and LORNAMEAD BRANDS, INC., a Delaware corporation ("Purchaser").

WHEREAS Seller, directly or indirectly through certain of its affiliates (collectively, the "Seller Affiliates"), manufactures, markets, distributes and sells the Finesse brand of hair care products (the "Finesse Brand") and the Aqua Net brand of hair styling products (the "Aqua Net Brand", and together with the Finesse Brand, the "Brands"). Seller wishes to sell to Purchaser, and Purchaser wishes to purchase from Seller, the Transferred Assets (as defined in Section 1.02(a)) of the Businesses (as defined in Section 11.05(b)), upon the terms and subject to the conditions of this Agreement. In addition, Purchaser has agreed to assume from Seller and the Seller Affiliates the Assumed Liabilities (as defined in Section 1.04(a)), upon the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, the parties hereby agree as follows:

ARTICLE I

Purchase and Sale of Transferred Assets

SECTION 1.01. Purchase and Sale. Upon the terms and subject to the conditions of this Agreement, at the Closing (as defined in Section 2.01) Seller agrees to, and agrees to cause the Seller Affiliates to, sell, transfer, assign and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller and the Seller Affiliates, all of Seller's and the Seller Affiliates' right, title and interest in, to and under the Transferred Assets as of the Closing for (i) an aggregate purchase price of $40,000,000 (the "Base Purchase Price"), payable as set forth in Section 2.02(b), plus the additional payments payable as set forth in Section 5.06 (such aggregate purchase price, the "Purchase Price") and (ii) the assumption of the Assumed Liabilities. The purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities are collectively referred to in this Agreement as the "Acquisition".

SECTION 1.02. Transferred Assets and Excluded Assets. (a) The term "Transferred Assets" means all of Seller's and the Seller Affiliates' right, title and interest in, to and under the following assets as they exist at the time of Closing:

(i) all assets listed on Schedule 1.02(a)(i) (such assets, the "Molds");

(ii) all trademarks, trademark registrations and trademark applications set forth in Schedule 1.02(a)(ii), together with the goodwill associated exclusively therewith (collectively, the "Transferred Trademarks");

(iii) all trade names and domain names set forth in Schedule 1.02(a)(iii) and all copyrights owned by Seller or any Seller Affiliate that are used or held for use exclusively in the operation or conduct of the Businesses (collectively, the "Other Transferred

Intellectual Property" and, together with the Transferred Trademarks, the "Transferred Intellectual Property");

(iv) all trade secrets, proprietary inventions, know-how, formulae, processes, procedures, research records, records of inventions and test information ("Technology") owned by Seller or any Seller Affiliate that are used or held for use exclusively in the operation or conduct of the Businesses (the "Transferred Technology");

(v) all written contracts, leases, subleases, licenses, indentures, agreements, commitments and all other legally binding instruments ("Contracts") set forth in Schedule 3.07, and all other Contracts to which Seller or any Seller Affiliate is a party or by which Seller or any Seller Affiliate is bound that are used or held for use exclusively in the operation or conduct of the Businesses (the "Transferred Contracts");

(vi) all Claims (as defined below) of Seller or any Seller Affiliate to the extent relating to any other Transferred Asset or any Assumed Liability, other than (A) any such items arising under insurance policies and (B) all Seller's or any Seller Affiliate's rights, rights to assert claims, demands, actions, suits and causes of action, whether class, individual or otherwise in nature, in law or in equity (collectively, "Claims") including any Claim for damages, injunctive relief, declaratory relief or other relief under the antitrust laws of any foreign country or the United States or any State thereof, unfair competition, unfair practices, price discrimination, unitary pricing, consumer protection, fraud prevention or trade practice laws (in any such case, domestic or foreign), that Seller or any Seller Affiliate, in any capacity, ever had, now have or may or shall have in the future, whether known or unknown, relating in any way to (x) the Businesses' purchase or procurement of any good, service or product or (y) Seller's or any Seller Affiliate's purchase or procurement of any good, service or product for, or on behalf of, the Businesses, in either case, at any time up until the Closing, along with any and all recoveries by settlement, judgment or otherwise in connection with any such Claims;

(vii) all books of account, general, financial and accounting records, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, advertising materials, manuals and customer and supplier correspondence owned by Seller or any Seller Affiliate that are used or held for use exclusively in, or that arise exclusively out of, the operation or conduct of the Businesses, except to the extent relating to the Excluded Assets (as defined in Section 1.02(b)) or the Retained Liabilities (as defined in Section 1.04(b)) and except to the extent not reasonably separable from documents that do not relate exclusively to the Businesses; and

(viii) all pre-paid expenses that are used or held for use exclusively in, or that arise exclusively out of, the operation or conduct of the Businesses.

(b) Notwithstanding anything to the contrary contained in this Agreement, the Transferred Assets shall not include any assets or rights other than the assets specifically listed or described in Section 1.02(a) and shall expressly exclude the following assets (collectively, the "Excluded Assets"), which shall not be sold, transferred, assigned or delivered to Purchaser:

(i) all assets listed in Schedule 1.02(b)(i);

(ii) all cash, cash equivalents or securities of Seller or any Seller Affiliate;

(iii) all accounts, notes receivable and similar rights to receive payments of Seller or any Seller Affiliate on the Closing Date arising out of the operation or conduct of the Businesses;

(iv) all Claims of Seller or any Seller Affiliate relating to any other Excluded Asset or any Retained Liability, including (A) any such items arising under insurance policies and (B) all Claims that Seller or any Seller Affiliate, in any capacity, ever had, now have or may or shall have in the future, whether known or unknown, relating in any way to (x) the Businesses' purchase or procurement of any good, service or product or (y) Seller's or any Seller Affiliate's purchase or procurement of any good, service or product for, or on behalf of, the Businesses, in either case, at any time up until the Closing, along with any and all recoveries by settlement, judgment or otherwise in connection with any such Claims;

(v) any shares of capital stock of any affiliate of Seller or any Seller Affiliate;

(vi) all tangible personal property and interests therein, including all machinery, equipment, furniture, furnishings, parts, spare parts, molds and vehicles, owned by Seller or any Seller Affiliate, that is not specifically listed or described in Section 1.02(a);

(vii) all patents (including all reissues, divisions, continuations and extensions thereof), patent applications and patent rights held by the Seller or any Seller Affiliate ;

(viii) all permits, licenses, franchises, approvals or authorizations from any Governmental Entity (as defined in Section 3.03) issued to Seller or any Seller Affiliate;

(ix) any assets relating to any employee benefit plan in which any employees of Seller, any Seller Affiliate or any of their respective affiliates participate;

(x) any refunds or credits, claims for refunds or credits or rights to receive refunds or credits from any Taxing Authority (as defined in Section 3.08(a)) with respect to Taxes (as defined in Section 3.08(a)) paid or to be paid by Seller, any Seller Affiliate or any of their respective affiliates relating to any Pre-Closing Tax Period (as defined in Section 3.08(a));

(xi) any records (including accounting records) related to Taxes paid or payable by Seller, any Seller Affiliate or any of their respective affiliates and all financial and Tax records relating to the Businesses that form part of Seller's, any Seller Affiliate's or any of their respective affiliates' general ledger;

(xii) all records prepared in connection with the sale of the Businesses, including bids received from third persons and analyses relating to the Businesses;

(xiii) all rights of Seller or any Seller Affiliate under this Agreement and any other agreements, certificates and instruments relating to the sale of the Businesses (or any portion thereof) or otherwise delivered in connection with this Agreement;

(xiv) the names and marks "Unilever", "CONOPCO", "Unilever Home & Personal Care", "Helene Curtis", "Chesebrough-Pond's", "Lever Brothers", "Lever Ponds" and the name of any Seller Affiliate (in any style or design), and any name or mark derived from, similar to or including any of the foregoing, and any other logos or trademarks of Seller or its affiliates not included in Schedules 1.02(a)(ii) or 1.02(a)(iii) (collectively, the "Names");

(xv) all real property, leaseholds and other interests in real property of Seller or any Seller Affiliate; and

(xvi) all division or corporate-level services of the type currently provided to the Businesses by Seller, any Seller Affiliate or any of their respective affiliates.

