the Assumed Liabilities or the transactions contemplated by this Agreement or by the Ancillary Agreements furnished or made available to Purchaser and its representatives and (ii) Purchaser shall have no claim or right to indemnification pursuant to this Article VIII and none of Seller, any of its affiliates or any other person shall have or be subject to any liability to Purchaser or any other person with respect to any information, documents or materials furnished by Seller, any of its affiliates or any of their respective officers, directors, employees, agents or advisors to Purchaser, including the Confidential Information Memorandum dated September 2005 prepared by Deutsche Bank Securities Inc. and any information, documents or material made available to Purchaser and its representatives in certain "data rooms" (whether electronic or otherwise), management presentations or any other form in expectation of the transactions contemplated by this Agreement or the Ancillary Agreements. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller nor any Seller Affiliate makes any representations or warranties relating to the maintenance, repair, condition, design, performance or marketability of any Transferred Asset, including merchantability or fitness for a particular purpose. Purchaser acknowledges and agrees that it shall obtain rights in the Transferred Assets in their present condition and state of repair, "as is" and "where is".

(c) Purchaser further acknowledges and agrees that, should the Closing occur, its sole and exclusive remedy with respect to any and all claims relating to this Agreement, the Businesses, the Transferred Assets, the Excluded Assets, the Assumed Liabilities, the Retained Liabilities or the transactions contemplated by this Agreement and by the Ancillary Agreements (other than claims of, or causes of action arising from, fraud) shall be pursuant to the indemnification provisions set forth in this Article VIII. In furtherance of the foregoing, Purchaser hereby waives, from and after the Closing, any and all rights, claims and causes of action (other than claims of, or causes of action arising from, fraud) Purchaser or any other Purchaser Indemnitee may have against Seller or any of its affiliates or any of their respective directors, officers and employees arising under or based upon any Federal, state, provincial, local or foreign statute, law, ordinance, rule or regulation or otherwise (except pursuant to the indemnification provisions set forth in this Article VIII).

SECTION 8.05. Calculation of Indemnity Payments. The amount of any Loss for which indemnification is provided under this Article VIII shall be net of any amounts recovered or recoverable by the Indemnified Party under insurance policies with respect to such Loss and shall be (a) increased to take account of any net Tax cost actually incurred by the Indemnified Party arising from the receipt of indemnity payments hereunder (grossed up for such increase) and (b) reduced to take account of any net Tax benefit actually realized by the Indemnified Party arising from the incurrence or payment of any such indemnified amount. In computing the amount of any such Tax cost or Tax benefit, the Indemnified Party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified amount.

SECTION 8.06. Tax Treatment of Indemnification. For all Tax purposes, Purchaser and Seller agree to treat (and shall cause each of their respective affiliates to treat) any indemnity payment under this Agreement as an adjustment to the Final Purchase Price unless a final determination (which shall include the execution of an IRS Form 870-AD or successor form) provides otherwise.

28

ARTICLE IX

Tax Matters

SECTION 9.01. <u>Tax Matters.</u> (a) <u>Purchase Price Allocations.</u> (i) At least seven calendar days prior to the Closing Date, Purchaser shall provide Seller with an estimate of the allocation of the Base Purchase Price (including liabilities assumed) among the Transferred Assets, with a single number for all of the Transferred Assets of each of Seller and each Seller Affiliate. This estimate will be used at the Closing. If Seller does not agree with such estimate, Seller and Purchaser shall use good faith efforts to agree on an estimate prior to the Closing Date. If the parties cannot agree on such estimate prior to the Closing Date, Purchaser's estimate shall be used for allocating the Base Purchase Price pursuant to this Agreement at the Closing.

(ii) Without regard to the estimate determined pursuant to Section 9.01(a)(i), within 75 calendar days of the Closing, Purchaser shall provide Seller a proposed allocation (the "<u>Allocation</u>") of the Base Purchase Price (including liabilities assumed) among the Transferred Assets, as well as with a single amount for all of the Transferred Assets of each of Seller and each Seller Affiliate. The Allocation will be supported by a valuation report from a nationally recognized appraiser. The Allocation shall be made in accordance with Code §1060 and Treasury regulations thereunder (and any similar provisions of state, local or foreign law, as appropriate). The Allocation Statement shall become final and binding 20 calendar days after Purchaser provides the Allocation to Seller, unless Seller objects on the grounds that there is no reasonable basis for the Allocation (in which case, Seller shall propose an allocation). If the parties cannot agree on the Allocation, the parties shall each use their own Allocation, as each party shall see fit.

(iii) Any additional payments made pursuant to Section 5.06 shall be allocated in the same manner and pursuant to the same procedures as described in the preceding paragraph (ii). The Allocation with respect to each payment shall be delivered by the Purchaser within 60 days of the final determination of each payment amount.

(iv) Seller (and its affiliates) and Purchaser (and its affiliates) agree to file all Tax Returns consistent with the final versions of the allocations and forms described in this Section 9.01.

(b) <u>Transfer Taxes.</u> (i) Seller and Purchaser shall cooperate in timely making all filings, returns, reports and forms as may be required in connection with Purchaser's payment of Transfer Taxes. Each party shall execute and deliver all instruments and certificates reasonably necessary to enable the other to comply with any filing requirements relating to any such Transfer Taxes.

(ii) Purchaser shall pay all Transfer Taxes; provided, however, that Seller and each Seller Affiliate shall use reasonable efforts to avail itself of any available exemptions from any such Transfer Taxes, and to cooperate with the other parties in providing any information and documentation that may be necessary to obtain such exemption.

(c) Purchaser, Seller and each Seller Affiliate agree to provide each other with such information and assistance as is reasonably necessary, including access to records and personnel, for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with an audit or otherwise.

(d) Seller shall furnish to Purchaser on or prior to the Closing Date a certificate of its non-foreign status complying with the provisions of United States Treasury Regulation Section 1.1445-2(b).


ARTICLE X

Additional Agreements

SECTION 10.01. Publicity. From the date of this Agreement through the Closing Date, Purchaser shall not make any release or announcement, whether publicly or privately (such as internally to Purchaser's employees), concerning the transactions contemplated by this Agreement and by the Ancillary Agreements; provided, however, that Purchaser may discuss such transactions internally with each employee of Purchaser whose knowledge of such transactions is necessary for Purchaser to consummate such transactions on the Closing Date. From the date of this Agreement through the Closing Date, Seller shall not make any public release or announcement concerning the transactions contemplated by this Agreement and by the Ancillary Agreements without the prior consent of Purchaser (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case Seller shall allow Purchaser reasonable time to comment on such release or announcement in advance of such issuance.

SECTION 10.02. No Use of Certain Names. Purchaser shall, and shall cause the Businesses, promptly, and in any event (a) within 180 days after the Closing, to revise print advertising, Product labeling and all other information or other materials, including any internet or other electronic communications vehicles, to delete all references to the Names and (b) within 180 days after the Closing, to change signage and stationery and otherwise discontinue use of the Names; provided, however, that for a period of 180 days after the Closing Date Purchaser may continue to distribute product literature relating to the Businesses that uses any Names and distribute Products with labeling that uses any Names to the extent that such product literature and labeling exists on the Closing Date. In no event shall Purchaser or the Businesses use any Names after the Closing in any manner or for any purpose different from the use of such Names by Seller and the Seller Affiliates during the 90–day period preceding the Closing. With respect to any Inventory existing as of the Closing Date, Purchaser may sell such Inventory through the Manufacturing Agreement or the Transitional Services Agreement or otherwise, notwithstanding that it bears one or more of the Names, for a reasonable time after the Closing (not to exceed six months). Promptly after the Closing, Purchaser shall, and shall cause the Businesses to, file applications to amend or terminate any certificate of assumed name or d/b/a filings so as to eliminate the right of Purchaser and the Businesses to use the Names.

SECTION 10.03.  Support Services.  Purchaser acknowledges that as of the Closing Date, neither Seller nor any of its affiliates shall have any obligation to provide any support or other services to Purchaser relating to the Businesses other than those services expressly required to be provided pursuant to the manufacturing agreement in the form attached hereto as Exhibit B (the "Manufacturing Agreement") and the transitional services agreement in the form attached hereto as Exhibit C (the "Transitional Services Agreement"), each of which agreements shall be entered into by Seller and Purchaser as of the Closing Date.

SECTION 10.04.  Post-Closing Information.  Following the Closing, upon reasonable written notice to Purchaser, Purchaser shall afford or cause to be afforded to Seller and its affiliates reasonable access to the personnel, properties, books, Contracts, commitments and records relating to the Businesses for any reasonable business purpose, including in respect of litigation, insurance matters and financial reporting of Seller and its affiliates.

SECTION 10.05.  Records.  Purchaser recognizes that certain records may contain information relating to subsidiaries, divisions or businesses of Seller and its affiliates other than the Businesses and that Seller and its affiliates may retain copies thereof.

SECTION 10.06.  Bulk Transfer Laws.  Purchaser hereby waives compliance by Seller and the Seller Affiliates with the provisions of any so-called "bulk transfer laws" of any jurisdiction in connection with the sale of the Transferred Assets to Purchaser.

SECTION 10.07.  Refunds and Remittances.  After the Closing, if Seller or any of its affiliates receive any refund or other amount which is a Transferred Asset or is otherwise properly due and owing to Purchaser in accordance with the terms of this Agreement, Seller promptly shall remit, or shall cause to be remitted, such amount to Purchaser at the address set forth in Section 11.04.  After the Closing, if Purchaser or any of its affiliates receive any refund or other amount which is an Excluded Asset or is otherwise properly due and owing to Seller or any of its affiliates in accordance with the terms of this Agreement, Purchaser promptly shall remit, or shall cause to be remitted, such amount to Seller at the address set forth in Section 11.04.  After the Closing, if Seller or any of its affiliates receive any refund or other amount which is related to claims, litigation, insurance or other matters for which Purchaser is responsible hereunder, and which amount is not an Excluded Asset, or is otherwise properly due and owing to Purchaser in accordance with the terms of this Agreement, Seller promptly shall remit, or cause to be remitted, such amount to Purchaser at the address set forth in Section 11.04. After the Closing, if Purchaser or any of its affiliates receive any refund or other amount which is related to claims (including workers' compensation), litigation, insurance or other matters for which Seller is responsible hereunder, and which amount is not a Transferred Asset, or is otherwise properly due and owing to Seller in accordance with the terms of this Agreement, Purchaser promptly shall remit, or cause to be remitted, such amount to Seller at the address set forth in Section 11.04.