SECTION 1.03. Consents to Certain Assignments. (a) Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign, directly or indirectly, any asset or any claim or right or any benefit arising under or resulting from such asset if an attempted direct or indirect assignment thereof, without the consent of a third party, would constitute a breach, default, violation or other contravention of the rights of such third party, would be ineffective with respect to any party to an agreement concerning such asset, claim or right, or would in any way adversely affect the rights of Seller or any Seller Affiliate or, upon transfer, Purchaser under such asset, claim or right. If any transfer or assignment by Seller or any Seller Affiliate to Purchaser, or any direct or indirect acquisition or assumption by Purchaser of, any interest in, or liability, obligation or commitment under, any asset, claim or right requires the consent of a third party, then such transfer or assignment or assumption shall be made subject to such consent being obtained. Purchaser agrees that neither Seller nor any Seller Affiliate shall have any liability whatsoever to Purchaser arising out of or relating to the failure to obtain any such consent that may be required in connection with the transactions contemplated by this Agreement or because of any circumstances resulting therefrom. Purchaser further agrees that no representation, warranty or covenant of Seller in this Agreement shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of (i) the failure to obtain any such consent, (ii) any circumstances resulting therefrom or (iii) any suit, action or proceeding (a "Proceeding") or investigation commenced or threatened by or on behalf of any person arising out of or relating to the failure to obtain any such consent or any circumstances resulting therefrom.

(b) If any such consent is not obtained prior to the Closing, the Closing shall nonetheless take place on the terms set forth in this Agreement and, thereafter, Purchaser shall use its reasonable best efforts to secure such consent as promptly as practicable after the Closing and Seller shall provide or cause to be provided all commercially reasonable assistance to Purchaser (not including the payment of any consideration) reasonably requested by Purchaser to secure such consent after the Closing or cooperate with Purchaser (at Purchaser's expense) in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or

5

violating any Applicable Law (as defined in Section 3.03)) the economic claims, rights and benefits (net of the amount of any related Tax costs imposed on Seller, any Seller Affiliate or any of their respective affiliates) under the asset, claim or right with respect to which the consent has not been obtained in accordance with this Agreement and (ii) Purchaser shall assume any related economic burden (including the amount of any related Tax costs imposed on Seller, any Seller Affiliate or any of their respective affiliates) with respect to the asset, claim or right with respect to which the consent has not been obtained in accordance with this Agreement.

SECTION 1.04. Assumption of Liabilities. (a) Upon the terms and subject to the conditions of this Agreement, Purchaser shall assume, effective as of the Closing, and shall pay, perform and discharge when due, and indemnify, defend and hold harmless from and after the Closing, Seller, each Seller Affiliate and each of their respective affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives from and against all obligations, liabilities and commitments of any nature, whether known or unknown, express or implied, primary or secondary, direct or indirect, liquidated, absolute, accrued, contingent or otherwise and whether due or to become due, arising out of, relating to or otherwise in respect of the Transferred Assets, the Businesses or the operation or conduct of the Businesses, including (collectively, the "Assumed Liabilities"):

(i) all obligations, liabilities and commitments of Seller or any Seller Affiliate under the Transferred Contracts to the extent such obligations, liabilities and commitments relate to the period from and after the Closing;

(ii) all obligations, liabilities and commitments for refunds, adjustments, allowances, repairs, exchanges, returns and warranty or similar claims (including all Proceedings relating to any such obligations, liabilities or commitments) in respect of any and all products sold by the Businesses at any time, whether before or after the Closing (collectively, "Product Claims"), provided, however, that obligations, liabilities, and commitments for any product liability or personal injury claims to the extent arising out of or resulting from Product Claims arising from defective products sold by the Businesses prior to the Closing shall in no event exceed $100,000 in the aggregate (such obligations, liabilities and commitments for any product liability or personal injury claims in excess of $100,000 in the aggregate, the "Seller's Product Liabilities");

(iii) all Taxes arising out of, relating to or in respect of the Businesses for all taxable periods other than the Pre-Closing Tax Periods;

(iv) all obligations, liabilities and commitments (including under Environmental Laws) accruing, arising out of or relating to the operation or conduct of the Businesses or the use or ownership of the Transferred Assets on and after the Closing Date, including obligations, liabilities and commitments in respect of any and all products sold by the Businesses on and after the Closing Date (including in respect of product liability claims); and

(v) all obligations, liabilities and commitments (A) arising under or in respect of (x) the advertising commitments set forth in Schedule 1.04(a)(v) or (y) any advertising commitments entered into or assumed by Seller or any Seller Affiliate on or after the date of

6

this Agreement in accordance with the terms of this Agreement and (B) for trade promotions and consumer promotions (x) as set forth in Schedule 1.04(a)(v) or (y) planned or committed on or after the date of this Agreement in accordance with the terms of this Agreement, in each case in respect of any and all Products of the Businesses sold by Purchaser on and after the Closing Date.

(b)  Notwithstanding any other provision of this Agreement, Purchaser shall not assume any Retained Liability, each of which shall be retained and paid, performed and discharged when due by Seller and the Seller Affiliates.  The term "Retained Liabilities" means:

(i) all obligations, liabilities and commitments of Seller or any Seller Affiliate not listed in Section 1.04(a);

(ii) all accounts payable of Seller or any Seller Affiliate on the Closing Date arising out of the operation or conduct of the Businesses before the Closing Date;

(iii) all Taxes arising out of, relating to or in respect of the Businesses imposed upon Seller or any Seller Affiliate or any present or former affiliate of Seller or any Seller Affiliate for any Pre-Closing Tax Period;

(iv) all obligations, liabilities and commitments of Seller or any Seller Affiliate to the extent relating to or arising out of the Excluded Assets;

(v) all obligations, liabilities and commitments of Seller or any Seller Affiliate to the extent solely arising from the employment of any employee by the Seller or any Seller Affiliate;

(vi) all obligations, liabilities and commitments of Seller or any Seller Affiliate to the extent relating to or arising out of any suit, action or Proceeding (other than any Proceeding relating to Product Claims) pending before the Closing Date;

(vii)  all obligations, liabilities and commitments under Environmental Laws to the extent arising out of or relating to the operation or conduct of the Businesses or the use or ownership of the Transferred Assets in each case before the Closing Date;  and

(viii) the Seller's Product Liabilities and all obligations, liabilities and commitments related to the Squicciarini v. Unilever Home and Personal Care matter.

(c)  Purchaser agrees to reimburse Seller and any Seller Affiliate , dollar for dollar, in the event that any of Seller's or such Seller Affiliate's customers offset the cost of any Products returned by such customer which are the responsibility of Purchaser pursuant to Section 1.04(a)(ii) against accounts payable by such customer to Seller or such Seller Affiliate. Seller agrees to, and to cause the Seller Affiliates to, provide notice to Purchaser of any such offset for which Seller or such Seller Affiliate is entitled to be reimbursed by Purchaser pursuant to this Section 1.04(c).  Purchaser shall pay Seller or such Seller Affiliate promptly following receipt of notice (together with supporting documentation) of any such offset by a customer.

SECTION 1.05.  Excluded Patents and Technology License.  At the Closing, Seller will execute and deliver a royalty-free, non-exclusive license (in the form attached hereto as Exhibit A) to Purchaser with respect to any patent or Technology owned by Seller or any Seller Affiliate that is used in connection with the operation or conduct of the Businesses on the Closing Date and that is not included in the Transferred Technology (the "Excluded Patents and Technology License").

SECTION 1.06.  Geographic Limitation.  (a)  Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges and agrees that it shall not, directly or indirectly, market, distribute or sell any products under the Aqua Net Brand in Mexico (it being understood that (x) if Seller notifies Purchaser in writing, or if Purchaser otherwise has knowledge, that a customer or other third person to which Purchaser has sold products is importing any products under the Aqua Net Brand into, or is marketing, distributing or selling any products under the Aqua Net Brand in, Mexico, Purchaser shall promptly notify in writing such customer or third person (with a copy to Seller) of the existence of this Agreement and the prohibition on such activities in Mexico and (y) if requested by Seller in writing following its receipt of a copy of the correspondence referred to in the immediately preceding clause (x), Seller and Purchaser shall agree to confer in good faith to develop a mutually agreed resolution of any issues arising from a situation described in the immediately preceding clause (x)). Purchaser further agrees that it will not register, apply to register or otherwise use any trademark relating to the Aqua Net Brand in Mexico.