SECTION 10.08.  UPC Codes.  Notwithstanding that Seller's UPC Codes for the Products shall not be transferred to Purchaser as a Transferred Asset pursuant to the terms of this Agreement, Purchaser shall be entitled to use such UPC Codes for the Products in the operation of the Businesses from the Closing Date until the date that is 18 months immediately following the Closing Date.

SECTION 10.09. <u>Shared Finesse Brand Mold</u>. Notwithstanding that Seller's mold listed on Schedule 10.09 shall not be transferred to Purchaser as a Transferred Asset pursuant to the terms of this Agreement, Seller shall provide Purchaser reasonable access to such mold and shall allow Purchaser to use such mold in the operation of the Businesses, consistent with past use by Seller of such mold; <u>provided</u>, <u>however</u>, that Seller shall have no obligation to maintain, repair or otherwise replace such mold. If Seller and the Seller Affiliates permanently discontinue the use of such mold and have no intent to resume use of such mold, Seller or the applicable Seller Affiliate shall offer to sell such mold to Purchaser, and Purchaser may purchase such mold from Seller or such Seller Affiliate, for the greater of net book value thereof and $1.00.

ARTICLE XI

<u>Miscellaneous</u>

SECTION 11.01. <u>Assignment.</u> Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any of the parties hereto without the prior written consent of the other party hereto, except that (a) Purchaser may assign its right to purchase the Transferred Assets hereunder to any of its wholly owned subsidiaries without the prior written consent of Seller and (b) Seller may assign any rights and obligations hereunder to any affiliate of Seller without the prior written consent of Purchaser. Notwithstanding the foregoing, each of Seller and Purchaser shall remain liable for all of their respective obligations under this Agreement. Subject to the first sentence of this Section 11.01, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and no other person shall have any right, obligation or benefit hereunder. Any attempted assignment or transfer in violation of this Section 11.01 shall be void.

SECTION 11.02. <u>No Third-Party Beneficiaries.</u> Except as provided in Article VIII, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 11.03. <u>Expenses.</u> Whether or not the transactions contemplated by this Agreement and the Ancillary Agreements are consummated, except as otherwise expressly provided herein or therein, each of the parties hereto and thereto shall be responsible for the payment of its own respective costs and expenses incurred in connection with the negotiations leading up to and the performance of its respective obligations pursuant to this Agreement and the Ancillary Agreements including the fees of any attorneys, accountants, brokers or advisors employed or retained by or on behalf of such party. Purchaser shall pay any filing fee required under the HSR Act.

32

SECTION 11.04. <u>Notices.</u> All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; <u>provided</u> that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

    (i) if to Seller:

> Conopco, Inc. d/b/a Unilever
> 33 Benedict Place
> Greenwich, Connecticut 06830
> Attention: President
> Facsimile No.: (203) 625-1602

> with copies to:

> Conopco, Inc., d/b/a Unilever
> 700 Sylvan Avenue
> Englewood Cliffs, New Jersey 07632
> Attention: General Counsel
> Facsimile No.: (201) 894-2727

> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, NY 10019-7475
> Attention: Mark I. Greene, Esq.
> Facsimile No.: (212) 474-3700

    (ii) if to Purchaser:

> Lornamead Brands, Inc.
> 175 Cooper Avenue
> Tonawanda, New York 14150
> Attention: Daryle M. Shaw, CFO
> Facsimile No.: (716) 874-0670

> with a copy to:

> Harris Beach PLLC
> 726 Exchange Street, Suite 1000
> Buffalo, New York 14210
> Attention: Alan J. Laurita, Esq.
> Facsimile No.: (716) 200-5201

[[NYCORP:2539469v25]]

or to such other address(es) as shall be furnished in writing by any such party to the other party to this Agreement in accordance with the provisions of this Section 11.04.

SECTION 11.05. Headings; Certain Definitions. (a) The descriptive headings of the several Articles and Sections of this Agreement and the Disclosure Schedule to this Agreement and the Table of Contents to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references in this Agreement to "Articles", "Sections", "Exhibits" or "Schedules" shall be deemed to be references to Articles or Sections of this Agreement or Exhibits or Schedules hereto unless otherwise indicated.

(b) For all purposes of this Agreement:

"affiliate" of any party means any person or entity controlling, controlled by or under common control with such party and, in the case of Seller, shall include Unilever N.V., Unilever PLC or any entity a majority of the voting shares of which is owned directly or indirectly by Unilever N.V. or Unilever PLC or both of them together (including the Seller Affiliates).

"business day" shall refer to a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in New York City.

"Business" means (i) in the case of the Finesse Brand, the business of manufacturing, marketing, distributing and selling the Products constituting such Brand on a worldwide basis as such business is currently conducted by Seller and the Seller Affiliates and (ii) in the case of the Aqua Net Brand, the business of manufacturing, marketing, distributing and selling the Products constituting such Brand on a worldwide basis (other than in or from Mexico) as such business is currently conducted by Seller and the Seller Affiliates.

"Businesses" shall refer, collectively, to the Business of each Brand.

"Businesses Material Adverse Effect" means a material adverse effect (i) on the financial condition or results of operations of the Businesses, taken as a whole or (ii) on the ability of Seller to consummate the Acquisition. For purposes of this Agreement, "Businesses Material Adverse Effect" shall exclude any effects to the extent resulting from (A) changes in the United States or foreign economies in general, (B) changes in industries relating to the Businesses in general and not specifically relating to the Businesses or (C) the execution of this Agreement (including the identity of Purchaser) or any of the Ancillary Agreements and the consummation of the transactions contemplated hereby or thereby.

"$" means United States dollars.

"including" means including, without limitation.

"knowledge of Seller" means the actual knowledge of Stan Cook, Geert van Iwaarden and Michael Spendio.

"person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"Products" means, with respect to each Brand, products currently held for sale by Seller or a Seller Affiliate, including those products set forth in Schedule 11.05(b).

"subsidiary" of any person means another person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its Board of Directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first person or by another subsidiary of such first person.

SECTION 11.06. Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

SECTION 11.07. Integrated Contract; Exhibits and Schedules. This Agreement, including the Schedules (and the Introduction thereto) and Exhibits hereto, any written amendments to the foregoing satisfying the requirements of Section 11.13 hereof, the Confidentiality Agreement and the Ancillary Agreements, including the schedules, exhibits and annexes thereto, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any previous agreements and understandings between the parties with respect to such matters. All Exhibits and Schedules annexed hereto or referred to in this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. There are no restrictions, promises, representations, warranties, agreements or undertakings of any party to this Agreement with respect to the transactions contemplated by this Agreement, the Confidentiality Agreement or the Ancillary Agreements other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder. In the event of any conflict between the provisions of this Agreement (including the Schedules (and the Introduction thereto) and Exhibits hereto), on the one hand, and the provisions of the Confidentiality Agreement or the Ancillary Agreements (including the schedules and exhibits thereto), on the other hand, the provisions of this Agreement shall control.

SECTION 11.08. Severability; Enforcement. The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 11.09. Governing Law. This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be

[[NYCORP:2539469v25]]

governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 11.10.  Jurisdiction.  Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam*, with respect to any such action, suit or proceeding.

SECTION 11.11.  Service of Process.  Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 11.04 shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 11.10.

SECTION 11.12.  Waiver of Jury Trial.  Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 11.12.

SECTION 11.13.  Amendments.  This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.

*[SIGNATURE PAGE IS THE NEXT PAGE]*

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

CONOPCO, INC., as Seller,

by *Thomas S. Girardi*

Name: Thomas S. Girardi
Title: authorized Signatory

LORNAMEAD BRANDS, INC., as Purchaser,

by

Name:
Title:

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

[[NYCORP:2539469]]

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

CONOPCO, INC., as Seller,

by _____

        Name: _____
        Title:

LORNAMEAD BRANDS, INC., as Purchaser,

by _____

        Name: DARYLE M SHAW
        Title: CHIEF FINANCIAL OFFICER

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

[[NYCORP:2539469]]

EXHIBIT A TO THE
ASSET PURCHASE AGREEMENT

## EXCLUDED PATENTS AND TECHNOLOGY LICENSE AGREEMENT

This Excluded Patents and Technology License Agreement (this "Agreement") dated as of [ ● ], 2006, between Conopco, Inc., a New York corporation ("Licensor"), and Lornamead Brands, Inc., a Delaware corporation ("Licensee").

WHEREAS, Licensee and Licensor have entered into an Asset Purchase Agreement dated as of March 24, 2006 (the "Asset Purchase Agreement"), pursuant to which Licensor has agreed to sell to Licensee and Licensee has agreed to purchase from Licensor the Transferred Assets related to the Businesses, and Licensee has agreed to assume from Licensor the Assumed Liabilities;

WHEREAS, the patents listed on Exhibit A to this Agreement, and the respective inventions disclosed therein, are owned by Licensor and are used in the operation of the Businesses, but are not being sold to Licensee pursuant to the Asset Purchase Agreement (the "Retained Licensed Patents");

WHEREAS, certain trade secrets, proprietary inventions, know-how, formulae, processes, procedures, research records, records of inventions, test information, market surveys and marketing know-how may be in possession of Licensor and its affiliates and used in the operation of the Businesses, but are not being sold to Licensee pursuant to the Asset Purchase Agreement (the "Retained Licensed Technology"); and

WHEREAS, Licensee wishes to use the Retained Licensed Patents and Retained Licensed Technology in its operation of the Businesses (the "Transferred Businesses"), and Licensor, as the owner of the entire right, title and interest in and to the Retained Licensed Technology and Retained Licensed Patents, has agreed to license the Retained Licensed Patents and Retained Licensed Technology to Licensee for use exclusively in the Transferred Businesses, subject to the limitations set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein it is hereby agreed:

SECTION 1.  Definitions.  Terms that are not otherwise defined in this Agreement shall have the meanings ascribed to them in the Asset Purchase Agreement.