(b)  Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges and agrees that Seller, the Seller Affiliates and their respective affiliates may continue to manufacture, market, distribute and sell, or have manufactured, marketed, distributed or sold on their behalf, products under the Aqua Net Brand in Mexico (it being understood that (x) if Purchaser notifies Seller in writing, or if Seller otherwise has knowledge, that a customer or other third person to which Seller has sold products is exporting any products under the Aqua Net Brand out of, or is marketing, distributing or selling any products under the Aqua Net Brand outside of, Mexico, Seller shall promptly notify in writing such customer or third person (with a copy to Purchaser) of the existence of this Agreement and the prohibition on such activities outside of Mexico and (y) if requested by Purchaser in writing following its receipt of a copy of the correspondence referred to in the immediately preceding clause (x), Purchaser and Seller shall agree to confer in good faith to develop a mutually agreed resolution of any issues arising from a situation described in the immediately preceding clause (x)).  Purchaser further agrees that Seller, the Seller Affiliates and their respective affiliates may register, apply to register or otherwise use any trademark relating to the Aqua Net Brand in Mexico.

ARTICLE II

Closing and Post-Closing Purchase Price Adjustment

SECTION 2.01.  Closing.  The closing of the Acquisition (the "Closing") shall take place at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York,

New York 10019, at 10:00 a.m. on April 14, 2006, or, if on such day any condition set forth in Article VI has not been satisfied (or, to the extent permitted, waived by the party or parties entitled to the benefit thereof), as soon as practicable after all the conditions set forth in Article VI have been satisfied (or, to the extent permitted, waived by the party or parties entitled to the benefit thereof), or at such other place, time and date as may be agreed by Seller and Purchaser. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date". The Closing shall be deemed to be effective as of the close of business on the Closing Date.

SECTION 2.02.  Transactions To Be Effected at the Closing.  At the Closing:

(a)  Seller shall deliver or cause to be delivered to Purchaser (i) such appropriately executed deeds, bills of sale, assignments and other instruments of transfer relating to the Transferred Assets (other than the Transferred Intellectual Property), (ii) appropriately executed assignments of the Transferred Intellectual Property, (iii) an appropriately executed counterpart to the Excluded Patents and Technology License, (iv) an appropriately executed counterpart to the Transitional Services Agreement (as defined in Section 10.03), (v) an appropriately executed counterpart to the Manufacturing Agreement (as defined in Section 10.03), and (vi) appropriately executed letters, in form and content reasonably satisfactory to Purchaser, addressed to the makers or suppliers of fragrances used in the Products authorizing such makers and suppliers to sell and deliver such fragrances to Purchaser (it being understood that such deeds, bills of sale, assignments and other instruments of transfer shall not require Seller to make any additional representations, warranties or covenants, expressed or implied, not contained in this Agreement); and

(b)  Purchaser shall deliver to Seller and the Seller Affiliates (i) payment, by wire transfer of immediately available funds to one or more accounts designated in writing by Seller (such designation to be made at least one business day prior to the Closing Date), in an amount equal to the Base Purchase Price, (ii) appropriately executed counterparts to such deeds, bills of sale, assignments and other instruments of transfer referred to in Section 2.02(a), (iii) appropriately executed assumption agreements and other instruments of assumption providing for the assumption of the Assumed Liabilities, (iv) an appropriately executed counterpart to the Excluded Patents and Technology License, (v) an appropriately executed counterpart to the Transitional Services Agreement and (vi) an appropriately executed counterpart to the Manufacturing Agreement.


ARTICLE III

Representations and Warranties of Seller

Seller hereby represents and warrants to Purchaser as follows:

SECTION 3.01.  Organization and Standing.  Seller is validly existing and in good standing under the laws of the State of New York.  Each Seller Affiliate is validly existing under the laws of its jurisdiction of its organization.  Each of Seller and each Seller Affiliate has full corporate power and authority to enable it to own, lease or otherwise hold the Transferred

Assets owned, leased or otherwise held by it and to conduct the Businesses as presently conducted by it.

SECTION 3.02. <u>Authority; Execution and Delivery; Enforceability.</u> Seller has full corporate power and authority to execute this Agreement and the other agreements and instruments to be executed and delivered in connection with this Agreement (the "<u>Ancillary Agreements</u>") to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements. Each Seller Affiliate has full corporate power and authority to execute the Ancillary Agreements to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it by such Ancillary Agreements. Seller has taken all corporate action required by its Certificate of Incorporation and By–laws to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is, or is specified to be, a party and to authorize the consummation of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements. Each Seller Affiliate has taken all corporate action required by its comparable organizational documents to authorize the execution and delivery of the Ancillary Agreements to which it is, or is specified to be, a party and to authorize the consummation of the transactions contemplated to be consummated by it by such Ancillary Agreements. Seller has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and this Agreement constitutes, and each Ancillary Agreement to which it is, or is specified to be, a party will after the Closing constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles. Each Seller Affiliate prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and each Ancillary Agreement to which it is, or is specified to be, a party will after the Closing constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles.

SECTION 3.03. <u>No Conflicts or Violations; No Consents or Approvals Required.</u> The execution and delivery by Seller of this Agreement does not, the execution and delivery by Seller and each Seller Affiliate of each Ancillary Agreement to which it is, or is specified to be, a party will not, and the consummation by Seller of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements and by each Seller Affiliate of the transactions contemplated to be consummated by it by such Ancillary Agreements, will not conflict with, or result in any breach of or constitute a default under, or result in the creation of any Lien (as defined in Section 3.05) (other than Permitted Liens (as defined in Section 3.05) or Liens caused by Purchaser) upon any of the Transferred Assets under, any provision of (i) in the case of Seller, its Certificate of Incorporation or By-laws and, in the case of each Seller Affiliate, its comparable organizational documents, (ii) except as set forth in Schedule 3.03, any Transferred Contract or (iii) any judgment, order or decree ("<u>Judgment</u>") or statute, law, ordinance, rule or regulation ("<u>Applicable Law</u>") applicable to Seller or any Seller Affiliate or any of the Transferred Assets, other than, in the case of clauses (i), (ii) and (iii) above, any such items that would not reasonably be expected to have a Businesses Material

Adverse Effect. No consent, approval or authorization ("Consent") of, or registration, declaration or filing with, any Federal, state, local or foreign court of competent jurisdiction, governmental agency, authority, instrumentality or regulatory body (a "Governmental Entity"), is required to be obtained or made by or with respect to Seller or any Seller Affiliate in connection with the execution, delivery and performance of this Agreement or the consummation of the Acquisition, other than (A) compliance with and any filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (B) compliance with and filings and notifications under applicable Environmental Laws (as defined in Section 3.11(b)), (C) those that may be required solely by reason of Purchaser's (as opposed to any other third party's) participation in the Acquisition and the other transactions contemplated by this Agreement and by the Ancillary Agreements and (D) those the failure of which to obtain or make would not reasonably be expected to have a Businesses Material Adverse Effect.

SECTION 3.04. Financial Statements. (a) Schedule 3.04(a) sets forth (i) the unaudited special-purpose Statement of Net Assets to be Sold at December 31, 2005 of the Businesses (the "Statement of Assets") and (ii) the unaudited special-purpose Statement of Direct Revenues and Expenses for the year ended December 31, 2005 of the Businesses (such financial statements, the "Unaudited Financial Statements"). The Unaudited Financial Statements present fairly (subject to normal recurring year-end adjustments and the absence of notes), in all material respects, the assets of the Businesses as of December 31, 2005 and the related direct revenues and expenses of their operations, for the year ended December 31, 2005 in conformity with the internal accounting policies and practices of Seller and the Seller Affiliates.

(b) Schedule 3.04(b) sets forth (i) the unaudited special-purpose Statement of Net Assets to be Sold at December 31, 2004 of the Businesses and (ii) the unaudited special-purpose Statement of Direct Revenues and Expenses for the years ended December 31, 2004 and December 31, 2003 of the Businesses, together with the notes to such financial statements (such financial statements, together with the notes to such financial statements, the "Financial Statements"). The Financial Statements present fairly, in all material respects, the assets of the Businesses as of December 31, 2004 and the related direct revenues and expenses of their operations, for each of the years ended December 31, 2004 and December 31, 2003 in conformity with United States generally accepted accounting principles ("GAAP").