SECTION 2.  Grant.  Subject to the terms and conditions set forth in this Agreement, Licensor grants to Licensee a fully paid and royalty-free, non-exclusive license to use the Retained Licensed Patents and Retained Licensed Technology exclusively in the Transferred Businesses, with respect to Retained Licensed Patents and Retained Licensed Technology related to the Finesse Brand, on a worldwide basis, and, with respect to Retained Licensed Patents and Retained Licensed Technology related to the Aqua Net Brand, on a worldwide basis, other than in Mexico; provided, however, that Licensee may use the Retained License Patents and Retained License Technology related to (a) the Finesse Brand only in

2

connection with the Business of the Finesse Brand and (b) the Aqua Net Brand only in connection with the Business of the Aqua Net Brand. This License shall be effective as of the date first above written.

SECTION 3. <u>Term and Termination.</u> The license granted by Section 2 of this Agreement with respect to each Retained Licensed Patent shall extend for the period during which such Retained Licensed Patent and any renewals thereof are in force and indefinitely (which, for the avoidance of doubt, shall not be less than the duration of the license applicable to any Retained License Patent and any renewals thereof), with respect to Retained Licensed Technology; <u>provided</u> that this Agreement may be terminated by Licensor in the event Licensee makes or attempts to make an assignment of this Agreement, or grants a sublicense hereunder, in violation of Section 17 below.

SECTION 4. <u>No Waiver of Breach.</u> No forbearance, indulgence or relaxation by either party at any time to require performance of any provision of this Agreement shall in any way affect, diminish or prejudice the right of such party to require performance of that provision, and waiver by either party of any breach of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision.

SECTION 5. <u>Infringement Actions.</u> Licensor will from time to time take all steps which it may consider necessary to protect its rights, and Licensee agrees forthwith to communicate to Licensor any infringements or threatened infringements of any of the rights of Licensor which may come to its notice and, at Licensor's expense, to do all and any such acts as Licensor may reasonably require for preventing such infringements or threatened infringements, <u>provided</u> always that nothing in this Section 5 shall impose upon Licensor any obligation to incur any expense in protecting any of its rights in any case where, in Licensor's absolute discretion, such expense is considered not warranted. In the event Licensor decides to take affirmative action against an infringement or unfair competition, Licensee agrees to assist Licensor in whatever manner Licensor directs, at the expense of Licensor. Recovery of damages resulting from any such action shall be solely for the account of Licensor. Licensee will provide information reasonably requested by Licensor in any infringement action, including in connection with the calculation of damages.

SECTION 6. <u>No Third-Party Beneficiaries.</u> This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 7. <u>Notices.</u> All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; <u>provided</u> that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

3

(i) if to Licensor:

    Conopco, Inc. d/b/a Unilever
    33 Benedict Place
    Greenwich, Connecticut 06830
    Attention:  President
    Facsimile No.:  (203) 625-1602

    with copies to:

    Conopco, Inc., d/b/a Unilever
    700 Sylvan Avenue
    Englewood Cliffs, New Jersey 07632
    Attention:  General Counsel
    Facsimile No.:  (201) 894-2727

    Cravath, Swaine & Moore LLP
    Worldwide Plaza
    825 Eighth Avenue
    New York, NY 10019-7475
    Attention:   Mark I. Greene, Esq.
    Facsimile No.:  (212) 474-3700

(ii) if to Licensor:

    Lornamead Brands, Inc.
    175 Cooper Avenue
    Tonawanda, New York 14150
    Attention: Daryle M. Shaw, CFO
    Facsimile No.: (716) 874-0670

    with a copy to:

    Harris Beach PLLC
    726 Exchange Street, Suite 1000
    Buffalo, New York 14210
    Attention: Alan J. Laurita, Esq.
    Facsimile No.: (716) 200-5201

or to such other address(es) as shall be furnished in writing by any such party to the other party
to this Agreement in accordance with the provisions of this Section 7.

    SECTION 8.   _Amendments._  This Agreement may be amended, modified,
superseded or canceled and any of the terms, covenants or conditions hereof may be waived only
by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or
on behalf of the party waiving compliance.

[[NYCORP:2542739v12]]

4

SECTION 9. <u>Independent Contractors.</u> The parties to this Agreement intend by this Agreement to enter into only a license agreement and this Agreement shall not in any way be deemed to establish any other relation between them. Neither Licensee, on the one hand, nor Licensor, on the other hand, shall be considered a partner, joint venturer, agent or other representative of the other for any purpose whatsoever and neither shall hold itself out as such. Neither Licensee, on the one hand, nor Licensor, on the other hand, nor any employee, officer, director or agent of either shall hold themselves out as an agent of the other party. Nothing in this Agreement shall be construed to grant either party any right or authority to assume or create any obligation on behalf or in the name of the other; to accept summons or legal process for the other; or to bind the other in any manner whatsoever.

SECTION 10. <u>Severability; Enforcement.</u> The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 11. <u>Integrated Contract; Schedule.</u> This Agreement, including the Schedule hereto, any written amendments to the foregoing satisfying the requirements of Section 8 hereof, the Asset Purchase Agreement, the Ancillary Agreements and the Confidentiality Agreement, including the schedules, exhibits and annexes thereto, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any previous agreements and understandings between the parties with respect to such matters. The Schedule annexed to this Agreement is hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any terms used in the Schedule but not otherwise defined therein shall be defined as set forth in this Agreement or the Asset Purchase Agreement, as the case may be. There are no restrictions, promises, representations, warranties, agreements or undertakings of any party to this Agreement with respect to the transactions contemplated by this Agreement, the Asset Purchase Agreement, the Ancillary Agreements or the Confidentiality Agreement other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder. In the event of any conflict between the provisions of this Agreement (including the Schedule hereto), on the one hand, and the provisions of the Asset Purchase Agreement (including the schedules and exhibits thereto), on the other hand, the provisions of the Asset Purchase Agreement shall control.

SECTION 12. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

SECTION 13. <u>Governing Law.</u> This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference

[[NYCORP:2542739v12]]

5

to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 14. <u>Jurisdiction</u>. Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam, with respect to any such action, suit or proceeding.

SECTION 15. <u>Service of Process</u>. Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 14.

SECTION 16. <u>Waiver of Jury Trial</u>. Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto. Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 16.

SECTION 17. <u>Assignment; Sublicense</u>. This Agreement and all rights and obligations of Licensee hereunder may not be assigned by Licensee or subject to a sublicense without the prior written consent of Licensor; <u>provided</u>, <u>however</u>, that Licensee may, without such consent, (a) assign this Agreement, in whole or in part, or grant sublicenses, in each case to any Affiliate of Licensee (in which case Licensee shall continue to be bound by the terms of this Agreement), (b) grant limited sublicenses to present and future suppliers, co–packers, consultants, contractors and contract researchers and developers solely for the benefit of Licensee or any Affiliate of Licensee (in which case Licensee shall continue to be bound by the terms of this Agreement) or (c) assign this Agreement, in whole or in part, to a purchaser or transferee of all or substantially all of the Transferred Businesses; <u>provided</u> that in each case the assignee or sublicensee agrees to be bound by the terms and conditions of this Agreement by executing an acknowledgement in the form and substance acceptable to Licensor. Any transfer or other disposition by Licensor of any Retained Licensed Patent or Retained Licensed Technology shall be made subject to the terms of this Agreement and the person or entity acquiring such Retained Licensed Patent or Retained Licensed Technology from Licensor shall agree to be bound by the terms and conditions of this Agreement by executing an acknowledgement in form and substance acceptable to Licensee.

6

SECTION 18. <u>Effectiveness</u>. Notwithstanding anything to the contrary in this Agreement, this Agreement shall only become effective as of the Closing and shall not become effective if the Closing does not occur.

SECTION 19. <u>Headings</u>. The descriptive headings of the several Sections of this Agreement and the Schedule hereto are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references in this Agreement to "Sections" or "Schedules" shall be deemed to be references to Sections of this Agreement or the Schedules hereto unless otherwise indicated.

*[SIGNATURE PAGE IS THE NEXT PAGE]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives effective as of the date first set forth above.

CONOPCO, INC.,

By _____
      Name:
      Title:


LORNAMEAD BRANDS, INC.,

By _____
      Name:
      Title:

*[SIGNATURE PAGE TO EXCLUDED PATENTS AND TECHNOLOGY LICENSE AGREEMENT]*

[[NYCORP:2542739v12]]

SCHEDULE A

TO THE

EXCLUDED PATENTS AND TECHNOLOGY LICENSE AGREEMENT

| Case No. | Title | Country | Application No. | Patent No. | Filing Date | Applicant | Associated Brands |
|---|---|---|---|---|---|---|---|
| J6316 | Aqueous Hair Styling Aid | United States | 07/716,109 | 5,164,177 | 6/18/91 | Helene Curtis, Inc. | Aqua Net; Finesse |
| J3126 | Conditioning Shampoo Comprising a Surfactant, A Non-Volatile Silicone Oil and Guar Hydroxypropyltrimmonium Chloride as a Cationic Conditioning Polymer | United States | 07/621,482 | 5,085,857 | 12/3/1990 | Chesebrough-Ponds | Finesse |
| | | Canada | 2031382 | 2031382 | 12/3/1990 | Unilever PLC | |
| J3267 | Hair Conditioning Shampoo Composition | United States | 08/660,974 | 5,720,964 | 6/12/96 | Chesebrough Ponds; Division of Conopco, Inc. | Finesse |
| | | Canada | 2171184 | 2171184 | 9/28/94 | Unilever PLC | |

EXHIBIT B TO THE
ASSET PURCHASE AGREEMENT

## MANUFACTURING AGREEMENT

This Manufacturing Agreement dated as of [ • ], 2006 (this "Agreement") is made by and between Lornamead Brands, Inc., a Delaware corporation ("Purchaser"), and Unilever Supply Chain, Inc., a Delaware corporation ("Manufacturer").