SECTION 3.05. Good and Valid Title. (a) Seller or one Seller Affiliate has, or as of the close of business on the Closing Date will have, good and valid title to all material Transferred Assets, other than those set forth in Schedule 3.05 and those sold or otherwise disposed of not in violation of this Agreement, in each case free and clear of all mortgages, liens, charges, claims, pledges or other encumbrances of any kind (collectively, "Liens"), except for (i) such Liens as are set forth in Schedule 3.05, (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business, (iii) Liens arising under original purchase price conditional sales Contracts or equipment leases with third parties entered into in the ordinary course of business, (iv) Liens for Taxes and other governmental charges that are not due and payable or that may be paid without penalty and (v) other imperfections of title, licenses or encumbrances, if any, which do not materially impair the continued use and operation of the assets to which they relate in the conduct of the

Businesses as presently conducted (the Liens described in clauses (i) through (v) above are referred to collectively as "Permitted Liens").

(b)  This Section 3.05 does not relate to Intellectual Property, such items being the subject of Section 3.06.

SECTION 3.06.  Intellectual Property.  (a)  With respect to the Transferred Trademarks, Schedule 1.02(a)(ii) sets forth a list of the trademarks, trademark registration and application numbers and the jurisdictions where such Transferred Trademarks are registered or where applications have been filed.  Except as set forth in Schedule 3.06, Seller or a Seller Affiliate is the owner of the registrations and applications set forth in Schedule 1.02(a)(ii) for the Transferred Trademarks and the other Transferred Intellectual Property and no license fees in respect of any Transferred Intellectual Property are paid to non-affiliated third parties for the use by Seller or the applicable Seller Affiliate of the Transferred Intellectual Property in those jurisdictions listed in Schedule 1.02(a)(ii).  Purchaser acknowledges and agrees that Seller does not make any representations or warranties relating to the Transferred Intellectual Property for any Brand in jurisdictions other than those set forth in Schedule 1.02(a)(ii) with respect to such Brand.

(b)  Except as set forth in Schedule 3.06, or as provided in any Contract listed in Schedule 3.06, neither Seller nor any Seller Affiliate has granted any license of any kind relating to any material Transferred Technology, except nonexclusive licenses to (i) end-users or (ii) co-packers in connection with co-packing arrangements, in each case in the ordinary course of business.  Neither Seller nor any Seller Affiliate is bound by or a party to any material option, license or similar Contract relating to any intellectual property of any other person for the use of such intellectual property in the conduct of the Businesses, except (i) as set forth in Schedule 3.06, (ii) for nonexclusive licenses to end-users of machinery and equipment in the ordinary course of business and (iii) for so–called "shrink-wrap" and other non-customized license agreements relating to computer software licensed to Seller or a Seller Affiliate in the ordinary course of business.  Except as set forth in Schedule 3.06, no material claims are pending or, to the knowledge of Seller, threatened, as of the date of this Agreement against Seller or any Seller Affiliate by any person claiming that use of the Transferred Technology as presently used infringes the intellectual property rights of any such person.

(c)  Except as set forth in Schedule 3.06 and other than (i) rights in connection with co–packing arrangements and (ii) cross–promotional rights entered into in the ordinary course of business, neither Seller nor any Seller Affiliate is a party to or bound by any material license, sublicense, option or other agreement relating in whole or in part to the Transferred Technology.

SECTION 3.07.  Contracts.  (a)  Except as set forth in Schedule 3.07 and except for Contracts relating to Excluded Assets, neither Seller nor any Seller Affiliate is a party to or bound by any Contract that is used and held for use exclusively in, or that arises exclusively out of, the operation or conduct of the Businesses (other than (x) any Transferred Contract that is not material in relation to the Businesses, (y) this Agreement and the Ancillary Agreements and (z) Transferred Contracts entered into after the date of this Agreement in the ordinary course of business) and that is:

12

(i) a covenant not to compete (other than (A) pursuant to any radius restriction contained in any lease, reciprocal easement or development, construction, operating or similar agreement and (B) any such covenant contained in any agreement with a broker) that materially limits the conduct of the Businesses as currently conducted;

(ii) (A) a continuing Contract for the future purchase of materials, supplies, equipment, raw materials, packaging or commodities (other than (x) purchase Contracts and orders for raw materials, supplies, packaging materials and other inventories in the ordinary course of business and (y) purchase orders for the co-packing or manufacturing of Products of the Businesses in the ordinary course of business), (B) a management, service, consulting or other similar Contract (other than Contracts for services in the ordinary course of business, including transportation and warehousing Contracts) or (C) an advertising Contract (other than Contracts relating to obligations, liabilities and commitments described in Section 1.04(a)(v)), in any such case of clauses (A), (B) or (C) which has an aggregate future liability to any person (other than Seller or a Seller Affiliate ) in excess of $150,000 and is not terminable by Seller or a Seller Affiliate by notice of not more than 90 days for a cost of less than $75,000;

(iii) a lease or similar Contract with any person (other than Seller or a Seller Affiliate ) under which Seller or a Seller Affiliate is lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by any person which lease or similar Contract has an aggregate future liability in excess of $150,000 and is not terminable by Seller or a Seller Affiliate by notice of not more than 90 days for a cost of less than $75,000; or

(iv) any other Contract that has an aggregate future liability to any person (other than Seller or a Seller Affiliate ) in excess of $150,000 and is not terminable by Seller or a Seller Affiliate by notice of not more than 90 days for a cost of less than $75,000 (other than (A) purchase orders, sales orders and Contracts with brokers, (B) leases of real property and (C) employment agreements and other Contracts relating to employee matters).

(b)  Except as set forth in Schedule 3.07, all Transferred Contracts required to be listed in Schedule 3.07 (such Contracts, the "Business Contracts") are valid, binding and in full force and effect and are enforceable by Seller or the applicable Seller Affiliate in accordance with their terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles, except for such failures to be valid, binding, in full force and effect or enforceable that would not reasonably be expected to have a Businesses Material Adverse Effect.  Except as set forth in Schedule 3.07, Seller or the applicable Seller Affiliate has performed all material obligations required to be performed by it to date under the Business Contracts, and it is not in breach or default thereunder and, to the knowledge of Seller, no other party to any Business Contract, as of the date of this Agreement, is in breach or default thereunder, except to the extent that such breach or default would not reasonably be expected to have a Businesses Material Adverse Effect.

SECTION 3.08. Taxes.  (a)  For purposes of this Agreement:

"Code" means the Internal Revenue Code of 1986, as amended.

"Pre-Closing Tax Period" means all taxable periods ending on or before the Closing Date and the portion ending on the Closing Date of any taxable period that includes but does not end on the Closing Date.

"Tax" or "Taxes" means all forms of taxation imposed by any Federal, state, provincial, local, foreign or other Taxing Authority, including income, franchise, property, sales, use, excise, employment, unemployment, payroll, social security, estimated, value added, ad valorem, transfer, recapture, withholding, health and other taxes of any kind, including any interest, penalties and additions thereto.

"Taxing Authority" means any Federal, state, provincial, local or foreign government, any subdivision, agency, commission or authority thereof or any quasi-governmental body exercising Tax regulatory authority.

"Tax Return" means any report, return, document, declaration or other information or filing required to be supplied to any Taxing Authority with respect to Taxes, including any amendment made with respect thereto.

"Transfer Taxes" means all sales (including bulk sales), use, transfer, recording, ad valorem, privilege, documentary, gross receipts, registration, conveyance, excise, license, stamp or similar Taxes and fees arising out of, in connection with or attributable to the transactions effectuated pursuant to this Agreement.

(b)  Except as set forth in Schedule 3.08(b), (i) all material Tax Returns required to be filed by the Code or by applicable state, provincial, local or foreign Tax laws to the extent such Tax Returns relate to the Transferred Assets for Pre-Closing Tax Periods have been timely filed or will be timely filed, (ii) all material Taxes due on such Tax Returns with respect to the Transferred Assets have been paid in full or will be timely paid in full by the due date thereof, (iii) no material claims are being asserted in writing with respect to any Taxes with respect to the Transferred Assets and (iv) no material Tax liens with respect to the Transferred Assets have been filed.