## WITNESSETH

WHEREAS, pursuant to an Asset Purchase Agreement dated as of March 24, 2006 (the "Asset Purchase Agreement"), between Conopco, Inc. ("Seller") and Purchaser, Manufacturer has agreed to manufacture certain products for Purchaser;

WHEREAS, Purchaser desires Manufacturer to manufacture for it such products at Manufacturer's facilities located in Southern California and Connecticut (the "Facilities" or the "Manufacturer's Facilities");

WHEREAS, Seller and Purchaser have entered into a Transitional Services Agreement (the "Transitional Services Agreement") contemporaneously with the entry into this Agreement, pursuant to which Seller will provide certain services to Purchaser, including procuring the manufacture of certain products by third parties on behalf of Purchaser; and

WHEREAS, the Transitional Services Agreement contains provisions regarding the Purchaser's payment for services of Manufacturer rendered pursuant to this Agreement.

NOW, THEREFORE, in consideration of the premises and of the covenants and conditions hereinafter contained, the parties to this Agreement mutually agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01.  Definitions.  Terms that are not otherwise defined in this Agreement shall have the meanings ascribed to them in the Asset Purchase Agreement.

## ARTICLE II

### Products, Pricing and Purchases

SECTION 2.01.  Products; Purchase Contracts.  Manufacturer agrees to manufacture and sell to Purchaser, and Purchaser agrees to purchase from Manufacturer, the products set forth in Section 2.01 of the Disclosure Schedule attached to this Agreement (the "Products") in certain quantities specified in electronic or written purchase orders (each a "Purchase Order").

SECTION 2.02.  Price and Payment Terms.  All pricing, payment terms, discounts, rebates, incentives, restrictions, allowable adjustments, guarantees and other pricing programs applicable to the Products shall be set forth in Section 2.01 of the Disclosure Schedule.

[[NYCORP:2542066v12]]

2

Section 2.01 of the Disclosure Schedule shall be deemed amended to reflect any new Products, pricing or payment terms agreed to in writing by the parties after the date of this Agreement.

SECTION 2.03.  Terms and Conditions. Each transaction under this Agreement shall be subject to the terms and conditions set forth herein; any terms and conditions in any Purchase Order, invoice, instrument or other document provided by one party to the other during the course of performance that conflict with, vary or add to the terms and conditions set forth herein shall be void and of no force and effect.

SECTION 2.04.  Binding and Estimated Forecasts.  (a)  Not later than the fifth day of each calendar month during the term of this Agreement, commencing in the calendar month immediately following the month in which the date of the commencement of the term of this Agreement occurs (the "Effective Date"), Purchaser shall provide Manufacturer with a written forecast of Purchaser's projected demand for the Products for the three month period commencing on the first day of the calendar month following the month in which the forecast is delivered and for the two calendar months following such month (it being understood that during the period form and after the Effective Date through the end of the first calendar month following the month in which the Effective Date occurs, Manufacturer's production plan for the Products in existence as of the Effective Date shall constitute the forecast for such period).  Each forecast delivered by Purchaser shall also specify the quantities of Products required on a weekly basis during the forecast period.  The forecast for the period between the Effective Date and the end of the calendar month following the month in which the Effective date occurs, as well as the forecast for the first full calendar month of each forecast period (each, a "Binding Forecast") shall set forth the total quantity of Products that Purchaser shall order for delivery in such period and shall constitute a commitment by Purchaser to purchase and pay for the quantity of Products specified therein.  The period following the first full calendar month in each forecast delivered by Purchaser shall, subject to subparagraph (b) below, constitute a nonbinding, good faith estimate of the quantity of Products that Purchaser expects to order for delivery during such period (the "Estimated Forecast").

(b) In the event that Purchaser does not deliver a Binding Forecast for the next month by the fifth day of the then current month, the Estimated Forecast for the following month shall become the Binding Forecast for such following month.

(c) Notwithstanding anything in this Agreement to the contrary, any quantities set forth in a Binding Forecast and/or a Purchase Order shall be subject to and limited by Manufacturer's available capacity and run rules for the manufacture of the Products, in each case consistent with Manufacturer's past practices.

(d) Manufacturer may, without penalty, manufacture, package and deliver Products in a quantity ranging from 5% above to 5% below that specified in the applicable Binding Forecast.

SECTION 2.05.  Purchase of Materials.  Manufacturer shall purchase all ingredients, raw materials, packaging materials and other supplies necessary to produce the Products manufactured hereunder (the "Materials").

3.

SECTION 2.06.  Production Plant.  The Products shall be manufactured at the Facilities or any alternative facility that is approved in writing by Purchaser in its reasonable discretion.

SECTION 2.07.  Warehousing.  Manufacturer shall warehouse all Materials, unfinished inventory and work-in-process (together, "Unfinished Inventory") and Products.

SECTION 2.08.  Freight and Shipment.  Manufacturer shall prepare Products for shipment in accordance with reasonable directions provided to Manufacturer in writing, from time to time. Manufacturer shall deliver the Products F.O.B. Manufacturer's Facility.  Purchaser shall arrange for shipment of Products from Manufacturer's Facility at its own cost and expense. Manufacturer shall coordinate with Purchaser's approved carriers in order to arrange for pickup of the Products.

SECTION 2.09.  Manufacturer Non-Exclusivity. Purchaser agrees to purchase from Manufacturer, during the term of the Agreement, 100% of Purchaser's requirements for the Products; provided, however, the parties acknowledge that Purchaser is not obligated to purchase any minimum amount (either in terms of aggregated purchase price or aggregated volume) of Products beyond its actual business requirements therefor; provided, further, however, that Purchaser shall be entitled to reduce the percentage of Purchaser's requirements for the Products purchased from Manufacturer pursuant the terms of this Agreement so long as each such reduction (i) is made on a basis consistent with Manufacturer's past practices on run rules and minimum batch sizes and (ii) does not adversely affect Manufacturer, Seller or any Seller Affiliate, taking into account all costs suffered by Manufacturer, Seller or any Seller Affiliate of such reduction.

ARTICLE III

Intellectual Property; Equipment

SECTION 3.01.  Intellectual Property Licenses.  Purchaser hereby grants to Manufacturer a non-exclusive and non-transferable right and license to use the formulations for the Products, patents, know-how, technology, trade secrets and other proprietary information of Purchaser relating to the manufacture and use of the Products including, without limitation, the information, if any, set forth in Section 3.01 of the Disclosure Schedule (collectively, "Purchaser's Intellectual Property"), solely for the purpose of manufacturing Products in accordance with the terms of this Agreement.  Manufacturer hereby grants to Purchaser a non-exclusive and non-transferable right and license to use the formulations for the Products, patents, know-how, technology, trade secrets and other proprietary information of Manufacturer relating to the manufacture and use of the Products including, without limitation, the information, if any, set forth in Section 3.01 of the Disclosure Schedule (collectively, "Manufacturer's Intellectual Property"), solely for the purpose of procuring or manufacturing Products in accordance with the terms of this Agreement.

SECTION 3.02.  Use of Purchaser's Molds. Purchaser hereby grants to Manufacturer a non-exclusive and non-transferable right and license to use the product molds set forth in Section 3.02 of the Disclosure Schedule ("Purchaser's Molds"), solely for the purpose of manufacturing Products in accordance with the terms of this Agreement.  Purchaser shall be

[[NYCORP:2542066v12]]

4

responsible for the cost of maintenance and repair of Purchaser's Molds and for the cost of any mutually agreed upon capital improvements to Purchaser's Molds.

SECTION 3.03. Termination of License. Each of the licenses granted hereunder shall terminate upon the expiration or earlier termination of this Agreement.

## ARTICLE IV

### Manufacturing Standards

SECTION 4.01. Manufacturing Standards. The Products shall be manufactured in accordance with the product specifications utilized by Manufacturer as of the date of this Agreement with respect to the manufacture of the Products (the "Manufacturing Standards").

SECTION 4.02. Compliance with Law. The Products shall be manufactured in accordance with applicable laws, rules or regulations. All Products shall be manufactured in compliance with the Federal Food, Drug and Cosmetic Act (as amended, the "FFDC Act"), and the regulations promulgated thereunder. All Products shall not be adulterated or otherwise prohibited from use under or misbranded within the meaning of the FFDC Act or the pure food and drug laws of each state of the United States, and not prohibited from introduction into interstate commerce under Sections 404 or 406 of the FFDC Act.

SECTION 4.03. Loss Allowance. With respect to Materials, if any, to be procured and paid for by Purchaser as set forth in Section 2.05 of the Disclosure Schedule, Manufacturer shall not exceed any applicable loss allowances mutually agreed upon by the parties, in writing, with respect to such Materials. If Manufacturer exceeds such loss allowances, as measured by a physical count of Materials, Unfinished Inventory and Products against Manufacturer's book amount of these items, Purchaser shall receive a credit or refund, as appropriate, equal to its cost for the Materials allocable to such excess. The parties acknowledge that Manufacturer is entitled to the deduction under Section 199 of the Internal Revenue Code of 1986, as amended, as well as any comparable state income tax incentive, for all Products manufactured pursuant to this Agreement.

SECTION 4.04. Inspection Rights. Manufacturer shall maintain quality control/assurance records and other records relating to the manufacture of the Products in compliance with applicable laws, rules or regulations. Purchaser may assign a representative who shall have reasonable access to the Facility during normal business hours in order to observe the manufacturing process, storage facilities and have access to the applicable quality control/assurance records.