(c)  Seller is not a "foreign person" within the meaning of Section 1445 of the Code. Certain of the Seller Affiliates are foreign persons within the meaning of Section 1445 of the Code, but none of the assets to be transferred by such Seller Affiliates pursuant to this Agreement constitutes a "United States real property interest" within the meaning of Section 897(c)(l) of the Code.

SECTION 3.09.  Proceedings.  Schedule 3.09 sets forth a list as of the date of this Agreement of each pending Proceeding against Seller or any Seller Affiliate (as to which a complaint has been served on Seller or any Seller Affiliate), which relates to the Businesses and pursuant to which a party seeks (a) more than $150,000 from Seller or any Seller Affiliate or (b) injunctive relief prohibiting the consummation of the Acquisition. Except as set forth in Schedule 3.09, neither Seller nor any Seller Affiliate is a party or subject to or in default under any unsatisfied Judgment applicable to the conduct of the Businesses, other than for such Judgments that would not reasonably be expected to have a Businesses Material Adverse Effect.

14

This Section 3.09 does not relate to Taxes, environmental matters or Intellectual Property matters, such items being the subject of Sections 3.08, 3.11(b) and 3.06, respectively.

SECTION 3.10.  <u>Absence of Changes or Events.</u>  Except as set forth in Schedule 3.10 or Schedule 5.01, since the date of the Statement of Assets (i) there has not been a Businesses Material Adverse Effect and (ii) Seller has operated the Businesses, with regard to the return of Products by customers of the Products, in the ordinary course, consistent with past practice.  Purchaser acknowledges that there may be disruption to the operation of the Businesses as a result of the announcement by Seller of its intention to sell the Businesses (and there may be further disruption to the Businesses as a result of the execution of this Agreement (including the identity of Purchaser) and the consummation of the transactions contemplated by this Agreement), and Purchaser agrees that any such disruptions do not and shall not constitute a breach of this Section 3.10.

SECTION 3.11.  <u>Compliance with Applicable Laws.</u>  (a)  Except as set forth in Schedule 3.11 and except for any matter that would not reasonably be expected to have a Businesses Material Adverse Effect, to the knowledge of Seller, the Businesses are in compliance with all Applicable Laws.  This Section 3.11(a) does not relate to matters with respect to Taxes, which are the subject of Section 3.08, or to environmental matters, which are the subject of Section 3.11(b).

(b)  Except as set forth in Schedule 3.11, and except for any matter that would not reasonably be expected to have a Businesses Material Adverse Effect, to the knowledge of Seller (i) Seller and the Seller Affiliates conduct the Businesses in substantial compliance with all Applicable Laws relating to protection of the environment ("<u>Environmental Laws</u>") and (ii) there are no pending Proceedings against Seller or any Seller Affiliate alleging that the Businesses are in violation of any Environmental Law.


ARTICLE IV

<u>Representations and Warranties of Purchaser</u>

Purchaser hereby represents and warrants to Seller as follows:

SECTION 4.01.  <u>Organization and Standing.</u>  Purchaser, and each subsidiary of Purchaser that is specified to be a party to any Ancillary Agreement (each, a "<u>Purchaser Subsidiary</u>"), is validly existing and in good standing under the laws of the jurisdiction in which it is organized and has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Acquisition (a "<u>Purchaser Material Adverse Effect</u>").

SECTION 4.02.  <u>Authority; Execution and Delivery; Enforceability.</u>  Purchaser has full corporate power and authority to execute this Agreement and the Ancillary Agreements

to which it is, or is specified to be, a party and to consummate the Acquisition and the other transactions contemplated hereby and thereby. Each Purchaser Subsidiary has full corporate power and authority to execute the Ancillary Agreements to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it by such Ancillary Agreements. Purchaser has taken all corporate action required by its organizational documents to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is, or is specified to be, a party and to authorize the consummation of the Acquisition and the other transactions contemplated hereby and thereby. Each Purchaser Subsidiary has taken all corporate action required by its organizational documents to authorize the execution and delivery of the Ancillary Agreements to which it is, or is specified to be, a party and to authorize the consummation of the transactions contemplated to be consummated by it by such Ancillary Agreements. Purchaser has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and this Agreement constitutes, and each Ancillary Agreement to which it is, or is specified to be, a party will after the Closing constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles. Each Purchaser Subsidiary prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and each Ancillary Agreement to which it is, or is specified to be, a party will after the Closing constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles.

SECTION 4.03.  No Conflicts or Violations; No Consents or Approvals Required.  The execution and delivery by Purchaser of this Agreement does not, the execution and delivery by Purchaser and each Purchaser Subsidiary of each Ancillary Agreement to which it is, or is specified to be, a party will not, and the consummation by the Purchaser of the Acquisition and the other transactions contemplated hereby and thereby and by each Purchaser Subsidiary of the transactions contemplated to be consummated by it by such Ancillary Agreements will not conflict with, or result in any breach of or constitute a default under, or result in the creation of any Lien upon any of the properties or assets of Purchaser or any of Purchaser's subsidiaries under, any provision of (i) the organizational documents of Purchaser or any of Purchaser's subsidiaries, (ii) any Contract to which Purchaser or any of Purchaser's subsidiaries is a party or by which any of their respective properties or assets is bound or (iii) any Judgment or Applicable Law applicable to Purchaser or any of Purchaser's subsidiaries or their respective properties or assets, other than, in the case of clauses (i), (ii) and (iii) above, any such items that would not reasonably be expected to have a Purchaser Material Adverse Effect. No Consent of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Purchaser or any of Purchaser's subsidiaries in connection with the execution, delivery and performance of this Agreement or the consummation of the Acquisition other than (A) compliance with and any filings under the HSR Act, (B) compliance with and filings and notifications under Environmental Laws, (C) those that may be required solely by reason of Seller's (as opposed to any third party's) participation in the Acquisition and the other transactions contemplated by this Agreement and by the Ancillary

16

Agreements and (D) those the failure of which to obtain or make would not reasonably be expected to have a Purchaser Material Adverse Effect.

SECTION 4.04. Proceedings. There are not any (a) outstanding Judgments against Purchaser or any of Purchaser's subsidiaries, (b) Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser or any of Purchaser's subsidiaries or (c) investigations by any Governmental Entity that are pending or threatened against Purchaser or any of Purchaser's subsidiaries that, in any such case, would reasonably be expected to have a Purchaser Material Adverse Effect.

SECTION 4.05. Availability of Funds; Solvency. (a) Purchaser has cash available or has existing borrowing facilities which together are sufficient to enable it to consummate the Acquisition and the other transactions contemplated by this Agreement and the Ancillary Agreements. Copies of any such facilities have been provided to Seller. The financing required to consummate the Acquisition and the other transactions contemplated by this Agreement and the Ancillary Agreements is referred to in this Agreement collectively as the "Financing". Purchaser does not have any reason to believe that any of the conditions to the Financing will not be satisfied or that the Financing will not be available to Purchaser on a timely basis to consummate the Acquisition and the other transactions contemplated by this Agreement and the Ancillary Agreements.

(b) As of the Closing and immediately after consummating the Acquisition and the other transactions contemplated by this Agreement and the Ancillary Agreements, Purchaser will not (i) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair salable value of its assets will be less than the amount required to pay its probable liability on its debts as they become absolute and matured), (ii) have unreasonably small capital with which to engage in its business, including the Businesses, or (iii) have incurred or plan to incur debts beyond its ability to repay such debts as they become absolute and matured.

SECTION 4.06. No Knowledge of Misrepresentations or Omissions. Purchaser does not have any knowledge that any of the representations and warranties of Seller made in this Agreement are not true and correct in all material respects. Purchaser does not have any knowledge of any material errors in, or material omissions from, any Schedule.