## ARTICLE V

### Nonconforming Products

SECTION 5.01. Nonconforming Products. Any Products supplied hereunder that do not conform in all material respects to the Manufacturing Standards shall be deemed "Nonconforming Products".

[[NYCORP:2542066v12]]

5

SECTION 5.02.  <u>Right to Reject</u>. Purchaser shall notify Manufacturer of any Nonconforming Products within thirty days after delivery of such Nonconforming Products and have the right to reject any such Nonconforming Products.

SECTION 5.03.  <u>Product Recall</u>.  If a recall of any Product is initiated by Purchaser or Manufacturer, either voluntarily or by order of any governmental agency, entity or authority (a "<u>Governmental Entity</u>"), Manufacturer shall provide reasonable assistance to Purchaser in developing a recall strategy and will work with Purchaser and any applicable Governmental Entity in monitoring the recall operation and in preparing such reports as may be reasonably required in connection therewith.

SECTION 5.04.  <u>Replace, Rework or Destroy</u>.  In the event any Nonconforming Product is the result of Manufacturer's gross negligence or willful misconduct, Manufacturer shall promptly issue a full credit or refund, as appropriate, and promptly ship new Products, at Manufacturer's sole cost and expense, F.O.B., Manufacturer's Facility.  The price for any such replacement Products shall be the price for the replacement Products when they are shipped.

ARTICLE VI

Term and Termination.

SECTION 6.01.  <u>Term</u>.  This Agreement shall commence on date hereof and shall continue in full force and effect until [insert date that is 180 days following the date of this Agreement], unless earlier terminated in accordance with the terms of this Agreement.

SECTION 6.02.  <u>Termination</u>.  This Agreement may be terminated (a) by either party, if the other party commits a breach of any provision of this Agreement and such breach continues for a period of thirty days following written notice, (b) by either party, effective immediately, if the other party files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law or makes or seeks to make a general assignment for the benefit of its creditors or applies for or consents to the appointment of a trustee, receiver or custodian for its or a substantial part of its property, (c) by either party, in the event of a Force Majeure Occurrence (as defined in Section 9.09) affecting the other party which continues for more than forty-five days or (d) by Purchaser upon 60 days prior written notice to Manufacturer.

SECTION 6.03.  <u>Effect of Expiration or Termination</u>.  Upon the expiration or earlier termination of this Agreement, all Materials, Unfinished Inventory and Products, in each case, whether purchased or produced before or after the date of this Agreement and whether held at a Manufacturer's Facility, a distribution center of Seller or a Seller Affiliate or a distribution center of a third-party, shall be loaded F.O.B. at such facility for shipment at Purchaser's sole cost and expense to a location designated by Purchaser.  Purchaser shall purchase from Manufacturer all such quantities of Materials and Unfinished Inventory at Manufacturer's actual cost therefor.  Purchaser shall purchase all Products at the then current price for the Products. Manufacturer shall, at Purchaser's option and expense, destroy such Materials, Unfinished Inventory and Products, in compliance with all applicable laws, rules and regulations. Notwithstanding the foregoing, Purchaser shall not be obligated to purchase from Manufacturer any Materials, Unfinished Inventory or Products if such Materials, Unfinished Inventory or

[[NYCORP:2542066v12]]

Products are not valued as such by Manufacturer pursuant to the accounting practices of Manufacturer. Manufacturer shall make Purchaser's Molds, if any, available for pickup by Purchaser at Purchaser's cost during normal business hours; provided that Manufacturer shall indemnify and hold harmless Purchaser against any losses, damages, claims or expenses (including reasonable attorney's fees) incurred by Purchaser arising out of property damage or personal injury (including death) to the extent caused by Purchaser or its contractors in connection with the removal of such Molds.

## ARTICLE VII

### Indemnification

SECTION 7.01. Indemnification. (a) Purchaser shall indemnify, defend and hold Manufacturer harmless, to the maximum extent permitted by law, from and against any and all claims, losses, damages, costs, expenses or other liabilities, including without limitation, reasonable attorney's fees ("Losses"), arising out of or relating to (i) actual or alleged injury to any person (including death) or property to the extent caused in whole in part by Purchaser's gross negligence or willful misconduct, (ii) non-fulfillment or breach by Purchaser of any agreement or covenant under this Agreement, or (iii) the inaccuracy or breach of any warranty or representation made by Purchaser under this Agreement.

(b) Manufacturer shall indemnify, defend and hold Purchaser harmless, to the maximum extent permitted by law, from and against any and all Losses arising out of or relating to (i) actual or alleged injury to any person (including death) or property to the extent caused in whole or in part by Manufacturer's gross negligence or willful misconduct, (ii) non-fulfillment or breach by Manufacturer of any agreement or covenant under this Agreement, or (iii) the inaccuracy or breach of any warranty or representation made by Manufacturer under this Agreement.

## ARTICLE VIII

### Confidentiality

SECTION 8.01. Confidential Information. The parties acknowledge that in the course of performing their respective obligations hereunder, each party will come into possession of confidential information of the other (collectively, "Confidential Information").

SECTION 8.02. Ownership; Disclosure. Confidential Information of the disclosing party coming into possession of the receiving party shall remain the sole and exclusive property of the disclosing party. The receiving party shall use reasonable care, but in no event less than such party uses to safeguard and protect its own Confidential Information, to protect the Confidential Information of the other party and such party shall not use such Confidential Information for any purpose other than the discharge of its obligations under this Agreement. Each party may make available the Confidential Information of the other party to those of its and its affiliates' officers, directors, employees, agents and representatives (each a "Representative") only on a "need to know" basis. Representatives shall be advised of their obligation to abide by the confidentiality obligations set forth in this Agreement and the

receiving party shall be responsible for a breach by any of its Representatives. Neither party shall divulge the Confidential Information of the other to any third party without the prior written consent of the disclosing party, except as the receiving party is specifically required by any Governmental Entity lawfully requesting the same, under compulsion of civil or criminal process or to any court of competent jurisdiction acting pursuant to its powers and then only after notice has been given to the disclosing party as early as reasonably possible so that the disclosing party can attempt to object to such disclosure.

SECTION 8.03.  Exceptions to Confidential Information.  Information disclosed hereunder shall not be considered "Confidential Information" to the extent it is (a) previously known by the receiving party prior to the disclosure thereof, (b) hereafter becomes, other than through the fault of the receiving party, generally available to the public, (c) disclosed to the receiving party by a third party other than in breach of an obligation of confidentiality owed by such third party to the disclosing party or (d) independently developed by the receiving party without using Confidential Information as shown by the receiving party's written records.

SECTION 8.04.  Duration.  Upon the expiration or early termination of this Agreement, unless otherwise required by applicable laws, rules or regulations, each party shall return to the other all Confidential Information of the other within its possession or control, and not thereafter use such Confidential Information in the promotion of its own business or the business of any third party, or otherwise make use of or refer to any Confidential Information or the identity of the other party.  The obligations of confidentiality set forth in this Agreement shall remain in effect for five years after the expiration or earlier termination of this Agreement.

ARTICLE IX

Miscellaneous

SECTION 9.01.  Notices.  All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

if to Manufacturer:

Unilever Supply Chain, Inc. d/b/a Unilever
1 John Street
Clinton, CT 06413

[[NYCORP:2542066v12]]

8

with copies to:

Conopco, Inc., d/b/a Unilever
700 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Attention:  General Counsel
Facsimile No.:  (201) 894-2727

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attention:  Mark I. Greene, Esq.
Facsimile No.:  (212) 474-3700

if to Purchaser:

Lornamead Brands, Inc.
175 Cooper Avenue
Tonawanda, New York 14150
Attention:  Daryle M. Shaw, CFO
Facsimile No.:  (716) 874-0670

with a copy to:

Harris Beach PLLC
726 Exchange Street, Suite 1000
Buffalo, New York 14210
Attention:  Alan J. Laurita, Esq.
Facsimile No.:  (716) 200-5201

or to such other address(es) as shall be furnished in writing by any such party to the other party
to this Agreement in accordance with the provisions of this Section 9.01.

SECTION 9.02.  Integrated Contract; Exhibits and Schedules.  This Agreement,
including the Schedules to this Agreement, any written amendments to the foregoing satisfying
the requirements of Section 9.14 hereof, the Asset Purchase Agreement, the Ancillary
Agreements and the Confidentiality Agreement, including the schedules, exhibits and annexes
thereto, constitute the entire agreement among the parties with respect to the subject matter
hereof and thereof and supersede any previous agreements and understandings between the
parties with respect to such matters.  All Schedules annexed to this Agreement or referred to
herein are incorporated in and made a part of this Agreement as if set forth in full herein.  Any
terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this
Agreement or the Asset Purchase Agreement, as the case may be.  There are no restrictions,
promises, representations, warranties, agreements or undertakings of any party to this Agreement
with respect to the transactions contemplated by this Agreement, the Asset Purchase Agreement,
the Ancillary Agreements or the Confidentiality Agreement, other than those set forth herein or
therein or in any other document required to be executed and delivered hereunder or thereunder.

[[NYCORP:2542066v12]]

In the event of any conflict between the provisions of this Agreement (including the Schedules hereto), on the one hand, and the provisions of the Asset Purchase Agreement (including the schedules and exhibits thereto), on the other hand, the provisions of the Asset Purchase Agreement shall control.

SECTION 9.03.  Severability; Enforcement.  The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 9.04.  Assignment.  Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any of the parties hereto without the prior written consent of the other party hereto, except that (a) Purchaser may assign its rights under this Agreement to any of its wholly owned subsidiaries without the prior written consent of Manufacturer and (b) Manufacturer may assign any rights and obligations hereunder to (i) any affiliate of Seller or (ii) third parties to the extent such third parties are routinely used to manufacture the Products, in either case, without the prior written consent of Purchaser. Notwithstanding the foregoing, each of Manufacturer and Purchaser shall remain liable for all of their respective obligations under this Agreement.  Subject to the first sentence of this Section 9.04, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and no other person shall have any right, obligation or benefit hereunder.  Any attempted assignment or transfer in violation of this Section 9.04 shall be void.