ARTICLE V

Covenants

SECTION 5.01. Covenants Relating to Conduct of the Businesses. (a) Except for matters (x) set forth in Schedule 5.01, (y) expressly agreed to by Purchaser or (z) otherwise contemplated by the terms of this Agreement, from the date of this Agreement to the Closing Date, Seller shall, and shall cause the Seller Affiliates to, conduct the Businesses in all material respects in the ordinary course in a manner substantially consistent with past practice and, to the extent consistent therewith, use commercially reasonable efforts to preserve the material business relationships with customers, suppliers, distributors and others with whom Seller and the Seller

Affiliates deal with in connection with the conduct of the Businesses in the ordinary course of business. Notwithstanding the foregoing, Purchaser acknowledges and agrees that relationships with Seller and certain of its affiliates providing services to the Businesses will terminate as of the Closing as contemplated in Section 10.04 and that such termination shall not constitute a breach of this Agreement. In addition, except as set forth in Schedule 5.01 or otherwise contemplated by the terms of this Agreement, Seller shall not, and shall not cause any Seller Affiliate to, do any of the following in connection with the Businesses without the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed):

(i) subject any of the Transferred Assets to any Lien of any nature whatsoever that would have been required to be set forth in Schedule 3.05 if existing on the date of this Agreement;

(ii) waive any claims or rights of material value that relate exclusively to the Businesses;

(iii) sell, lease, license or otherwise dispose of any Transferred Asset that is material to the Businesses, except raw materials, work-in-process, finished goods, supplies, packaging materials and other inventories ("Inventory"); or

(iv) agree, whether in writing or otherwise, to do any of the foregoing.

(b) Seller shall use its reasonable best efforts to keep, or to cause to be kept, all insurance policies currently maintained with respect to the Transferred Assets (the "Seller Insurance Policies"), or suitable replacements therefor, in full force and effect through the close of business on the Closing Date; it being understood that any and all Seller Insurance Policies are owned and maintained by Seller and its affiliates (and do not exclusively relate to the Businesses). Purchaser will not have any rights under the Seller Insurance Policies from and after the Closing Date.

(c) Upon the execution of this Agreement or as soon as reasonably practicable thereafter, Seller shall instruct its sales employees who handle the Products that, unless otherwise indicated by Purchaser, (i) such employees have no authority to agree with any customer of any Product to the return to Seller, any Seller Affiliate or Purchaser by such customer of any Product sold before or after the Closing Date, (ii) such employees shall not encourage the delisting of any Product by any customer and (iii) from and after the Closing Date, any customer request regarding such a return or delisting be promptly referred to Purchaser.

SECTION 5.02. Access to Information. Seller shall, and shall cause the Seller Affiliates to, afford to Purchaser and its accountants, counsel and other representatives reasonable access, upon reasonable prior notice during normal business hours during the period prior to the Closing, to personnel, properties, books, Contracts, commitments and records relating exclusively to the Businesses (other than the Excluded Assets); provided, however, that such access does not unreasonably disrupt the normal operations of Seller or any Seller Affiliate relating to the Businesses. Nothing contained in this Section 5.02 shall obligate Seller or any of its affiliates to breach any duty of confidentiality owed to any person whether such duty arises contractually, statutorily or otherwise.

SECTION 5.03. <u>Confidentiality.</u> Purchaser acknowledges that the information being provided to it in connection with the Acquisition and the consummation of the other transactions contemplated by this Agreement and the Ancillary Agreements is subject to the terms of a confidentiality agreement between Purchaser and Conopco, Inc. (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated in this Agreement by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate with respect to information relating solely to the Businesses (other than information related to the Excluded Assets and the personnel engaged in the conduct of the Businesses); provided, however, that Purchaser acknowledges that any and all other information provided to it by Seller or Seller's representatives concerning Seller and its affiliates shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

SECTION 5.04. <u>Reasonable Best Efforts.</u> (a) On the terms and subject to the conditions of this Agreement, each of Seller and Purchaser shall use its reasonable best efforts to cause the Closing to occur, including taking all reasonable actions necessary to comply promptly with all legal requirements that may be imposed on it or any of its affiliates with respect to the Closing. Each of Seller and Purchaser shall not, and shall not permit any of their respective affiliates to, take any actions that would, or that could reasonably be expected to, result in any of the conditions set forth in Article VI not being satisfied.

(b) Each of Seller and Purchaser shall as promptly as practicable, but in no event later than five business days following the execution and delivery of this Agreement, (i) file or cause to be filed with the United States Federal Trade Commission (the "<u>FTC</u>") and the United States Department of Justice (the "<u>DOJ</u>") any notification and report form required for the transactions contemplated by this Agreement and any supplemental information requested in connection therewith pursuant to the HSR Act and (ii) make such other filings as are necessary in other jurisdictions in order to comply with all Applicable Laws relating to competition and shall promptly provide any supplemental information requested by applicable Governmental Entities relating thereto. Any such filing, notification and report form and supplemental information shall be in substantial compliance with the requirements of the HSR Act or such other Applicable Law. Each of Seller and Purchaser shall furnish to the other such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such other Applicable Law. Each of Seller and Purchaser shall keep the other apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC, the DOJ and any other applicable Governmental Entity and shall comply promptly with any such inquiry or request and shall promptly provide any supplemental information requested in connection with any filings made hereunder pursuant to the HSR Act or such other Applicable Law. Any such supplemental information shall be in substantial compliance with the requirements of the HSR Act or such other Applicable Law. Each party shall use its reasonable best efforts to obtain any clearance required under the HSR Act or such other Applicable Law for the consummation of the transactions contemplated by this Agreement.

SECTION 5.05. <u>Brokers or Finders.</u> Each of Purchaser and Seller represents, as to itself and its affiliates, that no agent, broker, investment banker or other firm or person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in

connection with any of the transactions contemplated by this Agreement, except, as to Seller, Deutsche Bank Securities Inc., whose fees and expenses will be paid by Seller.

SECTION 5.06. Additional Payments.

(a) Definitions. For the purposes of this Agreement:

"2006 Fixed Payment" means $4,250,000.

"2006 Calendar Year" means the year ended December 31, 2006.

"2006 Variable Payment" means 50% of the amount by which the Finesse U.S. Based Sales for the 2006 Calendar Year exceed $27,500,000.

"Finesse U.S. Based Sales" means the net sales of the Finesse Brand, as determined in accordance with GAAP, (i) in the United States and (ii) arising from any export from the United States to any other country.

"Finesse Payments" means, collectively, the 2006 Fixed Payment and the 2006 Variable Payment.

(b) Finesse Payment. If the Finesse U.S. Based Sales for the 2006 Calendar Year exceed $27,500,000, Purchaser shall pay to Seller the sum of (i) the 2006 Fixed Payment plus (ii) the 2006 Variable Payment.

(c) Calculation of Payments. No later than February 15, 2007, Purchaser shall prepare and deliver to Seller a written statement (the "Finesse Payment Statement") (i) setting forth the Finesse U.S. Based Sales for the 2006 Calendar Year, including a detailed analysis of how such Finesse U.S. Based Sales were derived, (ii) setting forth the Finesse Payment for the 2006 Calendar Year, including how such Finesse Payment was calculated, (iii) certified by the chief financial officer of Purchaser and (iv) certified by Purchaser's independent auditor in a written agreed upon procedures report of such firm.

(d) Objection; Resolution of Disputes.

(i) Unless Seller notifies Purchaser in writing within 30 days after Purchaser's delivery of the Finesse Payment Statement of any objection to the computation of Finesse U.S. Based Sales or the calculation of the Finesse Payment set forth therein (a "Finesse Notice of Objection"), such Finesse Payment Statement shall become final and binding. During such 30 day period Seller and its representatives shall be permitted to review the working papers of Purchaser relating to such Finesse Payment Statement. Any Finesse Notice of Objection shall specify in reasonable detail the basis for the objections set forth therein.