SECTION 9.05.  No Third-Party Beneficiaries.  Except as provided in Article VII, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 9.06.  Public Announcements.  No public release or announcement concerning this Agreement or the transactions contemplated hereby shall be issued by a party without the prior consent of the other party (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance; provided, however, that each of the parties may make internal announcements to their respective employees that are consistent with the parties' prior public disclosures regarding the transactions contemplated by this Agreement.

SECTION 9.07.  Independent Status.  Manufacturer is an independent contractor engaged by Purchaser to manufacture the Products.  Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of any party with respect to the indebtedness, liabilities, obligations or actions of the other party or any of its respective officers, directors, employees, stockholders, agents or representatives, or any other

10

person or entity, nor shall either party have the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against, in the name of or on behalf of, the other party.

SECTION 9.08. <u>Survival</u>. The provisions of this Agreement that survive by their terms shall survive the expiration or earlier termination of this Agreement.

SECTION 9.09. <u>Force Majeure</u>. Manufacturer shall not be in default hereunder by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to any cause beyond its control, including strikes, labor disputes, civil disturbances, riot, rebellion, invasion, epidemic, hostilities, war, terrorism, embargo, natural disaster, acts of God, flood, fire, sabotage, accident, delay in transportation, loss and destruction of property, intervention by Governmental Entities, change in laws, regulations or orders, other events or any other circumstances or causes beyond Manufacturer's control (a "<u>Force Majeure Occurrence</u>").

SECTION 9.10. <u>Governing Law</u>. This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 9.11. <u>Jurisdiction</u>. Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam*, with respect to any such action, suit or proceeding.

SECTION 9.12. <u>Service of Process</u>. Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 9.11.

SECTION 9.13. <u>Waiver of Jury Trial</u>. Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto. Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 9.13.

SECTION 9.14.  <u>Amendments</u>.  This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.

SECTION 9.15.  <u>Headings</u>.  The descriptive headings of the several Articles or Sections of this Agreement and the Disclosure Schedule to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  All references in this Agreement to "Articles", "Sections" or "Schedules" shall be deemed to be references to Articles or Sections of this Agreement or Schedules to this Agreement unless otherwise indicated.

SECTION 9.16.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

*[SIGNATURE PAGE IS THE NEXT PAGE]*

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

UNILEVER SUPPLY CHAIN, INC., as Manufacturer,

by

———————————————————
Name:
Title:

LORNAMEAD BRANDS, INC., as Purchaser,

by

———————————————————
Name:
Title:

[[NYCORP:2542066v12]]

# DISCLOSURE SCHEDULE
## TO
## MANUFACTURING AGREEMENT

Section 2.01 Products, Pricing and Payment Terms

*Products and Pricing*

## PRODUCT PRICING – FINESSE USA

| | | Units Per Case | DU Code | Raw Material Costs (1) | Packaging Costs | Variable Manufacturing | Fixed Manufacturing | Total Product Cost |
|---|---|---|---|---|---|---|---|---|
| **FINESSE** | | | | | | | | |
| **16z** | | | | | | | | |
| **SH/CD** | | | | | | | | |
| | Finesse SH Moisturizing 6pc 16 | 6 | 037220601 | $ 1.86 | $ 1.66 | $ 0.06 | $ 0.48 | $ 4.06 |
| | Finesse CD Moisturizing 6pc 16 | 6 | 037230601 | $ 0.98 | $ 1.63 | $ 0.06 | $ 0.47 | $ 3.14 |
| | Finesse SH Enhancing 6pc 16z | 6 | 037240601 | $ 1.61 | $ 1.66 | $ 0.06 | $ 0.48 | $ 3.81 |
| | Finesse CD Enhancing 6pc 16z | 6 | 037250601 | $ 0.99 | $ 1.63 | $ 0.05 | $ 0.47 | $ 3.15 |
| | Finesse SH 2N1 Enhancing 6pc 1 | 6 | 037260001 | $ 1.86 | $ 1.66 | $ 0.06 | $ 0.48 | $ 4.06 |
| | FIN SH BeauuFULL Volume 6pc 1 | 6 | 037290103 | $ 1.41 | $ 1.66 | $ 0.06 | $ 0.47 | $ 3.60 |
| | FIN CD BeautiFULL Volume 6pc 1 | 6 | 037300003 | $ 0.94 | $ 1.55 | $ 0.06 | $ 0.46 | $ 3.01 |
| | Finesse SH Color Care 6pc 16z | 6 | 037310601 | $ 1.89 | $ 1.66 | $ 0.06 | $ 0.48 | $ 4.09 |
| | Finesse CD Color Care 6pc 16z | 6 | 037320601 | $ 1.04 | $ 1.37 | $ 0.05 | $ 0.43 | $ 2.89 |
| | Finesse SH 2N1 Moisturizing 6p | 6 | 037350601 | $ 1.86 | $ 1.66 | $ 0.06 | $ 0.48 | $ 4.06 |
| **Finesse** | | | | | | | | |
| **26.4z** | | | | | | | | |
| **SH/CD** | | | | | | | | |
| | Finesse Conditioner Enhancing | 6 | 038680605 | $ 1.66 | $ 1.74 | $ 0.06 | $ 0.65 | $ 4.13 |
| | Finesse Conditioner Moisturizi | 6 | 038700605 | $ 1.65 | $ 1.74 | $ 0.12 | $ 0.54 | $ 4.05 |
| | Finesse Shampoo Enhancing 6pc | 6 | 038720605 | $ 2.72 | $ 2.12 | $ 0.12 | $ 0.56 | $ 5.52 |
| | Finesse Shampoo Moisturizing 6 | 6 | 038740605 | $ 3.14 | $ 2.12 | $ 0.12 | $ 0.56 | $ 5.94 |
| | Finesse SH BeautiFull Volume 6 | 6 | 11108170 | $ 2.44 | $ 2.11 | $ 0.12 | $ 0.54 | $ 5.21 |
| | Finesse CD BeautiFull Volume 6 | 6 | 11108171 | $ 1.67 | $ 1.75 | $ 0.12 | $ 0.54 | $ 4.08 |
| | Finesse SH 2 n1 Moisturizing 6 | 6 | 11108172 | $ 3.17 | $ 2.11 | $ 0.12 | $ 0.56 | $ 5.98 |
| **Finesse** | | | | | | | | |
| **8.6z Non-Aero** | | | | | | | | |
| | FIN HS MAX NA 12 8.5Z | 12 | 038510016 | $ 3.29 | $ 3.62 | $ 1.48 | $ 0.24 | $ 8.63 |
| | FIN HS XH NA 12 8.5Z | 12 | 038530016 | $ 3.05 | $ 3.66 | $ 1.48 | $ 0.24 | $ 8.43 |

**Notes**
(1) All raw materials and packaging materials costs are subject to change based on the then current costs of raw materials and packaging materials.

1

[NYCORP:2542066v12]]

(Section 2.01 – continued)

*Payment Terms*

All payments made pursuant to the terms of this Agreement, including those required by Section 6.03, shall be (i) made in accordance with the terms of the Transitional Services Agreement as if they were payments required by the terms of the Transitional Services Agreement and (ii) incorporated into a Reconciliation Statement (as defined in the Transitional Services Agreement) delivered by Seller to Purchaser pursuant to the terms of the Transitional Services Agreement.

Section 3.01 Intellectual Property

*Purchaser's Intellectual Property*

All Transferred Intellectual Property and Transferred Technology.

*Manufacturer's Intellectual Property*

All Retained Licensed Patents (as defined in the Manufacturing Agreement) and Retained Licensed Technology (as defined in the Manufacturing Agreement).

Section 3.02 Purchaser's Molds

All Molds.

[[NYCORP:2542066v12]]

EXHIBIT C TO THE
ASSET PURCHASE AGREEMENT

## TRANSITIONAL SERVICES AGREEMENT

TRANSITIONAL SERVICES AGREEMENT, dated as of [●], 2006 (this "Agreement"), between CONOPCO, INC., a New York corporation ("Seller"), and LORNAMEAD BRANDS, INC., a Delaware corporation ("Purchaser").

WHEREAS, pursuant to an Asset Purchase Agreement dated as of March 24, 2006 (the "Asset Purchase Agreement"), between Seller and Purchaser, Seller has agreed to, and has agreed to cause the Seller Affiliates to, sell, transfer, assign and deliver to Purchaser, and Purchaser has agreed to purchase, acquire and accept from Seller and the Seller Affiliates, all of Seller's and the Seller Affiliates' right, title and interest in, to and under the Transferred Assets, in each case as provided in the Asset Purchase Agreement;

WHEREAS, Purchaser has agreed to assume the Assumed Liabilities, as provided in the Asset Purchase Agreement;

WHEREAS, Purchaser desires to purchase from Seller, and Seller is willing to provide to Purchaser, transitional services on the terms and conditions set forth in this Agreement;

WHEREAS, Seller and Purchaser have entered into a Manufacturing Agreement (the "Manufacturing Agreement") contemporaneously with the entry into this Agreement, pursuant to which Seller will manufacture certain products for Purchaser at certain facilities owned by Seller or a Seller Affiliate; and

WHEREAS, this Agreement contains provisions regarding Purchaser's payment for products manufactured for it pursuant to the Manufacturing Agreement.

NOW, THEREFORE, the parties agree as follows:

SECTION 1.  Definitions.  Terms used but not defined in this Agreement shall have the meanings assigned to them in the Asset Purchase Agreement.