(ii) If Seller provides the Finesse Notice of Objection to Purchaser within such 30 day period, Seller and Purchaser shall, during the 15–day period following Purchaser's receipt of such Finesse Notice of Objection, attempt in good faith to resolve Seller's objections. During such 15–day period, Purchaser and its representatives shall be permitted

to review the working papers of Seller relating to the Finesse Notice of Objection. If Seller and Purchaser are unable to resolve all such objections within such 15–day period, the matters remaining in dispute shall be submitted to KPMG LLP (or, if such firm declines to act, to another internationally recognized public accounting firm mutually agreed upon by Seller and Purchaser and, if Seller and Purchaser are unable to so agree within 10 days after the end of such 15–day period, then Seller and Purchaser shall each select a firm and such firms shall jointly select a third internationally recognized firm to resolve the disputed matters (such selected firm being the "Finesse Independent Expert")). Seller and Purchaser shall instruct the Finesse Independent Expert to render its reasoned written decision as promptly as practicable but in no event later than 60 days after its selection. The resolution of disputed items by the Finesse Independent Expert shall be final and binding, and the determination of the Finesse Independent Expert shall constitute an arbitral award that is final, binding and non appealable and upon which a judgment may be entered by a court having jurisdiction thereover. The fees and expenses of the Finesse Independent Expert shall be borne equally by Seller and Purchaser. After the Finesse Payment Statement shall have become final and binding, Seller shall have no further right to make any claims against Purchaser in respect of the Finesse Payment set forth in such Finesse Payment Statement.

(e) <u>Time and Form of Payment.</u> Upon the later of (i) April 2, 2007 and (ii) 5 business days after the Finesse Payment Statement shall have become final and binding, Purchaser shall pay to Seller (or its designee) the Finesse Payment, if any, in U.S. dollars by wire transfer of immediately available funds to a bank account designated by Seller.

(f) <u>Seller's Right of Access.</u> Not more than once per calendar year, Purchaser shall afford or cause to be afforded to Seller and its affiliates and its and their accountants and other representatives (i) reasonable access during normal business hours to the personnel, properties, books, contracts, commitments and records relating to the business of Purchaser and its affiliates in connection with Seller's review of each Finesse Payment Statement and (ii) the right to make copies of such books, contracts, commitments and records.

(g) <u>Monthly Net Sales Reports.</u> Within 15 days immediately following the end of each calendar month, from April 2006 to and including December 2006, Purchaser shall deliver to Seller a written statement setting forth the Finesse U.S. Based Sales for such calendar month.

SECTION 5.07. <u>Aqua Net Mexico.</u> Until the date that is 18-months immediately following the date of this Agreement, (a) Seller agrees that it shall not sell, transfer or otherwise dispose of all or substantially all the assets of the Aqua Net Brand located in Mexico ("Aqua Net Mexico") to a single third party or a number of third parties acting as a group; provided, however, that Seller shall be allowed to continue to operate the business of Aqua Net Mexico as it is currently operated as of the date of this Agreement and subject to the provisions of Section 1.06 hereof, including engaging in the sale of any raw materials, work-in-process, finished goods, supplies, packaging materials and other inventories in the ordinary course of business and (b) Purchaser shall have the option (the "Option") during such 18-month period to purchase Aqua Net Mexico from Seller at a purchase price in cash in United States dollars equal to the sum of (i) the net sales of Aqua Net Mexico for the 12 full calendar months immediately preceding the date of Seller's receipt of notice of exercise of the Option, calculated in accordance with GAAP, plus (ii) the aggregate value of all useable or saleable raw materials, work-in-

process, finished goods, supplies, packaging materials and other inventories existing as of the date of the closing of such purchase, at Aqua Net Mexico's fully absorbed cost therefor.  In order to exercise the Option, Purchaser shall deliver to Seller a written notice of such exercise prior to the expiration of such 18-month period, which shall state that it is being delivered pursuant to this Section 5.07.  If Purchaser shall have delivered such written notice to Seller and a definitive agreement between Purchaser and Seller (or any of their respective affiliates) for the purchase of Aqua Net Mexico by Purchaser or any of its affiliates shall not have been executed within 4 weeks from the date of Seller's receipt of such notice (provided, that Seller shall have used its commercially reasonable efforts to reach such an agreement), Purchaser shall be considered to have forfeited the Option and Seller shall no longer be bound by the terms of this Section 5.07. If Purchaser shall not have delivered such written notice to Seller during such 18-month period, the Option shall expire and Seller shall no longer be bound by the terms of this Section 5.07.

SECTION 5.08.  Audit Opinion.  At or prior to the Closing, Seller shall deliver to Purchaser a signed audit opinion of PricewaterhouseCoopers LLP relating to the Financial Statements.


ARTICLE VI

Conditions to Closing

SECTION 6.01.  Conditions to Each Party's Obligation.  The obligation of Purchaser to purchase and pay for the Transferred Assets and the obligation of Seller to, or to cause the Seller Affiliates to, sell, transfer, assign and deliver the Transferred Assets to Purchaser is subject to the satisfaction (or waiver by Purchaser and Seller) on or prior to the Closing Date of the following conditions:

(a) Governmental Approvals.  All material Consents of, or registrations, declarations or filings with, or expirations of waiting periods imposed by, any Governmental Entity the absence of which would prohibit the consummation of the purchase of any portion of the Transferred Assets, or the assumption of any portion of the Assumed Liabilities, in each case that is material, individually or in the aggregate, to the Businesses, shall have been obtained or filed or shall have occurred.

(b) No Injunctions or Restraints.  No Applicable Law or injunction enacted, entered, promulgated, enforced or issued by any Governmental Entity or other legal restraint or prohibition preventing the purchase of any portion of the Transferred Assets, or the assumption of any portion of the Assumed Liabilities, in each case that is material, individually or in the aggregate, to the Businesses, shall be in effect; provided, however, that each of the parties shall have used its reasonable best efforts (as required by Section 5.04) to prevent the occurrence or entry of any such legal restraint and to remove or appeal as promptly as possible any such legal restraint.

SECTION 6.02.  Conditions to Obligation of Purchaser.  The obligation of Purchaser to purchase and pay for the Transferred Assets is subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date of the following conditions:

(a) <u>Representations and Warranties.</u> The representations and warranties of Seller in this Agreement qualified as to materiality or Businesses Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality or Businesses Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date). Purchaser shall have received a certificate signed by an authorized officer of Seller as to the satisfaction of the foregoing condition.

(b) <u>Performance of Obligations of Seller.</u> Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller by the time of the Closing. Purchaser shall have received a certificate signed by an authorized officer of Seller as to the satisfaction of the foregoing condition.

(c) <u>Ancillary Agreements.</u> Seller or the applicable Seller Affiliate shall have duly executed and delivered the Excluded Patents and Technology License, the Manufacturing Agreement and the Transitional Services Agreement.

SECTION 6.03.  <u>Conditions to Obligation of Seller.</u>  The obligation of Seller to, or to cause the Seller Affiliates to, sell, transfer, assign and deliver the Transferred Assets is subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date of the following conditions:

(a) <u>Representations and Warranties.</u> The representations and warranties of Purchaser made in this Agreement qualified as to materiality or Purchaser Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality or Purchaser Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date). Seller shall have received a certificate signed by an authorized officer of Purchaser as to the satisfaction of the foregoing condition.

(b) <u>Performance of Obligations of Purchaser.</u> Purchaser shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Purchaser by the time of the Closing. Seller shall have received a certificate signed by an authorized officer of Purchaser as to the satisfaction of the foregoing condition.

SECTION 6.04.  <u>Frustration of Closing Conditions.</u>  Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VI to be satisfied if such failure was caused by such party's failure to act in good faith or to use its reasonable best efforts to cause the Closing to occur, as required by Section 5.04.