SECTION 2.  Transitional Services.  (a) During the term of this Agreement as set forth in Section 6, Seller shall provide, or shall cause one or more of its affiliates to provide, to Purchaser the services set forth on Annex A to this Agreement (the "Services"), in the manner and at a level of service generally consistent with that provided by Seller or its affiliates to the Businesses immediately preceding the date of this Agreement, and Purchaser shall use the Services for substantially the same purposes and in substantially the same manner as the Businesses had used the Services prior to the date of this Agreement. Seller shall be required to provide the Services only to Purchaser or its affiliates in connection with the conduct of the Businesses. Purchaser shall not resell any of the Services to any person whatsoever or permit the use of the Services by any person other than in connection with the conduct of the Businesses in the ordinary course consistent with past practice.

2

(b) Purchaser acknowledges that Seller may be providing similar services, and/or services that involve the same resources as those used to provide the Services, to its internal organizations, affiliates and to third parties. Seller reserves the right to modify the Services in connection with changes to its internal organization in the ordinary course of business; provided, however, that no such modifications materially diminish the Services.

(c) Purchaser further acknowledges that, in connection with providing the Services, Seller will not be required to use its own funds for any third party provided service or payment obligation of Purchaser, its affiliates or the Businesses, except to the extent that (i) such use by Seller is necessary to fulfill Seller's obligations hereunder and (ii) Seller will be reimbursed by Purchaser for such use. In addition, Seller shall not be obligated to pay any amounts to Purchaser, the Businesses or any of Purchaser's employees in respect of payroll, benefits or similar obligations, unless Seller has received such amounts in advance from Purchaser.

SECTION 3. Access; Books and Records. Purchaser shall make available on a timely basis to Seller all information and materials reasonably requested by Seller to enable it to provide the Services hereunder. Purchaser shall give Seller and its representatives reasonable access, during regular business hours and at such other times as are reasonably required, to Purchaser's premises or the premises of the Businesses for the purpose of providing the Services hereunder. Seller shall make available on a timely basis to Purchaser all information and materials reasonably requested by Purchaser. Seller shall give Purchaser reasonable access, during regular business hours and at such other times as are reasonably required, to Seller's premises or the premises of the Businesses providing the Services hereunder.

SECTION 4. Payment. (a) For each Service rendered under this Agreement, Purchaser shall pay to Seller the fees (the "Fees") set forth in Annex B hereto, in accordance with the terms of this Agreement.

(b) No later than the tenth business day of each month, Seller shall deliver to Purchaser a reconciliation statement in the form of Annex C hereto (the "Reconciliation Statement") setting forth the information required by such Reconciliation Statement for the immediately preceding month. Seller shall include in each such Reconciliation Statement any payments required to be made by Purchaser pursuant to the terms of the Manufacturing Agreement or by Seller pursuant to the terms of this Agreement. Any amounts set forth on the Reconciliation Statement as owed by Purchaser to Seller or by Seller to Purchaser shall be paid within 10 days after Purchaser's receipt of such Reconciliation Statement (the date such a payment is due, as may be adjusted pursuant to Section 4(c) below, a "Payment Date"). All payments required to be paid under this Section 4 shall be paid by wire transfer in immediately available funds to one or more accounts designated in writing by Seller or Purchaser. Any Fees not paid within five days of a Payment Date shall be subject to late charges for each day such Fees are overdue, calculated at a rate of 15% per annum from the Payment Date to the date of payment.

(c) If Purchaser disagrees with any amounts set forth on a Reconciliation Statement, Purchaser shall send to Seller written notice of such disagreement (a "Reconciliation

3

Objection") within 10 days after Purchaser's receipt of such Reconciliation Statement. Notwithstanding the delivery of a Reconciliation Objection, Purchaser shall pay to Seller, or Seller shall pay to Purchaser, within 10 days after Purchaser's receipt of such Reconciliation Statement that part of the amount set forth on the Reconciliation Statement as to which Purchaser does not disagree.  Purchaser and Seller shall attempt in good faith to resolve any dispute within 30 days after the delivery of a Reconciliation Objection.  If Purchaser and Seller are unable to resolve all such disputes within such 30-day period, the matters remaining in dispute shall be submitted to KPMG LLP (the "Independent Expert").  The parties shall instruct the Independent Expert to render its reasoned written decision as promptly as practicable, but in no event later than 60 days after its selection. The resolution of disputed items by the Independent Expert shall be final and binding, and the determination of the Independent Expert shall constitute an arbitral award that is final, binding and non-appealable and upon which a judgment may be entered by a court having jurisdiction thereover.  The fees and expenses of the Independent Expert shall be borne equally by Purchaser and Seller.  Within 10 days after the Independent Expert renders its decision, any amounts the Independent Expert determines are owed shall be paid by the applicable party to the other.

(d) For the duration of this Agreement, the parties hereto shall use the Reconciliation Statement to fulfill their obligations under this Agreement, the Asset Purchase Agreement and the Manufacturing Agreement, to the extent that such obligations require the payment of any amounts from one party to the other.

SECTION 5.  Taxes.  Any taxes assessed on the provision of the Services hereunder shall be paid by Purchaser.

SECTION 6.  Term of Agreement.  The term of this Agreement shall commence on the Closing Date and shall continue for a period ending on the date that is 180 days after the Closing Date; provided, however, that Purchaser will use its best efforts to cease using all Services under this Agreement as soon as reasonably possible following the Closing Date.

SECTION 7.  Partial Termination; Termination.  (a) Purchaser may terminate any individual Service upon 30 days prior written notice to Seller; provided, however, that (i) in connection with the termination of any Service, Purchaser shall also terminate all other directly related Services at the same time and (ii) Purchaser shall not be able to terminate any individual Service if Seller or any Seller Affiliate is adversely affected by such termination, taking into account all costs suffered by Seller or any Seller Affiliate of such termination.  Once Purchaser has terminated any of the Services, Purchaser shall not be permitted to request such Services be resumed pursuant to this Agreement.

(b) This Agreement, in its entirety, may be terminated prior to the expiration of its stated term, upon written notice as set forth below:

(i)    by Seller, if Purchaser fails to pay any Fees within ten days following a Payment Date;

[[NYCORP:2540022v15]]

4

(ii)  by Seller, on the one hand, or Purchaser, on the other hand, if the other party commits a breach of any provision of this Agreement and such breach continues for a period of 30 days following a written request to cure such breach; or

(iii)  by Seller, on the one hand, or Purchaser, on the other hand, if the other party files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law or makes or seeks to make a general assignment for the benefit of its creditors or applies for or consents to the appointment of a trustee, receiver or custodian for it or a substantial part of its property.

(iv)  by Purchaser upon 30 days written notice to Seller.

(c)  Upon the expiration or earlier termination of this Agreement or any of the Services hereunder, if applicable to any particular Service, Purchaser shall purchase from Seller all existing ingredients, raw materials, packaging materials, work-in-process, finished goods inventory and other supplies, in each case, whether purchased or produced before or after the date of this Agreement, held at third-party manufacturers, third-party distribution centers or distribution centers of Seller or any Seller Affiliate in connection with the Services provided hereunder (or in connection with the Services being terminated at such time) (the "Purchased Inventory"), F.O.B. at the location of any such facility, at actual cost therefor.  Payment for the Purchased Inventory shall be made by Purchaser to Seller within 21 days following delivery of such Inventory to Purchaser; provided, however, that if payment is not made within 21 days, such payment shall be subject to late charges for each day such payment is overdue, calculated at a rate of 15% per annum from the date such payment was due to the date of payment. Notwithstanding the foregoing, Purchaser shall not be obligated to purchase from Seller any portion of the Purchased Inventory to the extent that such portion of the Purchased Inventory is not valued as such by Seller pursuant to the accounting practices of Seller.

SECTION 8.  Consequential and Other Damages.  (a) Seller shall not be liable, whether in contract, in tort (including negligence and strict liability), or otherwise, for any special, indirect, incidental or consequential damages whatsoever, which in any way arise out of, relate to, or are a consequence of, its performance or nonperformance hereunder, or the provision of or failure to provide any of the Services hereunder, including loss of profits, business interruptions and claims of customers or employees of Purchaser.

(b) Notwithstanding anything to the contrary contained in this Agreement, the liability of Seller with respect to this Agreement or anything done in connection herewith, including the performance or breach hereof, or from the sale, delivery, provision or use of any of the Services provided under or pursuant to this Agreement, whether in contract, in tort (including negligence and strict liability) or otherwise, shall not exceed the Fees previously paid to Seller by Purchaser in respect of the Service from which such liability flows; provided, however, that this paragraph (b) shall not limit Seller's liability with regard to Seller's willful failure in bad faith to provide the Services in breach of the terms of this Agreement.

SECTION 9.  Indemnification.  (a) Purchaser hereby releases Seller and each of its affiliates and each of their respective officers, directors, employees, stockholders, agents and

representatives (the "Seller Indemnitees") and agrees to indemnify and hold harmless the Seller Indemnitees from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third-party legal fees and expenses (collectively, "Losses"), to the extent arising or resulting from Seller's performance of the Services hereunder, except to the extent such Losses are due to Seller's gross negligence or willful misconduct in performing the Services hereunder.

(b) If a Seller Indemnitee (the "Indemnified Party") receives written notice of the commencement of any action or proceeding, the assertion of any claim by a third-party or the imposition of any penalty or assessment for which indemnity may be sought under this Section 9 (a "Third Party Claim"), and the Indemnified Party intends to seek indemnity pursuant to this Section 9, the Indemnified Party shall promptly provide Purchaser with written notice of such Third Party Claim. Purchaser shall be entitled to participate in or, at its option, assume the defense, appeal or settlement of such Third Party Claim. If Purchaser assumes the defense, appeal or settlement of such Third Party Claim, such defense, appeal or settlement shall be conducted through counsel selected by Purchaser and the Indemnified Party shall fully cooperate with Purchaser in connection therewith.