## ARTICLE VII

Termination; Effect of Termination

SECTION 7.01.  Termination.  (a) Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated and the Acquisition and the other transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(i) by mutual written consent of Seller and Purchaser;

(ii) by Seller if (x) any of the conditions set forth in Section 6.01 or 6.03 shall have become incapable of fulfillment, and shall not have been waived by Seller, (y) 15 days have elapsed since the receipt by Purchaser of a written notice by Seller of such incapability and (z) Purchaser shall have failed to fulfill such condition within such 15-day period;

(iii) by Purchaser if (x) any of the conditions set forth in Section 6.01 or 6.02 shall have become incapable of fulfillment, and shall not have been waived by Purchaser, (y) 15 days have elapsed since the receipt by Seller of a written notice by Purchaser of such incapability and (z) Seller shall have failed to fulfill such condition within such 15-day period; or

(iv) by Seller or Purchaser, if the Closing does not occur on or prior to April 24, 2006;

provided, however, that the party seeking termination pursuant to clause (ii), (iii) or (iv) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

(b)  In the event of termination by Seller or Purchaser pursuant to this Section 7.01, written notice thereof shall forthwith be given to the other party and the transactions contemplated by this Agreement shall be terminated, without further action by any party.  If the transactions contemplated by this Agreement are terminated as provided herein:

(i) Purchaser shall, and shall cause each of its directors, officers, employees, agents, representatives and advisors to, return to Seller all documents and other material received from Seller or any of its affiliates relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution hereof; and

(ii) all confidential information received by Purchaser, its directors, officers, employees, agents, representatives or advisors with respect to the businesses of Seller and its affiliates (including with respect to the Businesses) shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

SECTION 7.02.  Effect of Termination.  If this Agreement is terminated and the transactions contemplated hereby are abandoned as described in Section 7.01, this Agreement shall become null and void and of no further force and effect, except for the provisions of (i) Section 5.03 relating to the obligation of Purchaser to keep confidential certain information

and data obtained by it from Seller or Seller's representatives, (ii) Section 11.03 relating to certain expenses, (iii) Section 5.05 relating to finder's fees and broker's fees, (iv) Section 7.01 and this Section 7.02 and (v) Section 10.01 relating to publicity. Nothing in this Section 7.02 shall be deemed to release any party from any liability for any breach by such party of the terms, conditions, covenants and other provisions of this Agreement or to impair the right of any party to compel specific performance by any other party of its obligations under this Agreement.

## ARTICLE VIII

### Indemnification

SECTION 8.01. <u>Indemnification by Seller.</u> Subject to the limitations set forth in Section 8.04, from and after the Closing, Seller shall indemnify, defend and hold harmless Purchaser and its affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives (the "<u>Purchaser Indemnitees</u>") from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third-party legal fees and expenses (collectively, "<u>Losses</u>"), to the extent arising or resulting from any of the following:

(i) any breach of any representation or warranty of Seller contained in this Agreement;

(ii) any breach of any covenant of Seller contained in this Agreement;

(iii) any Retained Liability; and

(iv) any fees, expenses or other payments incurred or owed by Seller to any agent, broker, investment banker or other firm or person retained or employed by it in connection with the transactions contemplated by this Agreement.

SECTION 8.02. <u>Indemnification by Purchaser.</u> From and after the Closing, Purchaser shall indemnify, defend and hold harmless Seller and each of its affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives (the "<u>Seller Indemnitees</u>") from and against any and all Losses, to the extent arising or resulting from any of the following:

(i) any breach of any representation or warranty of Purchaser contained in this Agreement;

(ii) any breach of any covenant of Purchaser contained in this Agreement;

(iii) any Assumed Liability; and

(iv) any fees, expenses or other payments incurred or owed by Purchaser or its affiliates to any agent, broker, investment banker or other firm or person retained or employed by it in connection with the transactions contemplated by this Agreement.

SECTION 8.03.  Indemnification Procedures.  (a)  Procedures Relating to Indemnification of Third Party Claims.  If any party (the "Indemnified Party") receives written notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under Section 8.01 or 8.02 (a "Third Party Claim"), and such Indemnified Party intends to seek indemnity pursuant to this Article VIII, the Indemnified Party shall promptly provide the other party (the "Indemnifying Party") with written notice of such Third Party Claim, stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought.  Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from liability on account of this indemnification, except if and to the extent that the Indemnifying Party is actually prejudiced thereby.  The Indemnifying Party will have 60 days from receipt of any such notice of a Third Party Claim to give notice to assume the defense thereof.  If notice to the effect set forth in the immediately preceding sentence is given by the Indemnifying Party, the Indemnifying Party will have the right to assume the defense of the Indemnified Party against the Third Party Claim with counsel of its choice.  So long as the Indemnifying Party has assumed the defense of the Third Party Claim in accordance herewith, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (ii) the Indemnified Party will not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party and (iii) the Indemnifying Party will not (A) admit to any wrongdoing or (B) consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim to the extent such judgment or settlement provides for equitable relief, in each case, without the prior written consent of the Indemnified Party (such written consent will not be withheld or delayed unreasonably).  The parties will use reasonable best efforts to minimize Losses from Third Party Claims and will act in good faith in responding to, defending against, settling or otherwise dealing with such claims.  The parties will also cooperate in any such defense and give each other reasonable access to all information relevant thereto.  Whether or not the Indemnifying Party has assumed the defense, such Indemnifying Party will not be obligated to indemnify the Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent.

(b)  Procedures for Non-Third Party Claims.  The Indemnified Party will notify the Indemnifying Party in writing promptly of its discovery of any matter that does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party, giving rise to the claim of indemnity pursuant hereto.  The failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party from liability on account of this indemnification, except only to the extent that the Indemnifying Party is actually prejudiced thereby.  The Indemnifying Party will have 60 days from receipt of any such notice to give notice of dispute of the claim to the Indemnified Party.  The Indemnified Party will reasonably cooperate and assist the Indemnifying Party in determining the validity of any claim for indemnity by the Indemnified Party and in otherwise resolving such matters.  Such assistance and cooperation will include providing reasonable access to and copies of information, records and documents relating to such matters, furnishing employees to assist in the investigation, defense and resolution of such matters and providing legal and business assistance with respect to such matters.

SECTION 8.04. <u>Limitations on Indemnification.</u> (a) Notwithstanding the foregoing provisions of this Article VIII:

(i) Seller shall not be responsible, pursuant to Section 8.01(i) or (ii), for any indemnifiable Losses suffered by any Purchaser Indemnitee arising out of a breach of any representation, warranty or covenant of Seller in this Agreement unless a claim therefor is asserted in writing within 18 months after the Closing Date, failing which such claim shall be waived and extinguished,

(ii) Seller shall not be liable, pursuant to Section 8.01(i) or (ii), for (x) any Losses suffered by any Purchaser Indemnitee unless the aggregate of all Losses suffered by the Purchaser Indemnitees exceeds, on a cumulative basis, an amount equal to $750,000, and then only to the extent of any such excess or (y) any individual items where the Loss relating thereto is less than $25,000 and such items shall not be aggregated for purposes of the immediately preceding clause (x);

(iii) the aggregate liability of Seller hereunder, pursuant to Section 8.01(i) or (ii), for Losses suffered by the Purchaser Indemnitees shall in no event exceed $4,000,000; <u>provided, however,</u> that the foregoing limitation shall not apply in connection with a breach of Section 3.05 or Section 3.06(a), in which case the aggregate liability of Seller pursuant to Section 8.01(i) shall in no event exceed $40,000,000; <u>provided, further, however,</u> the neither of the foregoing limitations shall apply in connection with a breach of Section 3.04, in which case the aggregate liability of Seller pursuant to Section 8.01(i) shall in no event exceed $20,000,000;

(iv) Seller shall not have any liability pursuant to Section 8.01(i) for any breach if Purchaser had knowledge of such breach as of the date of this Agreement; and

(v) neither party hereto shall be liable to the other for indirect, special, incidental, consequential or punitive damages claimed by such other party resulting from such first party's breach of its representations, warranties or covenants hereunder.

(b) Purchaser acknowledges that it and its representatives have received or been afforded the opportunity to review prior to the date of this Agreement all written materials which Seller was required to deliver or make available, as the case may be, to Purchaser pursuant to this Agreement on or prior to the date of this Agreement. Purchaser acknowledges that it and its representatives have been permitted full and complete access to the books and records, facilities, equipment, machinery, molds, parts, spare parts, Tax Returns, Contracts and other properties and assets of the Businesses that it and its representatives have desired or requested to see and/or review, and that it and its representatives have had a full opportunity to meet with the officers and employees of Seller and its affiliates to discuss the Businesses and the Transferred Assets. Purchaser further acknowledges and agrees that (i) other than the representations and warranties of Seller specifically contained in Article III of this Agreement, none of Seller, any of its affiliates or any other person has made any representation or warranty either expressed or implied (A) with respect to the Businesses, the Transferred Assets, the Assumed Liabilities or the transactions contemplated by this Agreement or the Ancillary Agreements or (B) as to the accuracy or completeness of any information regarding the Businesses, the Transferred Assets,