SECTION 10. Assignment. Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any of the parties hereto without the prior written consent of the other party hereto, except that (a) Purchaser may assign its rights under this Agreement to any of its wholly owned subsidiaries without the prior written consent of Seller and (b) Seller may assign any rights and obligations hereunder to (i) any affiliate of Seller or (ii) third parties to the extent such third parties are routinely used to provide the Services to affiliates and businesses of Seller, in either case, without the prior written consent of Purchaser. Notwithstanding the foregoing, each of Seller and Purchaser shall remain liable for all of their respective obligations under this Agreement. Subject to the first sentence of this Section 10, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and no other person shall have any right, obligation or benefit hereunder. Any attempted assignment or transfer in violation of this Section 10 shall be void.

SECTION 11. No Third Party Beneficiaries. Except as provided in Section 9, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 12. Notices. All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

if to Seller:

Conopco, Inc. d/b/a Unilever
33 Benedict Place
Greenwich, Connecticut 06830
Attention: President
Facsimile No.: (203) 625-1602

with copies to:

Conopco, Inc., d/b/a Unilever
700 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Attention: General Counsel
Facsimile No.: (201) 894-2727

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attention: Mark I. Greene, Esq.
Facsimile No.: (212) 474-3700

if to Purchaser:

Lornamead Brands, Inc.
175 Cooper Avenue
Tonawanda, New York 14150
Attention: Daryle M. Shaw, CFO
Facsimile No.: (716) 874-0670

with a copy to:

Harris Beach PLLC
726 Exchange Street, Suite 1000
Buffalo, New York 14210
Attention: Alan J. Laurita, Esq.
Facsimile No.: (716) 200-5201

or to such other address(es) as shall be furnished in writing by any such party to the other party to this Agreement in accordance with the provisions of this Section 12.

SECTION 13. Headings. The descriptive headings of the several Sections of this Agreement and the Annexes hereto are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references in this Agreement to "Sections" or "Annexes" shall be deemed to be references to Sections of this Agreement or the Annexes hereto unless otherwise indicated.

7

SECTION 14. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person, by facsimile or by electronic image scan, receipt acknowledged in each case, to the other party hereto.

SECTION 15. <u>Integrated Contract; Annexes.</u> This Agreement, including the Annexes hereto, any written amendments to the foregoing satisfying the requirements of Section 21 hereof, the Asset Purchase Agreement, the Ancillary Agreements and the Confidentiality Agreement, including the schedules, exhibits and annexes thereto, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any previous agreements and understandings between the parties with respect to such matters. The Annexes to this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any terms used in the Annexes hereto but not otherwise defined therein shall be defined as set forth in this Agreement or the Asset Purchase Agreement, as the case may be. There are no restrictions, promises, representations, warranties, agreements or undertakings of any party to this Agreement with respect to the transactions contemplated by this Agreement, the Asset Purchase Agreement, the Ancillary Agreements or the Confidentiality Agreement other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder. In the event of any conflict between the provisions of this Agreement (including the Annexes hereto), on the one hand, and the provisions of the Asset Purchase Agreement (including the schedules and exhibits thereto), on the other hand, the provisions of the Asset Purchase Agreement shall control.

SECTION 16. <u>Severability; Enforcement.</u> The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 17. <u>Governing Law.</u> This Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 18. <u>Jurisdiction.</u> Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts <u>in personam,</u> with respect to any such action, suit or proceeding.

[[NYCORP:2540022v15]]

8

SECTION 19.  Service of Process.  Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 12 shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 18.

SECTION 20.  Waiver of Jury Trial.  Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 20.

SECTION 21.  Amendments.  This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.

SECTION 22.  Public Announcements.  No public release or announcement concerning this Agreement or the transactions contemplated by this Agreement shall be issued by a party without the prior consent of the other party (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance; provided, however, that each of the parties may make internal announcements to their respective employees that are consistent with the parties' prior public disclosures regarding the transactions contemplated by this Agreement.

SECTION 23.  Independent Contractor.  At all times during the term of this Agreement, Seller shall be an  independent contractor in providing the Services hereunder with the sole right to supervise, manage, operate, control and direct the performance of the Services and the sole obligation to employ, compensate and manage its employees and business affairs. Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of any party with respect to the indebtedness, liabilities, obligations or actions of the other party or any of its respective officers, directors, employees, stockholders, agents or representatives, or any other person or entity, nor shall either party have the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against, in the name of or on behalf of, the other party.

SECTION 24.  Survival.  The provisions of Sections 4, 5, 8 & 9, as well as the related provisions of Sections 10 through 27, shall survive the expiration or earlier termination of this Agreement for any reason whatsoever.

[[NYCORP:2540022v15]]

9

SECTION 25.  Force Majeure.  Seller shall not be in default hereunder by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to any cause beyond its control, including strikes, labor disputes, civil disturbances, riot, rebellion, invasion, epidemic, hostilities, war, terrorism, embargo, natural disaster, acts of God, flood, fire, power failures, sabotage, accident, delay in transportation, loss and destruction of property, intervention by Governmental Entities, change in laws, regulations or orders, other events or any other circumstances or causes beyond Seller's control.

SECTION 26.  Confidentiality.  Purchaser and, except to the extent necessary to perform the Services hereunder, Seller shall, and shall cause their respective affiliates to, keep confidential all information, whether in tangible or intangible form, received from each other or that concerns the other party or the Businesses in the course of the performance of this Agreement, and Purchaser and, except to the extent necessary to perform the Services, Seller acknowledge and agree that such information is the sole property of the other party.  Upon the expiration or earlier termination of this Agreement, Seller and Purchaser shall return to each other all such information and all copies, extracts and derivatives thereof.

SECTION 27.  Warranties.  Seller has not made any express or implied warranty with respect to the Services.

*[Signature Page is the Next Page]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first set forth above.

CONOPCO, INC.,

by _____
    Name:
    Title:

LORNAMEAD BRANDS, INC.,

by _____
    Name:
    Title:

*[SIGNATURE PAGE TO TRANSITIONAL SERVICES AGREEMENT]*

ANNEX A

## DESCRIPTION OF TRANSITION SERVICES

With respect to the Businesses, during the term of this Agreement (the "Transition Period"), Seller shall provide the following: transitional order processing, product shipping, customer data transfer, inventory management, production planning, forecasting, storage and accounts receivable/collection on behalf of Purchaser.

| SERVICE AREA | DESCRIPTION OF SERVICE | REPORTING REQUIREMENT |
|---|---|---|
| **SUPPLY CHAIN SUPPORT** | | |
| Production Planning/Scheduling | Develop consensus demand for products in accordance with the terms of the Manufacturing Agreement relating thereto. Develop a master production schedule and develop and agree, subject to Purchaser review, to a monthly production schedule with the plants and co-packers. | Consensus demand report (frequency: monthly). Production plan (frequency: bi-weekly). All normal plant reports for scheduling. |
| Purchase/Procure Components | Negotiate supply arrangements needed to fulfill this Agreement, and generate purchase orders for production items. Purchaser shall have the right to review and approve contracts involving obligations beyond the term of this Agreement and in excess of $25,000. Obtain component materials, ensuring procurement of sufficient quantity and quality thereof. | Contract/purchase order status (frequency: monthly). Copies of all applicable purchase orders, exclusive to the Businesses. |
| Third Party Manufacturing | Manage arrangements with third party manufacturers of the Products. | |
| Inventory Component Materials | Maintain and manage inventory of component items. Ensure appropriate controls over and maintenance of inventory. Maintain inventory records. Record inventory transactions on a timely basis. Have record-keeping in place to support vendor recall. | Plant component inventory (frequency: monthly). |
| Quality Assurance | Oversee and assure compliance with material product specifications. | |
| Forecasting Requirements | Develop forecasts for production requirements for the Products in accordance with applicable terms of the Manufacturing Agreement. | Monthly forecast report. |
| | | |
| **SELLING** | | |
| Field Sales and Brokers | Manage field sales force and broker network. | |

[NYCORP:2540022v15]]

2

## DESCRIPTION OF TRANSITION SERVICES

### CUSTOMER SERVICE – ORDERS

| | | |
|---|---|---|
| Maintain Product/Customer Data | Maintain and provide Purchaser with the sales system master data regarding the Products -- including: configurations, price and trade deals. Maintain and provide Purchaser with the sales system master customer files including: order, shipping and billing data for the product by customer account. | Customer master data for customer purchasing Businesses' brands (frequency: one time). |
| Communicate Info to Customers | Communicate news on the Products, prices and deals, with customers. | Copy provided of all customer communications (frequency: as needed). |
| Pricing Management | Within 15 business days of written request by Purchaser, Seller will provide customers notice of upcoming price changes with respect to the Businesses' list price customers, per Purchasers instruction consistent with past practices. | Product price list (frequency: monthly). |
| Process Customer Orders | Take customer orders (via EDI as consistent with past practice); accept and provide orders from customers, check to ensure final orders are correctly entered into the system on a timely basis, change orders as requested by customers and answer customer questions regarding order status. Orders received by Seller after the Transition Period shall be immediately transferred to Purchaser. | Orders by customer/SKU (frequency: daily). |

### PICK/SHIP ORDERS

| | | |
|---|---|---|
| Pick Product for Orders | Generate picking documents for orders/deliveries. Physically pick and stage product for pick-up by carrier or customer. | |
| Ship Product to Customer | Per customer purchase orders, arrange for carrier to pick up product at the warehouse and deliver to customer on a timely basis; provided that Seller shall prepare bills of lading relating to such carrier's delivery. | Customer short shipments (frequency: weekly). |

### CUSTOMER SERVICE - CREDIT/COLLECTION

| | | |
|---|---|---|
| Invoice Customer | Generate and deliver invoices to brokers/customers in a timely manner, consistent with past practice. Post accounts receivable and the status relating thereto. Handle customer billing inquiries. | Sales for the day (frequency: daily). Sales by customer/product month-to-date and year-to-date (frequency: weekly). |
| Receive/Apply Cash | Collect and process all receivables from customers, including, subject to commercially reasonable efforts, collection of amounts | Accounts Receivable status report including deductions - |

[NYCORP:2540022v1Sl]